**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-20242-CR-ALTONAGA/TORRES**

**UNITED STATES OF AMERICA**

**v.**

**MARK SCOTT GRENON,**
**JONATHAN DAVID GRENON,**
**JORDAN PAUL GRENON, and**
**JOSEPH TIMOTHY GRENON,**

      **Defendants.**

_____/

**GOVERNMENT'S MOTION _IN LIMINE_**

The United States of America, through undersigned counsel, hereby moves for entry of an order precluding the Defendants from presenting argument or evidence to the jury that is irrelevant to the charges against them or based upon legally insufficient defenses. Specifically, the government seeks to exclude: (1) argument or evidence in furtherance of a defense under the Free Exercise Clause of the First Amendment of the U.S. Constitution; (2) argument or evidence in furtherance of a defense under the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb _et seq._; (3) lay or anecdotal evidence regarding the safety or effectiveness of Miracle Mineral Solution; (4) argument or evidence regarding the Defendants' supposed lack of intent to cause harm; (5) argument or evidence regarding the alleged corruption of the U.S. Food and Drug Administration ("FDA") or the pharmaceutical industry; (6) argument or evidence in furtherance of a "selective prosecution" defense; and (7) argument or evidence in furtherance of a justification or necessity defense.

## BACKGROUND

### I.     The Fraudulent Scheme

From 2010 through 2020, the Defendants manufactured, promoted, sold, and distributed Miracle Mineral Solution ("MMS"), a chemical solution containing sodium chlorite and water. When ingested orally as directed by the Defendants, MMS became chlorine dioxide, a powerful bleaching agent typically used for industrial water treatment or bleaching textiles, pulp, and paper.

The Defendants claimed that MMS was a miracle cure-all that could treat, prevent, and cure a variety of serious diseases and disorders, including cancer, Alzheimer's, diabetes, autism, malaria, hepatitis, Parkinson's, herpes, HIV/AIDS, and COVID-19.  However, MMS was not approved by the FDA for any use whatsoever.  Rather, the FDA had previously issued public warnings strongly urging consumers not to purchase or use MMS, advising that ingesting MMS was the same as drinking bleach and could cause serious and potentially life-threatening side effects, including severe vomiting, diarrhea, and life-threatening low blood pressure.

Over the past decade, the Defendants sold tens of thousands of bottles of MMS nationwide, including to consumers in the Southern District of Florida.  They sold these bottles from their home in Bradenton, Florida, which was also where they manufactured the MMS, in a shed in Jonathan Grenon's backyard.  They promoted and distributed MMS through a complex network of websites that they created and maintained, featuring countless newsletters, posts, and articles authored by the Defendants, and dozens of podcasts and video interviews featuring the Defendants, in which they touted the miraculous healing powers of MMS.

The Defendants were well aware that their activities with respect to MMS were unlawful. So, they decided to sell MMS under the guise of the Genesis II Church of Health and Healing ("Genesis"), an entity that Mark Grenon created in an attempt to avoid government regulation of

MMS.  The Defendants repeatedly admitted that they operated the Genesis "church" for the express purpose of cloaking their unlawful conduct with respect to MMS as constitutionally protected religious exercise, to avoid government scrutiny of their actions and shield themselves from liability.  However, Genesis' own websites, which were created and are maintained by the Defendants, described Genesis as a "non-religious church."  And Mark Grenon has admitted, in recorded statements, that Genesis "has nothing to do with religion," and that he founded Genesis to "legalize the use of MMS" and avoid "going [ ] to jail."

## II.    The Defendants' Contemptuous Violation of Court Orders

In response to the foregoing conduct, on April 16, 2020, the United States filed a civil complaint against the above-captioned Defendants and Genesis in the U.S. District Court for the Southern District of Florida, seeking an injunction to prohibit the Defendants from further violating the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA"), by distributing MMS.  *See United States v. Genesis II Church of Health and Healing, et al.*, Case No. 20-21601-CV-WILLIAMS (hereinafter, the "Civil Docket"), ECF No. 1.  U.S. District Judge Kathleen M. Williams subsequently issued a Temporary Restraining Order on April 17, 2020 (the "TRO"), and an Order of Preliminary Injunction on May 1, 2020 (the "PI"), both of which prohibited the Defendants from "directly or indirectly, label[ing], hold[ing], and/or distribut[ing] any [misbranded] drug, including but not limited to MMS."  *Id.*, ECF No. 4 (TRO) at 3; ECF No. 26 (PI) at 8.

The Defendants violated those court orders by continuing to label and distribute MMS.  For example, on June 13, 2020, Jordan Grenon published a newsletter directing consumers to a video featuring Jonathan Grenon, in which Jonathan explained that, despite the TRO and the PI, the Defendants had decided to continue distributing MMS.  A few weeks later, on July 4, 2020,

Jonathan posted a new video in which he stated that the Defendants had distributed "over a hundred" bottles of MMS to consumers over the prior two to three weeks.

While the Defendants' continued distribution of MMS plainly violated the TRO and the PI, the Defendants' public statements erased any doubt as to whether those violations were willful. For example, on April 21, 2020, in a letter addressed to Judge Williams and attorneys for the United States, co-signed by all of the Defendants, the Defendants claimed that they were "NOT bound to obey" the TRO.  Civil Docket, ECF No. 12 at 2.  In another letter addressed to Judge Williams and attorneys for the United States dated that same day, Mark Grenon, on behalf of all the Defendants, wrote: "We are practicing 'civil disobedience' against this unjust order! . . .  Civil disobedience is permitted in the US Constitution[,] peaceably of course at first[,] if possible . . . . NOTE: The 2nd Amendment is there in case it can't be done peaceably . . . .  The Genesis II Church of Health and Healing will not stop . . . providing [MMS] to the world!"  Civil Docket, ECF No. 11.  Similarly, in several of the weekly Genesis podcasts co-hosted by Mark and Joseph Grenon, they acknowledged: "We're violating a temporary restraining order.  Well, we don't care . . . . . We're going to do it whether you like it or not."  They further threatened to "pick up guns" and instigate "a Waco" should the government interfere with the Defendants' marketing of MMS, while remarking of Judge Williams, "You think we're afraid of some Obama-appointed judge that broke their oath? … You're no judge . . . .  This judge could go to jail . . . .  You could be taken out Ms. Williams . . . .  [W]e're not obeying it.  Don't care what you do."

### III.   <u>Criminal Charges and Jury Trial</u>

Based on the foregoing conduct, a federal grand jury sitting in the Southern District of Florida returned an Indictment charging the Defendants with one count of conspiracy to defraud the United States and to commit offenses against the United States, in violation of 18 U.S.C. § 371,

and two counts of criminal contempt, in violation of 18 U.S.C. § 401(3).  (ECF No. 16 (hereinafter, the "Indictment" or "Ind.").)

Trial in this matter is set for the second week of the two-week trial period starting on July 3, 2023, i.e. trial is set to commence on July 10, 2023.  (ECF Nos. 137, 139.)

**ARGUMENT**

"Irrelevant evidence is not admissible."  Fed. R. Evid. 402.  Once a court determines that a defendant's proffered evidence is irrelevant, "it should issue a ruling *in limine* precluding the introduction of that information at trial."  *United States v. Baptista-Rodriguez*, 17 F. 3d 1354, 1363 (11th Cir. 1994).  Likewise, argument and evidence "based upon an invalid defense should be excluded because [it is] irrelevant as a matter of law to the charges of the indictment."  *United States v. Anderson*, 872 F.2d 1508, 1516 n.12 (11th Cir. 1989) ("[A] jury should not be burdened with testimony regarding a defense where that defense has already been determined to be legally insufficient."); *cf. United States v. Foster*, 153 F. App'x 674, 676 (11th Cir. 2005) ("A defendant is entitled to have the district court instruct the jury on a defense theory 'only if that theory has an evidentiary foundation and the requested instruction presents a cognizable legal defense.'") (quoting *United States v. Fernandez*, 837 F.2d 1031, 1035 (11th Cir. 1988)).

Even relevant evidence should be excluded from trial if "its probative value is substantially outweighed by a danger of . . . confusing the issues [or] misleading the jury."  Fed. R. Evid. 403.  Although Rule 403 should be applied sparingly, its "'major function'" is to exclude evidence "'of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.'"  *United States v. Veltmann*, 6 F.3d 1483, 1506 (11th Cir. 1993) (quoting *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979)).

As detailed below, the Defendants have made clear that they intend to present argument and evidence to the jury that is based upon legally insufficient defenses, that is irrelevant to the charges against them, and which would undoubtedly confuse the issues and mislead the jury. The Court should issue a ruling *in limine* precluding the introduction of such argument and evidence at trial.

**I.      The Court Should Prohibit the Defendants from Arguing That Their Conduct Was Protected Under the Free Exercise Clause of the First Amendment.**

Over the past 13 years, the Defendants have repeatedly acknowledged that they sold MMS under the guise of the Genesis "church" in order to falsely cloak their unlawful conduct in the garb of a religious exercise, constitutionally protected under the First Amendment. Now that they must answer for their conduct, they will undoubtedly attempt to escape accountability by invoking the First Amendment. But even if the Defendants' distribution of MMS constituted actual religious exercise (which, to be clear, it does not), the First Amendment does not shield the Defendants from criminal liability. And the Defendants should not be allowed to suggest otherwise to the jury.

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const., Amdt. 1. It is long established that there are two aspects to free exercise of religion—the freedom to believe, and the freedom to act—and that while the freedom to believe is "absolute," the freedom to act is not. *Cantwell v. State of Connecticut*, 310 U.S. 296, 303-04 (1940). As the Supreme Court explained over eighty years ago, religious conduct "remains subject to regulation for the protection of society," *id.* at 304, and persons may not, "under the cloak of religion . . . with impunity, commit frauds upon the public," *id.* at 306.

In the seminal case of *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872 (1990), the Supreme Court held that the Free Exercise Clause "does not relieve an individual of

the obligation to comply with a valid and neutral law of general applicability on the ground that

the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Id.* at 879.

The respondents in *Smith*, relying on the Free Exercise Clause, had argued that "their religious

motivation for using peyote place[d] them beyond the reach" of criminal drug laws prohibiting

peyote use, despite the fact that those criminal laws were "not specifically directed at [the

respondents'] religious practice" and were "concededly constitutional as applied to those who use

the drug for other [non-religious] reasons." *Id.* at 878.  The Supreme Court rejected this argument

and held that an individual's religious belief does not "excuse him from compliance with an

otherwise valid law prohibiting conduct that the State is free to regulate." *Id.* at 878-79; *see also*

*id.* at 882 ("Respondents urge us to hold, quite simply, that when otherwise prohibitable conduct

is accompanied by religious convictions, not only the convictions but the conduct itself must be

free from governmental regulation.  We have never held that, and decline to do so now.").

Likewise, the Eleventh Circuit recently explained (relying on *Smith*), that although "the

government may not dictate what an individual can believe, it may enact neutral and generally

applicable laws that incidentally burden religious conduct and exercise." *Dorman v. Aronofsky*,

36 F.4th 1306, 1312 (11th Cir. 2022).  "So long as the restriction or prohibition of religious conduct

or exercise is not the 'object' of the regulation 'but merely the incidental effect of a generally

applicable and otherwise valid provision, the First Amendment has not been offended.'" *Id.* at

1312-13 (quoting *Smith*, 494 U.S. at 878); *see also United States v. Stevens*, No. 20-20270-CR,

2022 WL 2704522, at *11 (S.D. Fla. May 2, 2022) (Torres, C. M.J.), *report and recommendation*

*adopted*, No. 1:20-CR-20270, 2022 WL 2702658 (S.D. Fla. July 12, 2022) ("Where an individual

violates an otherwise valid criminal statute, the First Amendment does not act as a shield to

preclude the prosecution of that individual simply because their criminal conduct has a connection to religious activity.") (citation omitted).

The Defendants do not (and cannot credibly) claim that the federal statutes prohibiting conspiracy and criminal contempt are facially unconstitutional, or otherwise invalid in any way. Rather, the Defendants merely claim that the First Amendment shields their unlawful conduct from prosecution. This argument is foreclosed by *Smith*. Even if the Defendants' unlawful conduct had been motivated by actual religious conviction, the First Amendment would not relieve the Defendants of the obligation to comply with the valid and neutral laws of general applicability which they are accused of violating. *Smith*, 494 U.S. at 878-79; *see also United States v. Meyers*, 95 F.3d 1475, 1480-81 (10th Cir. 1996) (holding "Meyers' challenge to his convictions under the Free Exercise Clause must fail" for "the same reasons as the respondents' challenge in *Smith* failed, i.e., the right to free exercise of religion under the Free Exercise Clause of the First Amendment does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability").

The Free Exercise Clause, as interpreted by the Supreme Court, does not provide a valid defense to the Defendants' unlawful conduct. The Defendants should not be allowed to argue otherwise to the jury. The Court should therefore exclude the Defendants from arguing that their conduct was protected by the First Amendment, as any such argument would be irrelevant, and therefore inadmissible. Fed. R. Evid. 402; *see also Anderson*, 872 F.2d at 1516 n.12 (holding that evidence "based upon an invalid defense should be excluded because [it is] irrelevant as a matter of law to the charges of the indictment").

Precluding the Defendants from invoking the First Amendment as a defense—through argument, evidence, or cross-examination—is not only required by binding precedent and Fed. R.

Evid. 402, but also is consistent with Fed. R. Evid. 403.  Allowing the Defendants to even suggest that the First Amendment protects their conduct will confuse the jury into believing the Defendants had a constitutional right to violate the law.  The concept of religious freedom has deep resonance with Americans, and great emotional and intellectual appeal.  That is as it should be, but the Defendants should not be allowed to wrap themselves in the cloak of the First Amendment and misleadingly invite the jury to acquit them—notwithstanding sufficient evidence of their guilt— to vindicate a right to religious freedom which has no basis in the law.

## II.   The Court Should Prohibit the Defendants from Arguing That Their Conduct Was Protected Under the Religious Freedom Restoration Act.

In direct response to *Smith*, Congress enacted the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, to provide greater protection for religious exercise than is available under the Free Exercise Clause.  *See generally Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693-955 (2014).  The RFRA provides that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government "demonstrates that application of the burden to the person— (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling government interest."  42 U.S.C. § 2000bb-1(a), (b); *see also* 42 U.S.C. § 2000bb-1(c) ("A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.").

"[T]o establish a *prima facie* RFRA claim, a defendant must first show (1) that he or she was exercising (or was seeking to exercise) his or her sincerely held religious belief, and (2) that the government substantially burdened the defendant's religious exercise."  *United States v. Grady*, 18 F.4th 1275, 1285 (11th Cir. 2021) (citation omitted), *cert. denied*, 142 S. Ct. 2871 (2022).  Only

then does the burden shift to the government to demonstrate that "(3) it has a compelling interest, and (4) the challenged action in question is the least-restrictive means of furthering that interest." *Id.*

To be clear, the Defendants have not to date asserted a defense under the RFRA, much less established a *prima facie* claim, as is their burden.  Nevertheless, in consideration of the Defendants' *pro se* status and the desirability of resolving this issue in advance of trial, the government has set forth below why the Defendants are not entitled to protection under the RFRA.[1]

### A. The Defendants Cannot Establish a *Prima Facie* RFRA Claim Because Their Purported Religious Beliefs Were Not Sincerely Held.

A person cannot qualify for the RFRA's protection unless he can show in the first instance that he was exercising a "sincerely held religious belief."  *Grady*, 18 F.4th at 1285; *see also Burwell*, 573 U.S. at 717 n.28 ("To qualify for RFRA's protection, an asserted [religious] belief must be sincere," not "pretextual.") (citation omitted).  In other words, a claimant must establish

---

[1]  Sometimes, when the government contests a defendant's ability to make out a *prima facie* claim under the RFRA, an evidentiary hearing may be useful to decide the issue, especially regarding the sincerity of the defendant's claimed religious beliefs.  *See, e.g.*, *United States v. Quaintance*, 608 F.3d 717, 722–23 (10th Cir. 2010).  That is not the situation here.  First, to date, the Defendants have not presented any competent evidence, such as an affidavit, sworn declaration, or testimony attempting to establish the two requirements for a *prima facie* claim.  *See, e.g.*, *Navajo Nation v. United States Forest Service*, 535 F.3d 1058, 1068 (9th Cir. 2008) ("To establish a *prima facie* RFRA claim, a plaintiff must present evidence sufficient to allow a trier of fact rationally to find the existence of two elements.").  Second, any evidence the Defendants might seek to present today would be completely contradicted by their past admissions, detailed herein, making it unnecessary for the Court to seek live testimony from the Defendants or conduct any further inquiry.

Based upon the materials in the record, the government sees no way that the Defendants could meet their burden of making out a *prima facie* RFRA claim.  If the Court agrees, the government asks the Court to make that factual finding expressly as part of its broader ruling on this motion *in limine*.  If the Court disagrees, it should schedule an evidentiary hearing and put the Defendants to their burden.

that he "actually holds the beliefs he claims to hold," and is not merely "seeking to perpetrate a fraud on the court." *Davila v. Gladden*, 777 F.3d 1198, 1204 (11th Cir. 2015) (citation omitted).

The Defendants cannot come close to meeting this burden, because their purported religious beliefs regarding MMS are not sincerely held. As they have explicitly admitted—on countless occasions, in publicly available, video-recorded interviews—the Defendants decided to sell MMS as a "sacrament" under the guise of a "church" explicitly to avoid criminal liability for their misconduct, not because of any sincerely held religious beliefs. For example, in a publicly available February 2020 interview with "Age of Truth TV," Defendant Mark Grenon—the father of the other defendants and the leader of the conspiracy—was asked, "why create a church, though, in order to practice MMS?" The Controversial Healing Cure ~ CORONAVIRUS, CLIMATE & 5G ~ featuring MARK GRENON, Age of Truth TV (March 7, 2020), https://ageoftruth.tv/the-controversial-healing-cure-coronavirus-climate-5g-mark-grenon/. Grenon replied:

> Because everything you do commercially is under the Universal Commercial code, okay? A church is completely separate from that code, statutes, and laws. That's why a priest can give a kid wine in church publicly and not get arrested. Because it's a sacrament.[…] I knew this because as a pastor, they tried to arrest us for proclaiming stuff on the street in Boston. They threw it out of court because we're a church. *You can't arrest us from doing one of our sacraments, and I knew this. So that's why . . . I said let's do a church.* We could have done temple. We could have done synagogue. We could have done mosque.

*Id.* The interviewer then asked, "*so it wasn't really about religion? It was in order to, in a way, legalize the use of MMS*?" *Id.* Grenon replied, "*Right. It wasn't at all religious.*" *Id.*

In the same interview, Grenon described the 2010 MMS training seminar in the Dominican Republican that he hosted along with Co-Conspirator 1 (as identified in the Indictment), at which Grenon and Co-Conspirator 1 first decided to create Genesis. Grenon stated that he told the attendees of the training seminar, "we're going to start a church.[…] Everybody hated the idea.

*And we said you've got to do this, folks, or you're going to go to jail* because this is a thorn in the side of big pharma." *Id.*

Co-Conspirator 1, who co-founded Genesis with Mark Grenon, has made similarly revealing admissions regarding the fraudulent motivation for selling MMS under the guise of a "church." In an "MMS Newsletter" authored by Co-Conspirator 1 and distributed to his subscribers on or about April 29, 2010 (which is also publicly available), Co-Conspirator 1 wrote the following regarding the 2010 MMS training seminar that he had just led along with Mark Grenon:

> Let me tell you one other important concept that was introduced to the group that was here at our first seminar. Now hold on to your chair and don't get upset until you have read it all. Some of the group here got upset at first, too, but they all left here agreeing we have a tremendous idea . . . . So here it is: <u>we are forming a church of health and healing. Now that's not religion, that's health and healing.</u> It's called Genesis II Church of Health and Healing.[…]
>
> <u>Do you understand the power that a church has . . . ?</u> Look at the Catholics. Their priests have been molesting women and children for centuries and the governments have not been able to stop it. <u>If handled properly a church can protect us from vaccinations that we don't want, from forced insurance, and from many things that a government might want to use to oppress us. [. . .] I am sure you know that the constitution of the US says that congress shall make no laws regulating an establishment of religion, or the free exercise thereof.</u>[…]
>
> You can become a member of our church and still be a member of your own church because we do not dictate that anyone believe any particular thing. <u>Come to us for . . . sanctuary from vaccinations and other government interference, and go to your church for your spiritual beliefs.</u>

<u>Saludos from the Dominican Republic!</u>, MMS Newsletter 011 (April 29, 2010), https://web.archive.org/web/20100429000458/http://www.mareaweb.net/mms/NEWS011.htm.

These admissions make abundantly clear that the Defendants' unlawful sale of toxic industrial bleach as a bogus miracle cure did not constitute the exercise of any "sincerely held

religious belief." *Grady*, 18 F.4th at 1285.   Without this essential element of sincerity, the Defendants' RFRA defense must fail. *See id.*

Justice Gorsuch's influential RFRA decision in *United States v. Quaintance*, 608 F.3d 717, 722–23 (10th Cir. 2010), is directly on point.   The defendants in *Quaintance* were charged with various federal offenses related to the distribution of marijuana. *Id.*  They moved to dismiss the indictment by seeking refuge under the RFRA, claiming that they distributed marijuana as a "sacrament" under the "Church of Cognizance" (which they founded), and that distributing marijuana was "essential to their religious exercise." *Id.*  The district court denied the motion to dismiss upon finding that the defendants' purported religious beliefs were not "sincerely held," and that the Defendants were merely trying "to avoid prosecution for illegal conduct by transforming their lifestyle choices into a 'religion.'" *United States v. Quaintance*, 471 F.Supp.2d 1153, 1174 (D. N.M. 2006).   The Tenth Circuit Court of Appeals affirmed, because "[w]ithout the essential element of sincerity, [the defendants'] RFRA defense must fail." *Quaintance*, 608 F.3d at 724.  The Tenth Circuit agreed with the district court's conclusion that, in forming the "Church of Cognizance," the defendants "were acting for the sake of convenience, i.e. because they believed the church would cloak [them] with the protection of the law." *Id.* at 722 (quotations and citation omitted).   The Tenth Circuit emphasized how the defendants once suggested that a co-defendant join their "church" because "it would legalize his marijuana use." *Id.*  As Justice Gorsuch explained, the defendants only claimed the protection afforded a church in order to "insulate their drug transactions" from prosecution, "not because they had a sincere religious belief that marijuana is a sacrament and deity." *Id.*

The same is true with these Defendants, as they have repeatedly and publicly admitted. They should not be allowed now to escape liability for their wrongdoing by falsely claiming

religious protection. *See id.; see also Yellowbear v. Lampert*, 741 F.3d 48, 54 (10th Cir. 2014) (explaining that the religious liberty statutes do "not offer refuge to canny operators who seek through subterfuge to avoid laws they'd prefer to ignore," like "those who set up 'churches' as cover for illegal drug distribution operations") (Gorsuch, J.).

### B. This Prosecution Is the Least Restrictive Means of Furthering a Compelling Governmental Interest.

Even if the Defendants' could meet their burden to establish a *prima facie* RFRA claim, their RFRA defense would still fail because the government "has a compelling interest" and "the challenged action in question is the least-restrictive means of furthering that interest." *Grady*, 18 F.4th at 1285.

Here, the government has a compelling interest in protecting the health and safety of the American public by ensuring that drugs marketed and distributed to the American public are safe and effective. *Cf. Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 369 (2002) ("Preserving the effectiveness and integrity of the FDCA's new drug approval process is clearly an important governmental interest . . . ."). Indeed, this is the express mission of the FDA. 21 U.S.C. § 393(b)(2)(B) ("Mission—The Administration shall . . . protect the public health by ensuring that . . . drugs are safe and effective."). The FDA's ability to accomplish this mission would be "seriously compromise[d]" if individuals could circumvent the FDA's regulatory authority under the guise of religious freedom. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 435 (2006) ("[T]he Government can demonstrate a compelling interest [under the RFRA] . . . by offering evidence that granting the requested religious accommodations would seriously compromise its ability to administer the program.").

More specifically, the government has a compelling interest in prohibiting the Defendants from defrauding the FDA and distributing an unapproved new drug—in reality, a toxic industrial

bleach—to vulnerable Americans desperate for, as the Defendants promised, a "miracle cure." *See, e.g.*, *United States v. Dotterweich*, 320 U.S. 277, 280 (1943) (explaining that in enacting the FDCA, "Congress extended the range of the [FDA's] control over illicit and noxious articles and stiffened the penalties for disobedience," in order to protect consumers who, "in the circumstances of modern industrialism, are largely beyond self-protection" from the latent dangers of new drugs); *Stevens*, 2022 WL 2704522, at *10 ("Clearly, the government has a compelling interest to deter fraudulent schemes under the guise of religious activity."). Courts have found compelling governmental interests sufficient to defeat RFRA's protections in circumstances far less serious than these. *See, e.g.*, *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 473 (5th Cir. 2014) (holding that "protecting bald eagles qualifies as a compelling interest" under the RFRA); *United States v. Oliver*, 255 F.3d 588, 589 (8th Cir. 2001) (affirming the denial of a RFRA defense to a criminal prosecution because "the government demonstrated a compelling governmental interest in preserving the bald eagle population"); *United States v. Wilgus*, 638 F.3d 1274, 1285 (10th Cir. 2011) (same).

Likewise, courts have frequently found a compelling governmental interest under the RFRA in prosecutions involving the distribution of drugs—particularly where, as here, the government is not prosecuting a person merely for engaging in purported sacramental use of the drug, but rather for distributing that drug to others. *See, e.g.*, *United States v. Anderson*, 854 F.3d 1033, 1036 (8th Cir. 2017) ("Unlike in *O Centro*, the Government is not prosecuting Anderson for engaging in a 'circumscribed, sacramental use' of heroin. Instead, the Government is prosecuting Anderson for distributing heroin to others for non-religious uses.") (quoting and distinguishing *O Centro*, 546 U.S. at 432-33); *United States v. Christie*, 825 F.3d 1048, 1054, 1057 (9th Cir. 2016) (same, in a prosecution involving the distribution of marijuana by the founders of the "Hawaii Cannabis Ministry").

The instant prosecution is also the least-restrictive means of furthering the government's compelling interest in this case.  As noted above, the Defendants are not being prosecuted for their own (purportedly) religious use of MMS; rather, the government is prosecuting the Defendants for unlawfully distributing MMS to consumers nationwide.  The government cannot allow the Defendants to introduce this misbranded and unapproved new drug into interstate commerce, and still achieve its compelling interest in protecting the health and safety of the American public by ensuring that drugs marketed and distributed to the American public are safe and effective.  *See Anderson*, 854 F.3d at 1036-37 (concluding with "no difficulty" that criminal prosecution was the least restrictive means necessary to further the government's compelling interest in regulating heroin, because "Anderson's religious exercise involves heroin *distribution*," not mere sacramental use) (emphasis in original).  As was the case in *Grady*, where the Eleventh Circuit affirmed the denial of the defendant's motion to dismiss under RFRA even though the defendant had established a *prima facie* RFRA defense, "it would be impossible to achieve all of the government's compelling interests . . . and also accommodate the defendants' destructive religious exercise in this case."  *Grady*, 18 F.4th at 1287-88.  Simply put, "RFRA is not a 'get out of jail free card,' shielding from criminal liability individuals [who commit unlawful conduct], regardless of the sincerity of their religious beliefs."  *Id.*

> **C. Once the Court Finds that the Defendants' RFRA Defense Fails, the Court Should Preclude the Defendants from Introducing Evidence or Argument in Furtherance of a Religious Freedom Defense.**

Whether an individual is able to successfully establish a RFRA claim is a "pure question of law."  *Lawson v. Singletary*, 85 F.3d 502, 511–12 (11th Cir. 1996).  "Moreover, the determination of pure questions of law in criminal cases are not the province of the jury."  *United States v. Duncan*, 356 F. App'x 250, 253–54 (11th Cir. 2009) (*citing United States v. Gaudin*, 515

U.S. 506 (1995)).   Therefore, once the Court determines that the Defendants cannot avail themselves of the RFRA, the Court should preclude the Defendants from introducing evidence or argument in furtherance of a RFRA defense to the jury.  *See Duncan*, 356 F. App'x at 253-54 ("Because application of the RFRA was a question of law, we conclude that the district court abused no discretion in declining to submit the issue to the jury."); *Anderson*, 854 F.3d at 1037 ("Furthermore, we reject Anderson's argument that he was entitled to present his RFRA defense to the jury.  Because the district court concluded that prosecuting Anderson under the CSA was the least restrictive means to further a compelling governmental interest, it was proper for the court to reject Anderson's RFRA defense as a matter of law and to prohibit him from raising it again at trial."); *United States v. Kelly*, No. 2:18-CR-22, 2019 WL 5106374, at *2 (S.D. Ga. Oct. 11, 2019), *objections overruled*, No. 2:18-CR-22, 2019 WL 5328722 (S.D. Ga. Oct. 18, 2019) ("[T]he Court determined that the Government has shown a compelling interest and that it is utilizing the least restrictive means.  Because this determination has been made as a matter of law, [the] Defendants may not present a RFRA defense to the jury at trial.").

### III.  The Court Should Prohibit the Defendants from Introducing Lay Testimony or Anecdotal Evidence Regarding the Safety or Effectiveness of MMS.

In marketing MMS to consumers, the Defendants often emphasized anecdotal evidence as "proof" that MMS was a miracle cure-all that could treat, prevent, and cure a variety of serious diseases and disorders.  For example, in their podcasts, newsletters, and websites, the Defendants directed consumers to "MMS Testimonials" at mmstestimonials.co, a Genesis-affiliated website containing hundreds of purported testimonials supporting the effectiveness of MMS.  Similarly, throughout this litigation, the Defendants have maintained their claim that MMS is a safe and effective medical cure by arguing that MMS has cured thousands of people of various diseases.

The government therefore anticipates that the Defendants will attempt at trial to offer lay testimony and anecdotal evidence regarding the safety and effectiveness of MMS.

The Court should prohibit them from doing so.  The Supreme Court has made clear that this type of evidence is irrelevant to the charges facing the Defendants.  Admission of such evidence would open the door to a potential parade of lay defense witnesses who have consumed MMS and who have been duped by the Defendants into believing in its effectiveness.  This testimony is irrelevant, and would lead to confusion of the real factual issues before the jury.

There is only one issue in this case on which evidence of MMS's safety and effectiveness is relevant: whether the Defendants conspired to violate the FDCA by introducing into interstate commerce an unapproved new drug, as charged in Count 1.[2]  (Ind., Count 1, ¶ 2(b).)  Generally, the FDCA prohibits the introduction or delivery for introduction into interstate commerce of unapproved new drugs.  21 U.S.C. §§ 331(d) & 355(a).  A "new drug" is defined by the FDCA to include any drug "the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof."  21 U.S.C. § 321(p)(1).  Accordingly, whether MMS is a "new drug" within the meaning of the FDCA depends on whether MMS is generally recognized as safe and effective ("GRASE") under the proposed conditions of use.

---

[2] Count 1 also alleges the Defendants conspired to violate the FDCA by introducing into interstate commerce a misbranded drug.  (Ind., Count 1, ¶ 2(c).)  However, the misbranding allegations do not involve the safety or effectiveness of MMS.  Rather, they concern only whether MMS's labeling failed to bear "adequate directions for use," 21 U.S.C. § 352(f)(1), and whether MMS was manufactured, prepared, propagated, compounded, or processed in an establishment in any State not duly registered with the FDA, 21 U.S.C. § 352(o).  The safety and effectiveness of MMS is similarly irrelevant to Counts 2 and 3, charging criminal contempt.

A drug is GRASE only if three conditions are satisfied.  First, there must be "substantial evidence" of the drug's effectiveness.  21 U.S.C. § 355(d); *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 629 (1973).  The FDCA defines "substantial evidence" as "evidence consisting of adequate and well-controlled investigations, including clinical investigations . . . on the basis of which it could fairly and responsibly be concluded by . . . [qualified] experts that the drug will have the effect it purports or is represented to have . . . ."  21 U.S.C. § 355(d).  Second, these investigations must be published in the scientific literature so that they are made generally available to the community of qualified experts, and thereby subject to peer review.  *Weinberger v. Bentex Pharms., Inc.*, 412 U.S. 645, 652 (1973); *see also United States v. Article of Drug Consisting of 4,680 Pails . . . Etc.*, 725 F.2d 976, 987 (5th Cir. 1984) (explaining that "substantial evidence" consists of "adequate and well-controlled studies that must be generally available to the scientific community").  Third, there must be a consensus among the qualified experts, based on those published investigations, that the drug is actually safe and effective under the proposed conditions of use.  *Cf. Hynson*, 412 U.S. at 632 (requiring "expert consensus"); *Premo Pharm. Lab'ys, Inc. v. United States*, 629 F.2d 795, 803 (2d Cir. 1980) ("[A] genuine dispute among qualified experts regarding a drug product's safety and effectiveness preclude its qualifying for exclusion as 'generally recognized.'").

Anecdotal evidence regarding safety and effectiveness cannot establish that a new drug is GRASE.  In its seminal *Hynson* decision, the Supreme Court announced:

> The legislative history of the [FDCA] indicates that the test [for safety and effectiveness] was to be a rigorous one.  The 'substantial evidence' requirement reflects the conclusion of Congress, based upon hearings, that clinical impressions of practicing physicians and poorly controlled experiments do not constitute an adequate basis for establishing effectiveness . . . .  Isolated case reports, random experience, and reports lacking the details which permit scientific evaluation will not be considered.

*Hynson*, 412 U.S. at 630 (quotations and citations omitted).  The Supreme Court likewise noted that the legislative history shows a "marked concern" that "anecdotal evidence" is "treacherous." *Id* at 619; *see also id.* at 639 n.2 ("There can be no doubt, both from the legislative history and the language of the [FDCA], that Congress intended to impose standards that would bar reliance upon anecdotal evidence . . . as determinative of a drug's effectiveness.") (Powell, J. concurring).  As the Fifth Circuit later explained, "[t]he purpose of the *Hynson* rule is to avoid the use of clinical impressions and poorly controlled experiments as a basis for establishing effectiveness," and thus "anecdotal evidence" is insufficient to establish general recognition of effectiveness under the FDCA.  *An Article of Drug Consisting of 4,680 Pails . . .*, 725 F.2d at 987 n.26 (citations and punctuation omitted); *see also United States v. Sene X Eleemosynary Corp., Inc.*, 479 F. Supp. 970, 977 (S.D. Fla. 1979) ("[A]necdotal evidence . . . cannot be used to establish general recognition of safety and effectiveness.") (citing *Hynson*); *United States v. Vanmoor*, No. 06-CR-60064 (S.D. Fla.), D.E. 67 at 39 (instructing the jury: "Anecdotal and testimonial evidence from doctors or patients regarding the safety and/or effectiveness of a new drug is not sufficient to meet the standards of the FDCA with respect to establishing the drug's safety and effectiveness.  In addition, general recognition of safety and effectiveness cannot be based on clinical impressions of practicing physicians or patients, poorly controlled experiments, or isolated case reports, random experience, and reports lacking the details which permit scientific evaluation.").

The Defendants are welcome to offer properly-disclosed evidence of an expert consensus, based on well-controlled and published clinical investigations, that MMS is GRASE.  But the Court should preclude the Defendants from offering anecdotal or testimonial evidence regarding the safety or effectiveness of MMS.  Such evidence, based on the well-established case law cited above, is wholly irrelevant to the issues in this case, and therefore inadmissible.

**IV.**  **The Court Should Prohibit the Defendants from Introducing Argument or Evidence Regarding the Defendants' Supported Lack of Intent to Cause Harm.**

Based upon their public statements, the Defendants may seek to argue that they did not intend to harm anyone by distributing MMS.  In addition to being false, such an argument is irrelevant.  What matters for purposes of these charges is whether the Defendants acted with the criminal intent required by 18 U.S.C. §§ 371 and 401(3), the statutes charged in Count 1 and Counts 2-3, respectively, of the Indictment.  The government does not have to prove under either statute that the Defendants intended to cause harm, let alone actually caused harm, to any individuals by their actions.  Instead, the Government must prove only that the Defendants acted knowingly, willfully, and with the intent to defraud and mislead the FDA (for § 371), and willfully in defiance of a court order (for § 401(3)).  *See* Eleventh Circuit Pattern Jury Instr., Criminal, O13.1 & 13.6 (setting forth the elements of § 371); *United States v. Burstyn*, 878 F.2d 1322, 1324 (11th Cir. 1989) (setting forth the elements of § 401(3)); *cf. United States v. Bradshaw*, 840 F.2d 871 (11th Cir. 1988) (holding that the "intent to defraud" element necessary to sustain a felony conviction under the FDCA, the underlying offense alleged in Count 1, is not limited to intent to defraud "the ultimate consumer," and extends to "conduct intended to defraud government enforcement agencies").

Accordingly, evidence or argument to the effect that the Defendants did not have any intent to cause harm by distributing MMS is irrelevant, and should be precluded.

**V.**  **The Court Should Prohibit the Defendants from Introducing Argument or Evidence Regarding the Alleged Corruption of the FDA or the Pharmaceutical Industry.**

The Defendants repeatedly have asserted that both the FDA and the pharmaceutical industry are corrupt and in cahoots to deny the public access to cheaper and more effective drugs

(such as, by their lights, MMS).[3]  By extension, the Defendants have claimed that the instant prosecution is in furtherance of that plan.  Evidence and argument to this effect is plainly irrelevant to the charges in this case and should be precluded.  For example, the Court should exclude (1) references to the pricing of drugs or to controversies about prescription pharmaceuticals or the "drug industry"/"Big Pharma" generally; (2) references to the FDA's supposed corrupt ties to the pharmaceutical industry and corrupt intent in seeking to regulate the distribution and use of drugs not created by "Big Pharma"; and (3) references to the "toxins" supposedly present in vaccines and other conventional medicines that the FDA and Big Pharma allegedly promote.

There is no reason for the defense to be discussing any of those topics, or the pharmaceutical industry generally, at trial.  The pending charges relate to MMS, a dangerous, unapproved, and misbranded product created and distributed by the Defendants.  There is no evidence that "Big Pharma" had anything to do with the Defendants' product, let alone their crimes.  Moreover, the FDA's intent ("corrupt" or otherwise) in acting against MMS has nothing to do with whether the Defendants' conduct as charged violated federal law.  The FDA's broader relationship with the pharmaceutical industry has even less connection to any element of the charged offenses.

To be relevant, evidence must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be

---

[3]  The Defendants have stated in public communications related to this case that "Big Pharma/Medical industry produces poisons to the body and your agencies protect them!" (ECF No. 7, Ex. 5, at 9), and "Your tyrannical days of Draconian policies only allowing what elite want is over! . . . .  The Silent MAJORITY is exposing your lies, deceptions and the guarding of the swamp creatures i.e. Big Pharma . . . . " (*Id.* at 17).  They have speculated as well, "Is the FDA protecting Big Pharma? . . . .  Is the DOJ in on maintaining Big Pharma control of drugs?" (*Id.* at 15).  They also have complained vigorously about the "toxins [] found in many vaccines being administered to the public." (*Id.* at 11).

without the evidence." Fed. R. Evid. 401.  Implicit in that definition are two distinct requirements: "(1) The evidence must be probative of the proposition it is offered to prove, and (2) the proposition to be proved must be one that is of consequence to the determination of the action." *United States v. Glasser*, 773 F.2d 1553, 1559 n.4 (11th Cir. 1985) (quoting *United States v. Hall*, 653 F.2d 1002, 1005 (5th Cir. 1981)).  "Whether a proposition is of consequence to the determination of the action is a question that is governed by the substantive law" under which the defendant has been charged. *Hall*, 653 F.2d at 1005.  Evidence relating to the prescription drug industry generally, prescription drug pricing, and the FDA's supposed connection to them makes no fact of consequence to this case more or less probable, and must be excluded, as well as argument about those subjects.

Even if somehow marginally relevant, evidence and argument of this type should be excluded under Rule 403.  Evidence or argument about "Big Pharma" and the FDA, aside from having nothing to do with the Defendants' intentional misconduct (which is fundamentally the issue for trial), would only be offered to mislead the jury into thinking this is a trial about the drug industry and whether supposedly novel cures are kept from the market by devious means.  Those subjects may be fair issues for public debate, and ones about which some people may have passionate feelings, but they do not belong in this courtroom, for this trial.

This area is also one of several that may be raised by the Defendants only to invite jury nullification of this prosecution.  In *United States v. Funches*, 135 F. 3d 1405 (11th Cir. 1998), the Eleventh Circuit commented on evidence that the defendant insisted was relevant, but in reality was simply an invitation to the jury to ignore the facts and law.  As the court put it, the defendant's real contention, given his failure to proffer facts sufficient to support a purported affirmative defense, was that "he had a due process right to present evidence the only relevance of which is to

inspire a jury to exercise its power of nullification." *Id.* at 1408.  However, nullification is not a right of the jury, and the exercise of such power is a dereliction of the jury's sworn duty.  *Id.*

A jury has no more "right to find a guilty defendant not guilty than it has to find a not guilty defendant guilty, and the fact that the former cannot be corrected by a court, while the latter can be, does not create a right out of the power to misapply the law.  Such verdicts are lawless, a denial of due process and constitute an exercise of erroneously seized power." *Id.* at 1409 (citation and quotation marks omitted).  "Because the jury enjoys no right to nullify criminal laws, and the defendant enjoys a right to neither a nullification instruction nor a nullification argument to the jury, the potential for nullification is no basis for admitting otherwise irrelevant evidence." *Id.* Relying on *Funches* and similar Eleventh Circuit precedent, courts in this Circuit have frequently granted government motions *in limine* to preclude defendants from making arguments to the jury which might cause nullification.  *See, e.g.*, *United States v. Chugay*, No. 21-10008-CR, 2022 WL 1782583, at *1 (S.D. Fla. June 1, 2022) (granting the government's motion *in limine* because the "Eleventh Circuit has repeatedly disapproved of jury nullification") (citing *Funches* and *United States v. Joseph*, 567 F. App'x 844, 849 (11th Cir. 2014)); *United States v. Williams*, No. 17-14050-CR, 2017 WL 11607837, at *7 (S.D. Fla. Nov. 13, 2017) (similar, collecting cases).

Rule 402, Rule 403, and well-established precedent prohibit jury nullification, and serve to prevent from ever reaching the jury the kind of argument the Defendants have signaled they will make about "Big Pharma," its supposed connection to the FDA, and the FDA's supposed corruption or regulatory failures.  The Court should therefore preclude the introduction of such argument.

VI. **The Court Should Prohibit the Defendants from Introducing Argument or Evidence in Furtherance of a Selective Prosecution Defense.**

To date, the Defendants have not moved to dismiss based upon concepts of selective prosecution. They have, however, insisted in public pronouncements that they are being targeted for impermissible reasons, in particular their faith. These kinds of arguments have no place before the jury. That is so on multiple grounds.

One, "selective prosecution is a defect in the institution of the prosecution that has no bearing on the determination of factual guilt." *United States v. Jones*, 52 F.3d 924, 927 (11th Cir. 1995); *see also United States v. Armstrong*, 517 U.S. 456, 463 (1996) ("A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution."). In other words, selective prosecution issues are decided by the Court before trial (if they are properly and timely raised), not by a jury. *Id.* Indeed, "[i]f the defendant fails to raise a selective prosecution defense prior to trial, the defendant waives the defense[.]" *Id.* (citing Fed. R. Crim. P. 12(f)).

Two, even if a selective prosecution claim could be decided by a jury, it would have no merit here. Prosecutors are given broad discretion in deciding against whom to focus limited prosecutorial resources, and a strong "presumption of regularity supports . . . [those] decisions." *Armstrong*, 517 U.S. at 464 (citations and quotations omitted). While "the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification," defendants bear a "demanding" burden when seeking to establish that they are being selectively prosecuted in an unconstitutional manner. *Id.*

"In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present clear evidence" that the prosecution had a discriminatory effect and that it was motivated by a discriminatory purpose. *Id.* at 465. Here, there is absolutely no

25

evidence that the Defendants are being prosecuted while other similarly situated individuals are not, let alone that the reason for prosecuting the Defendants uniquely is constitutionally impermissible. *See United States v. Jordan*, 635 F.3d 1181, 1188 (11th Cir. 2011) ("[A] similarly situated person for selective prosecution purposes [is] one who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant—so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan—and against whom the evidence was as strong or stronger than that against the defendant.").

Simply put, the Defendants should not be allowed to offer evidence going only to a potential selective prosecution claim, or argue to the jury that they must or should be acquitted because they are being prosecuted selectively.

## VII.   The Court Should Prohibit the Defendants from Introducing Argument or Evidence in Furtherance of a Justification or Necessity Defense.

Drawing on many of the claims addressed in this motion, the Defendants may insist broadly that, even if they violated the statutes charged in this case, doing so was necessary to promote a greater public health good, or was justified by God or some perceived higher law. Indeed, they have been quite plain about this argument in public statements. *See, e.g.*, (ECF No. 7, Ex. 5, at 7-8) ("God commanded us to keep our temples clean! . . . The Lord told me to use these sacraments to heal the world and that is what we have been doing . . . . [T]his is a commandment with consequences. The consequences for ignoring what the Lord says in regarding to defiling our bodies is destruction, 'Him will God destroy!'"); (*id.* at 15) ("Nothing is legally right that is morally wrong.")

The statutes under which the Defendants have been charged do not expressly recognize defenses of necessity or justification.  We are also unaware of any decision holding that necessity or justification may be argued as a defense to the statutes charged in this case.  When such a defense has been allowed with respect to other statutes, the Eleventh Circuit has generally required a showing of "extraordinary circumstances."   *United States v. Deleveaux*, 205 F. 3d 1292, 1297 (11th Cir. 2000) (allowing necessity defense to 18 U.S.C. § 922(g), but ultimately finding that evidence was insufficient to warrant the defense).   Such extraordinary circumstances are not present here.[4]

The Defendants accordingly cannot suggest to the jury that, even if the government proves the elements of the charged offenses, they must be acquitted anyway because their conduct was necessary, or because it was morally, politically, or religiously justified.  *See, e.g.*, *United States v. Alvear*, 181 Fed. App'x 778 (11th Cir. 2006) (excluding trial testimony that improperly went to duress defense which had been excluded before trial).  For example, the Defendants should not be allowed to suggest to the jury that they must be acquitted because their distribution of MMS served a greater good by providing to the public a miracle cure that otherwise was being kept from it.  The idea of a "greater good" defense in this case is particularly absurd given the dangerousness of MMS and the profits that the Defendants knowingly reaped from the scheme.  Allowing the Defendants to go down such a path with the jury would be improper.

---

[4]    In order to present a necessity defense, a defendant must establish the following elements: (1) that he was under unlawful and present, imminent and impending threat of death or serious bodily injury; (2) that he did not negligently or recklessly place himself in a situation where he would be forced to engage in criminal conduct; (3) that he had no reasonable alternative to violating the law; and (4) that there was a direct causal relationship between the criminal action and the avoidance of the threatened harm. *United States v. Deleveaux*, 205 F. 3d 1292, 1297 (11th Cir. 2000).  The Defendants clearly cannot show those requirements, or even proffer enough evidence supporting them to allow the defense to be considered by a jury.

In summary, the Defendants cannot meet the criteria for any defenses of necessity or justification. Accordingly, the Court should make clear that those defenses are not available in this case, and evidence or argument that relate only to them will be excluded.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court grant the government's motion, and exclude the Defendants from introducing at trial the irrelevant evidence and arguments detailed above.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

BY:  */s/ Michael B. Homer*
MICHAEL B. HOMER
Assistant United States Attorney
Court ID No. A5502497
99 Northeast 4th Street
Miami, Florida 33132-2111
Telephone: 305-961-9289
Michael.Homer@usdoj.gov

JOHN C. SHIPLEY
Assistant United States Attorney
Senior Counsel to the Criminal Division
FL Bar No. 0069670
99 Northeast 4th Street
Miami, Florida 33132-2111
Telephone: 305-961-9111
John.Shipley@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on May 5, 2023, I caused a true and correct copy of the foregoing to be delivered via Certified Mail to *pro se* Defendants Mark Scott Grenon, Jonathan David Grenon, Jordan Paul Grenon, and Joseph Timothy Grenon at the Miami Federal Detention Center, Inmate Mail/Parcels, Post Office Box 019120, Miami, Florida 33101.

*/s/ Michael B. Homer*
MICHAEL B. HOMER
Assistant United States Attorney