1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2                          MIAMI DIVISION
                    CASE NO. 21-cr-20242-CMA
3

4     UNITED STATES OF AMERICA,          Miami, Florida

5              Plaintiff,                July 17, 2023

6         vs.                            8:19 a.m. to 4:36 p.m.

7     MARK SCOTT GRENON, JONATHAN        Courtroom 13-3
      DAVID GRENON, JORDAN PAUL
8     GRENON and JOSEPH TIMOTHY          (Pages 1 to 192)
      GRENON,
9
              Defendants.
10    _____

11                      JURY TRIAL - DAY 1
               BEFORE THE HONORABLE CECILIA M. ALTONAGA,
12              CHIEF UNITED STATES DISTRICT JUDGE

13    APPEARANCES:

14     FOR THE GOVERNMENT:    MICHAEL HOMER, ESQ.
                              JOHN SHIPLEY, ESQ.
15                            Assistant United States Attorneys
                              99 Northeast Fourth Street
16                            Miami, FL  33132-2131
                              (305) 961-9289
17                            (305) 961-9111
                              Michael.homer@usdoj.gov
18                            John.shipley@usdoj.gov

19     FOR DEFENDANT MARK     PRO SE
       SCOTT GRENON:
20

21     FOR DEFENDANT          PRO SE
       JONATHAN DAVID         ASHLEY KAY, ESQ. (Standby Counsel)
22     GRENON:                Assistant Federal Public Defender
                              150 West Flagler Street
23                            Miami, FL 33130-1536
                              (305) 533-4236
24                            Ashley_kay@fd.org

25

```
1    APPEARANCES CONTINUED:

2      FOR DEFENDANT         PRO SE
       JORDAN PAUL GRENON:    JOHN WYLIE, ESQ. (Standby Counsel)
3                            John W. Wylie, P.A.
                             40 Northwest 3rd Street, Ph 1
4                            Miami, FL 33128-1838
                             (305) 586-1338
5                            Jww@johnwylielaw.com

6
       FOR DEFENDANT         PRO SE
7      JOSEPH TIMOTHY        PAUL DONNELLY, ESQ. (Standby Counsel)
       GRENON:               Paul J. Donnelly, P.A.
8                            1 Northeast 2nd Avenue, Suite 200
                             Miami, FL 33132-2523
9                            (305) 757-3331
                             Donnellylaw@bellsouth.net
10

11     Also Present:         Jose Rivera, Special Agent

12
       REPORTED BY:          STEPHANIE A. McCARN, RPR
13                           Official Court Reporter
                             400 North Miami Avenue
14                           Thirteenth Floor
                             Miami, Florida 33128
15                           (305) 523-5518
                             Stephanie_McCarn@flsd.uscourts.gov
16

17

18

19

20

21

22

23

24

25
```

3

<pre>
                          I N D E X

                          WITNESSES


WITNESSES FOR THE GOVERNMENT:                        Page
Jose Rivera
   Direct Examination by Mr. Homer                    81




WITNESSES FOR THE DEFENDANTS:                        Page
                                                      --


EXHIBITS IN EVIDENCE              IDENTIFIED     ADMITTED

Government's Exhibit No. 1            83            84
Government's Exhibit No. 2            88            89
Government's Exhibit No. 3            91            91
Government's Exhibit No. 4            93            94
Government's Exhibit No. 5            96            96
Government's Exhibit No. 6            97            98
Government's Exhibit No. 7            98            --
Government's Exhibit No. 8           100           100
Government's Exhibit No. 12          103           104
Government's Exhibit No. 13          105           ---
Government's Exhibit No. 14          106           107
Government's Exhibit No. 15          109           109
Government's Exhibit No. 16          110           111
Government's Exhibit No. 17          110           111
Government's Exhibit No. 18          110           111
Government's Exhibit No. 19          110           111
Government's Exhibit No. 20          110           111
Government's Exhibit No. 21          110           111
Government's Exhibit No. 22          110           111
Government's Exhibit No. 23          116           117
Government's Exhibit No. 24          116           117
Government's Exhibit No. 25          116           117
Government's Exhibit No. 26          116           117
Government's Exhibit No. 26A         116           117
Government's Exhibit No. 27          116           117
Government's Exhibit No. 28A         116           117
Government's Exhibit No. 28B         116           117
Government's Exhibit No. 29          123           123
Government's Exhibit No. 30          123           123
Government's Exhibit No. 31          123           123
</pre>

```
1  EXHIBITS CONTINUED:
     Government's Exhibit No. 32          123       123
2    Government's Exhibit No. 33          123       123
     Government's Exhibit No. 34          126       126
3    Government's Exhibit No. 35          126       126
     Government's Exhibit No. 36          126       126
4    Government's Exhibit No. 37          126       126
     Government's Exhibit No. 38          130       130
5    Government's Exhibit No. 39          130       130
     Government's Exhibit No. 40          131       132
6    Government's Exhibit No. 41          131       132
     Government's Exhibit No. 42          131       132
7    Government's Exhibit No. 43          131       132
     Government's Exhibit No. 44          135       136
8    Government's Exhibit No. 45          135       136
     Government's Exhibit No. 46          141       142
9    Government's Exhibit No. 47          141       142
     Government's Exhibit No. 48          145       145
10   Government's Exhibit No. 49          145       145
     Government's Exhibit No. 50          147       147
11   Government's Exhibit No. 51          147       147
     Government's Exhibit No. 52          150       ---
12   Government's Exhibit No. 53          153       154
     Government's Exhibit No. 54          156       156
13   Government's Exhibit No. 55          159       159
     Government's Exhibit No. 56          161       161
14   Government's Exhibit No. 57          163       163
     Government's Exhibit No. 58          165       167
15   Government's Exhibit No. 59          166       167
     Government's Exhibit No. 60          168       169
16   Government's Exhibit No. 61          170       171
     Government's Exhibit No. 62          172       172
17   Government's Exhibit No. 63          172       ---
     Government's Exhibit No. 64A         175       176
18   Government's Exhibit No. 64B         175       176
     Government's Exhibit No. 64C         175       176
19   Government's Exhibit No. 64D         175       176
     Government's Exhibit No. 64E         175       176
20   Government's Exhibit No. 64F         175       176
     Government's Exhibit No. 64G         175       176
21   Government's Exhibit No. 64H         175       176
     Government's Exhibit No. 64I         175       176
22   Government's Exhibit No. 64J         175       176
     Government's Exhibit No. 64K         175       176
23   Government's Exhibit No. 64L         175       176
     Government's Exhibit No. 64M         175       176
24   Government's Exhibit No. 64N         175       176
     Government's Exhibit No. 64O         175       176
25   Government's Exhibit No. 65          179       180
```

```
 1    EXHIBITS CONTINUED:
      Government's Exhibit No. 66A              181      182
 2    Government's Exhibit No. 66B              181      182
      Government's Exhibit No. 66C              181      182
 3    Government's Exhibit No. 66D              181      182
      Government's Exhibit No. 66E              181      182
 4    Government's Exhibit No. 66F              181      182
      Government's Exhibit No. 66G              181      182
 5    Government's Exhibit No. 66H              181      182
      Government's Exhibit No. 66I              181      182
 6    Government's Exhibit No. 66J              181      182
      Government's Exhibit No. 66K              181      182
 7    Government's Exhibit No. 66L              181      182
      Government's Exhibit No. 66M              181      182

 8

 9

10

11                        MISCELLANEOUS

12                                                    Page
      Proceedings.......................................    6
13    Jury Voir Dire....................................   11
      Opening Statement on Behalf of the Government.....   67
14    Court Reporter's Certificate......................  192

15

16

17

18

19

20

21

22

23

24

25
```

Case 1:21-cr-20242-CMA   Document 298   Entered on FLSD Docket 01/03/2024   Page 6 of 192
6
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1          (The following proceedings were held at 8:19 a.m.)

2          THE COURT:  United States and Mark Grenon, Jonathan

3    Grenon, Jordan Grenon and Joseph Grenon.

4          Please state your appearances.

5          MR. HOMER:  Good morning, Your Honor.  Michael Homer

6    and John Shipley for the United States.

7          MR. SHIPLEY:  Morning.

8          THE COURT:  Morning.

9          MR. HOMER:  And with us at counsel table is Jose

10   Rivera with the FDA.

11         THE COURT:  Good morning.  Nice to see you.

12         We have all of the Defendants present and one standby

13   counsel.

14         MR. DONNELLY:  Yes, Your Honor.  I'm Paul Donnelly,

15   standby counsel for Joseph Grenon.

16         THE COURT:  Thank you.

17         Mr. Wylie, other standby counsel, called this morning.

18   He is at an airport trying to get a flight back to Miami.  He

19   will be here in time this afternoon, I believe.

20         All right.  The Grenons are all present here without

21   counsel at their choice.

22         And at the counsel table where you're seated, the

23   Grenons, you will see that there are written questionnaire

24   forms that have been filled out by jurors answering questions

25   that are on those questionnaire forms.  I invite you to read

1    through because these are among the people that you will be

2    selecting your jury from, so you might want to know something

3    about them.

4            And one of you has your hand up.

5            Do I know who that person is?  Do we know who that is?

6    Is that Jonathan?

7            THE COURT REPORTER:  I'm sorry, that's Mark -- no,

8    this is Jonathan?

9            MR. HOMER:  It is Jonathan.

10           THE COURT:  Jonathan Grenon has his hand up.  We will

11   hear from him now.

12           DEFENDANT J. D. GRENON:  This is not our court.  We

13   will not be participating.  I believe we have already addressed

14   this, Judge.  And under the Seventh Amendment, the Defendants

15   still are looking for a valid claim to be filed.

16           THE COURT:  All right.  So I will give everyone about

17   -- the Government just received these questionnaire forms, as

18   did Mr. Donnelly and the Defendants, if they choose to read

19   them.  I'll give you, what, 20, 25 minutes?  Sounds good?

20           MR. HOMER:  Thank you, Your Honor.

21           THE COURT:  Okay.  Then I'll come back.  Just sit

22   there and look at them, and if you don't want to look at them,

23   you don't.  We will see you back.

24           COURT SECURITY OFFICER:  All rise.

25       (A recess was taken from 9:04 a.m. to 9:44 a.m.)

July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

```
 1              COURT SECURITY OFFICER:  All rise.

 2              THE COURT:  Good morning.  Has everyone had the

 3   opportunity of reading the questionnaire?

 4              MR. HOMER:  Yes, Your Honor.

 5              THE COURT:  Hearing no response from Defendants.

 6              Mr. Donnelly?

 7              MR. DONNELLY:  Judge, I have.

 8              THE COURT:  Very good.  Thank you.

 9              All right.  There are two -- I think two or three

10   jurors we might want to excuse at the outset.  Juror No. 19.

11              MR. HOMER:  Because of the conflict, Your Honor, and

12   answer to 14?

13              THE COURT:  Right.  Starting a new job and doctor's

14   appointment.

15              MR. HOMER:  No objection, Your Honor.

16              THE COURT:  Juror 19 is excused.

17              Any objection from the Defendants?

18              (No audible response.)

19              THE COURT:  Again no objection from Defendants.

20              Juror No. 25.

21              MR. HOMER:  We agree, Your Honor.

22              THE COURT:  Any objection from the Defendants?

23              (No audible response.)

24              THE COURT:  Hearing no objection, excused for cause.

25              Any other cause challenges at the outset?
```

1          MR. HOMER:  We had two, Your Honor, No. 7 and No. 20,

2   both of whom in response to question No. 14 answered that they

3   would, in fact, be biased.

4          THE COURT:  No. 7, any objection from Defendants?

5          (No audible response.)

6          THE COURT:  Excused for cause.

7          What was the other one?

8          MR. HOMER:  No. 20, Your Honor.

9          THE COURT:  Yes.  Any objection from Defendants?

10          (No audible response.)

11          THE COURT:  All right.  Hearing no objection, 20 is

12   excused for cause.

13          MR. HOMER:  And then, Your Honor, the only other one,

14   though I think it is probably premature, but we would ask that

15   Your Honor question Juror No. 6 just to ensure that his or her

16   English skills are sufficient to understand the proceedings.

17   Based on some of the answers, we had some questions about that.

18          THE COURT:  Right.  I always ask if anyone has an

19   issue with the English language.

20          MR. HOMER:  Thank you, Your Honor.

21          THE COURT:  All right.  Anything else before we bring

22   the jury in?

23          MR. HOMER:  No, Your Honor.

24          THE COURT:  Okay.

25          Bring them in, please.

Case 1:21-cr-20242-CMA  Document 298  Entered on FLSD Docket 01/03/2024  Page 10 of 192
Proceedings
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA
10

 1          THE COURTROOM DEPUTY:  Yes, Judge.

 2          THE COURT:  Thank you.

 3          COURT SECURITY OFFICER:  Please remain standing for

 4    the jury.

 5          THE COURT:  I'll have the Government read out the

 6    names of potential witnesses with a point of reference as to

 7    each, so please have them handy.

 8          The Defendants never filed a witness list; am I

 9    correct?

10          MR. HOMER:  That's correct.

11          THE COURT:  All right.

12      (Pause in proceedings.)

13      (Prospective jury panel entered the courtroom at 9:47 a.m.)

14          THE COURT:  Everyone, please be seated.

15          Good morning, ladies and gentlemen, and welcome to my

16    courtroom.  My name is Cecilia Altonaga.  I'm a United States

17    District Court Judge, and we have brought you here this morning

18    in order to select a jury for the case that is about to be

19    tried.  We actually began the jury selection process a little

20    bit earlier when, in the jury room, you were asked to fill out

21    written questionnaire forms.  We have taken those forms, made

22    copies, distributed them to the parties and reviewed the

23    answers that you supplied us there.

24          We continue with the jury selection process here in

25    the courtroom, and that involves asking you some additional

```
1    questions and gathering additional information from you in

2    order to assess whether or not this is an appropriate case for

3    you to serve as a juror on.

4             All of the answers that you give to the questions that

5    we ask of you need to be given to us under oath.  So now that

6    you are comfortably seated, I would ask you to please stand

7    once more and raise your right hands so that my courtroom

8    deputy may administer your oath as perspective jurors.

9             THE COURTROOM DEPUTY:  Please raise your right hand.

10        (Time 9:51 a.m.)

11        (Prospective jury panel was sworn and testified as follows:)

12             THE PROSPECTIVE PANEL:  Yes.

13             THE COURTROOM DEPUTY:  Okay.  Please be seated.

14             THE COURT:  Thank you.

15             Ladies and gentlemen, let me just take a few minutes

16    the introduce you to those who are in the courtroom and briefly

17    explain their roles.  You have met Courtroom Deputy Warren

18    Condon, he's the gentleman who just brought you into the

19    courtroom, lined you up and gave you that oath.  He assists in

20    the administration of the cases that comprise my docket.  So if

21    you have any questions during the course of this trial, apart

22    from questions about the case being tried, you can let

23    Mr. Condon know, and he in turn will let me know that there is

24    a concern.

25             Seated to his left is the official court reporter,
```

1    Stephanie McCarn.  She takes down every word that is spoken

2    here in the courtroom, every word that I speak, as well as

3    every word that you speak when we ask questions of you.  To

4    assist her in making for a better record, I would ask that you

5    keep a few rules in mind.

6            First, please give us audible answers, like yes and no

7    instead of saying things like uh-huh and uh-uh and shaking your

8    head and using body language.  And should you forget that,

9    don't be surprised if I ask for clarification.

10           Also, please wait for the court security officers to

11   reach you with a hand-held microphone and speak into the

12   microphone once you have it.  And last, please give us your

13   juror number or name so she can identify the speaker.

14           Seated to Mr. Condon's right is a lawyer, Jack Dannon,

15   he is one of my law clerks who assists me with the cases that I

16   have on my docket.  He may be in the courtroom from time to

17   time.

18           In the very front of the courtroom to my right we have

19   -- and to the back of the courtroom by the door closest to the

20   jury, we have two court security officers, Officer Robert

21   Rodriguez and Officer Ralph Jimenez.  They are the gentlemen

22   who will be reaching you with hand-held microphones during this

23   jury selection process.  If you have questions, again, apart

24   from questions about the case, please let them know, and they

25   in turn will let me know that there is a concern that I need to

1    address.

2            Let me just ask preliminarily, going back to those

3    written questionnaires forms, is all of the information that

4    you wrote on your questionnaire form true and correct?

5            PROSPECTIVE JURY PANEL:  Yes.

6            THE COURT:  Yes?  If you should recall something that

7    you forgot to write down or need to correct something that you

8    wrote down, please let us know.

9            And I have a hand here in the second row, Officer.

10           Your juror number or name?  I'm sorry, I can't hear

11   you.

12           PROSPECTIVE JUROR:  Alonso, Mayra.

13           THE COURT:  Juror No. 8?

14           PROSPECTIVE JUROR:  Yes.

15           THE COURT:  Yes, ma'am.

16           PROSPECTIVE JUROR:  Just about the union something.

17           THE COURT:  I'm sorry?

18           PROSPECTIVE JUROR:  There is a question related to

19   union, something like that.

20           THE COURT:  To unions?

21           PROSPECTIVE JUROR:  For the job.

22           THE COURT:  All right.

23           PROSPECTIVE JUROR:  Because my position was included

24   now.  I didn't know the name of this union.

25           THE COURT:  All right.  And do you know it now?

Proceedings
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

```
1              PROSPECTIVE JUROR:  I ask.

2              THE COURT:  I'm sorry?

3              PROSPECTIVE JUROR:  I ask it now.

4              THE COURT:  So you are a pharmacy tech, and you are a

5    member of a union.

6              PROSPECTIVE JUROR:  (Shaking head.)

7              THE COURT:  All right.  Thank you, ma'am.

8              Anyone else?

9              THE PROSPECTIVE PANEL:  (No audible response.)

10             THE COURT:  Ladies and gentlemen, this jury selection

11   process is the most important part of every trial, every jury

12   trial that is, because it is at this point in the case when the

13   parties and the Court are involved in selecting the judges for

14   this case.  You see, I bear the title of judge, I preside over

15   the trial, I issue rulings on questions of law and I instruct

16   the jury on the law that it must follow in deciding the case,

17   but I don't decide the case.  It is that group of men and women

18   selected by the parties who will decide this case's outcome.

19             And what we are looking for is a group of fair and

20   impartial men and women who can judge this case fairly based

21   solely on the testimony and evidence presented here in the

22   courtroom, who can follow the law as I instruct and who can put

23   aside feelings of bias or prejudice or sympathy.

24             So the questions in the session this morning are

25   geared to gathering that information for us to determine
```

1   whether or not this is the right case for you or perhaps

2   another case would be better suited for you given your history

3   and experiences.

4        You took an oath to tell the truth.  The only correct

5   answers to give to the questions that we ask of you this

6   morning are truthful responses; please remember that.  And

7   should any particular subject matter make you uncomfortable and

8   you would prefer to discuss something privately outside the

9   presence of your fellow jurors, please let us know, and we will

10  bring you back for what we call individualized questioning.

11       We are not trying to make you more uncomfortable than

12  you probably are already being in a courtroom on a Monday

13  morning, but keep in mind the importance of what it is we are

14  doing.  And again, let us know if you would rather discuss

15  something privately.

16       Ladies and gentlemen, we are here to begin a criminal

17  trial.  You may have gathered that from the questionnaire form

18  that you filled out; it had that in the title at the very top.

19  This is the case of The United States of America versus Mark

20  Scott Grenon, Jonathan David Grenon, Jordan Grenon and Joseph

21  Grenon.

22       I am going to ask the Government's attorneys to

23  introduce themselves to you.

24       MR. HOMER:  Good morning, everybody.  My name is

25  Michael Homer.  Next to me is John Shipley.  We're federal

1    prosecutors here in Miami, and we are representing the United

2    States in this case.

3              THE COURT:  Thank you.

4              And at counsel table?

5              MR. HOMER:  Next to Mr. Shipley is José Rivera, he is

6    a special agent and criminal investigator with the U.S. Food

7    and Drug Administration.

8              THE COURT:  Thank you.

9              To the Grenons, would you like to introduce yourselves

10   to the jury?

11             (No audible response.)

12             THE COURT:  You see their names.  We have put the

13   names in front of the table so you can each identify -- so the

14   jury can identify who is Mark Grenon, Jonathan Grenon, Jordan

15   Grenon and Joseph Grenon.

16             At this time, I am going to ask the Government to read

17   out the names of potential witnesses; these are people who may

18   come into court and give testimony.

19             MR. HOMER:  Thank you, Your Honor.  The Government

20   anticipates calling two witnesses in this trial.  The first is

21   Special Agent Rivera.  The second is a doctor who's a senior

22   advisor with the FDA, he lives in Maryland and his name is

23   Dr. Arthur Simone.

24             THE COURT:  Thank you.

25             Ladies and gentlemen, do any of you know any of us who

Proceedings

July 17, 2023

USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

```
 1   have been introduced to you here this morning?

 2            THE PROSPECTIVE PANEL:  No.

 3            THE COURT:  We have a hand in the second row.

 4            PROSPECTIVE JUROR:  Yes, I know Officer Rodriguez.  I

 5   work for the City of Miami, and he used to work for the City of

 6   Miami Police.

 7            THE COURT:  And your name or juror number, please?

 8            PROSPECTIVE JUROR:  Michael Arnold, No. 10.

 9            THE COURT:  Thank you.  Thank you.

10            Anyone else?

11            THE PROSPECTIVE PANEL:  (No audible response.)

12            THE COURT:  Do any of you know each other?  Sometimes

13   we have jurors who happen to be neighbors or friends or

14   coworkers.

15            THE PROSPECTIVE PANEL:  (No audible response.)

16            THE COURT:  Ladies and gentlemen, let me go over some

17   fundamental principles that apply in every criminal case,

18   including this one.  First of all, we are here because an

19   indictment was returned charging the four Grenons with the

20   commission of crimes.  They have responded by saying, I am not

21   guilty and that's why we are here today.  The Government filed

22   this indictment, and the Government alone bears the entire

23   burden of proving the crimes charged in the indictment before

24   the Grenons can be found guilty.

25            I said quite a bit in those preliminary statements.
```

1    Let me go back to the indictment itself.  The "indictment" is a
2    charging document.  It is an accusation, nothing more.  It is
3    not evidence.
4          Can all of you follow the law in that regard?  Yes?
5          THE PROSPECTIVE PANEL:  Yes.
6          THE COURT:  The Defendants, as they sit here before
7    you today, are presumed innocent under our constitution.  That
8    presumption of innocence stays with them throughout every phase
9    of this trial until and unless it is overcome by the
10   Government's evidence showing beyond every reasonable doubt
11   that they are guilty.
12         So if, for example, we had you all squeeze into the
13   jury room behind me and render a verdict now, what is the only
14   possible verdict you could render; guilty or not guilty?
15         THE PROSPECTIVE PANEL:  Not guilty.
16         THE COURT:  Not guilty.  Can all of you give the
17   Grenons that presumption of innocence to which they are
18   entitled under our constitution?
19         THE PROSPECTIVE PANEL:  Yes.
20         THE COURT:  Yes.  Is there anyone here who cannot?
21         THE PROSPECTIVE PANEL:  (No audible response.)
22         THE COURT:  The burden of proving the Defendants
23   guilty rests with the Government, and the Government has a very
24   high burden.  Let me read to you how I will describe this at
25   the end of the trial.

1       While the Government's burden of proof is a strict or

2   heavy burden, it is not necessary that a Defendant's guilt be

3   proved beyond all possible doubt.  It is only required that the

4   Government's proof exclude any reasonable doubt concerning the

5   Defendant's guilt.

6       A "reasonable doubt" is a real doubt based upon reason

7   and common sense after careful and impartial consideration of

8   all the evidence in the case.

9       "Proof beyond a reasonable doubt" is proof of such a

10  convincing character that you would be willing to rely and act

11  upon it without hesitation in the most important of your own

12  affairs.

13      Can all of you hold the Government to that high burden

14  of proof in this case?  Yes?

15      THE PROSPECTIVE PANEL:  Yes.

16      THE COURT:  Is there anyone here who might not do so?

17      THE PROSPECTIVE PANEL:  (No audible response.)

18      THE COURT:  Now, as the accused in this case, the

19  Grenons also enjoy another fundamental constitutional right and

20  it's the right to remain silent.  Again, the Government bears

21  the entire burden of proof.  The Defendants do not have to

22  testify.  I am sure all of you have heard of the right to

23  remain silent and you studied civics.

24      So at the end of this trial, you may not hear them

25  testify.  They may not take the witness stand and give

1   testimony.  That is their right under the constitution, and you

2   cannot hold it against them if they do not testify.  It can't

3   be a strike against them.  You can't be wondering about it or

4   weighing it into your decision making.

5          Is there anyone here who thinks if you do not hear

6   Defendants testify, you may, in fact, hold it against them?

7          We have a hand in the back.

8          Yes, ma'am, juror number or name.

9          PROSPECTIVE JUROR:  Michelle McCoy.

10         THE COURT:  That's Juror No. 27.  Thank you, ma'am.

11         Anyone else?

12         There is another juror in that front row, Officer,

13  right there.

14         Yes, ma'am?

15         PROSPECTIVE JUROR:  No. 26.

16         THE COURT:  26, Thank you, ma'am.

17         Anyone else?

18         And in the back.

19         PROSPECTIVE JUROR:  Armando Diaz, 32.

20         THE COURT:  Thank you.

21         Anyone else?

22         THE PROSPECTIVE PANEL:  (No audible response.)

23         THE COURT:  Ladies and gentlemen, as judges of the

24  facts, your primary role will be to judge the credibility of

25  the witnesses who come before you.  Let me just say that you

1   come to court with life experience and you judge credibility

2   every day at home and at work.  Bring that common sense with

3   you.  Bring those experiences with you as you hear from the

4   witnesses.  Ask yourself as to each witness, does that witness

5   have an interest in the outcome of the case?  Did the -- is the

6   witness saying something here in court that is at odds with or

7   different from something that the witness might have said on

8   the prior occasion, and if so, why?

9        Is the witness being evasive or difficult in how he or

10  she answers questions?  Did the witness appear to understand

11  the questions clearly and answer them directly, or was the

12  witness being evasive?

13       I will give you more instructions on judging

14  credibility, but keep these things in mind as you listen and

15  evaluate the credibility of the witnesses who come before you.

16       Are there any law enforcement officers testifying?

17  Yes?

18       MR. HOMER:  Yes, Your Honor, Special Agent Rivera.

19       THE COURT:  Thank you.

20       Ladies and gentlemen, law enforcement officers, police

21  officers take the same oath.  Every witness is given the same

22  oath when he or she comes into court to testify.  We don't have

23  different oaths depending on your occupation and background.

24  It's the same oath to tell the truth.

25       I bring up people in law enforcement because it's been

1   my experience that sometimes there are jurors who have very

2   strong feelings about people in law enforcement.  Either very

3   positive or very negative based on your life experiences and

4   observations.

5          Is there anyone here who if you are selected to serve

6   as a juror in this case, thinks that you may judge the

7   credibility of a law enforcement officer differently than

8   another witness, either very positively or very negatively?

9          We have a hand over here.

10         PROSPECTIVE JUROR:  Michael Arnold, Juror No. 10.

11   Again, I work for the City of Miami, and I have a very vital

12   role supporting City of Miami police and fire.

13         THE COURT:  Right.  Now, the witnesses who are coming

14   here, none of them works for City of Miami police or fire,

15   right?

16         MR. HOMER:  That's correct.

17         THE COURT:  You still think you might tend to believe

18   a law enforcement officer more without knowing anything about

19   him or her?

20         PROSPECTIVE JUROR:  I do.

21         THE COURT:  Thank you.

22         Anyone else?

23         THE PROSPECTIVE PANEL:  (No audible response.)

24         THE COURT:  Ladies and gentlemen, different types of

25   evidence are introduced during the course of a trial.  The

1   testimony of witnesses, you believe what the witness is saying,

2   that is evidence that you can rely upon and consider.

3          Another type of evidence that is presented during the

4   course of the trial is physical evidence, something tangible

5   that you can touch, hold and see.  Keep in mind that most items

6   of physical evidence are only ever introduced in a trial

7   because there is a witness who can tell you something about it.

8          The last type of evidence that's introduced during the

9   course of the trial is what we call indirect evidence or

10  circumstantial evidence.  So for example, if you were all to

11  step outside now and you saw people shaking out umbrellas and

12  sidewalks were wet and the grass was wet, that would be strong

13  circumstantial evidence that it had just rained.

14         So those are the three types of evidence presented

15  during the course of the trial, and the law does not place

16  greater weight on one than another.  Your primary role as

17  judges of the facts will be to judge the strength of the

18  evidence presented and not to be so concerned about counting

19  items of evidence or counting the numbers of witnesses.

20         Ladies and gentlemen, I mentioned briefly and earlier

21  that there is no room for sympathy or prejudice, bias for or

22  against the Government or the Defendants in your role as

23  judges.

24         Is there anyone here who, as you sit here, you know

25  already that you are the type of person that feels sorry for

1    someone or has empathy or can't sit in judgment of others for

2    religious or moral reasons?

3           We have a hand over here in the box.

4           Yes, ma'am?

5           PROSPECTIVE JUROR:  Juror 20, ^ ck name I -- I am not

6    very --

7           THE COURT:  Thank you.

8           Anyone else in the second row?  Oh, in the first.

9           All right.  Yes, sir?

10          PROSPECTIVE JUROR:  Juror No. 2.

11          THE COURT:  Yes.

12          PROSPECTIVE JUROR:  I'm just sympathetic.

13          THE COURT:  I'm sorry?

14          PROSPECTIVE JUROR:  I am very sympathetic and very

15   religious and Christian.

16          THE COURT:  Thank you.

17          PROSPECTIVE JUROR:  I'm Juror No. 7, strong impasse --

18          THE COURT:  Thank you.

19          PROSPECTIVE JUROR:  -- feeling something right now.

20          THE COURT:  Thank you, ma'am.

21          Anyone else?

22          We have a hand in the back.

23          PROSPECTIVE JUROR:  26.

24          THE COURT:  Thank you, ma'am.

25          PROSPECTIVE JUROR:  25.

```
 1            THE COURT:  25.  Thank you.

 2            PROSPECTIVE JUROR:  27.

 3            THE COURT:  Thank you, ma'am.

 4            PROSPECTIVE JUROR:  Caridad Velasco.

 5            THE COURT:  Thank you, ma'am.

 6            PROSPECTIVE JUROR:  Pamela Vargas.

 7            THE COURT:  That was juror 43 [sic].

 8            Is there anyone here who has difficulty reading,

 9    speaking or understanding the English language that you think

10    will affect your ability to serve as a fair and impartial

11    juror?

12            We have a hand here.

13            Yes, ma'am?

14            I can't hear you.

15            PROSPECTIVE JUROR:  I do not speak English very well.

16            THE COURT:  This is Juror No. 4?

17            PROSPECTIVE JUROR:  Yes.

18            THE COURT:  Yes, ma'am.  Okay.

19            And just one second.  One second.  Go back to Juror 4,

20    please.  Thank you.

21            Ma'am, you are a nurse.  Are you working here in the

22    United States as a nurse?  Where do you work?

23            PROSPECTIVE JUROR:  In home healthcare.

24            THE COURT:  Home healthcare.  How many years have you

25    been in this country?
```

Proceedings
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

```
 1            PROSPECTIVE JUROR:  Ten.

 2            THE COURT:  Ten.  Thank you, ma'am.

 3            And Juror No. 1, Mr. Brazier?

 4            PROSPECTIVE JUROR:  Some of the words I don't

 5   understand sometimes, you know.  Thank you.

 6            THE COURT:  Some words you don't understand?

 7            PROSPECTIVE JUROR:  In English language.

 8            THE COURT:  All right.  Thank you.

 9            Second row.

10            PROSPECTIVE JUROR:  I am 11 number.  I have some

11   difficult to understand it, understand English.

12            THE COURT:  Okay.  So you work now for HCA Florida

13   Healthcare?

14            PROSPECTIVE JUROR:  Yes.

15            THE COURT:  As a medical technologist.

16            PROSPECTIVE JUROR:  Medical technologist.

17            THE COURT:  And how many years have you been in this

18   country, ma'am?

19            PROSPECTIVE JUROR:  Ten years.

20            THE COURT:  Ten years as well.  Thank you.

21            PROSPECTIVE JUROR:  No. 8, and my English is very

22   limited as well.  I don't understand everything.

23            THE COURT:  And how many years have you been in this

24   country, ma'am?

25            PROSPECTIVE JUROR:  15.
```

```
 1              THE COURT:  Ten as well.  All right.
 2              PROSPECTIVE JUROR:  15.
 3              THE COURT:  Ten?
 4              PROSPECTIVE JUROR:  15.
 5              THE COURT:  15, all right.
 6              Yes, ma'am.
 7              PROSPECTIVE JUROR:  I don't speak very well English.
 8              THE COURT:  I'm sorry, you are juror?
 9              PROSPECTIVE JUROR:  And I also have one kid with
10    special needs.
11              THE COURT:  Okay.  Your name or juror number, please?
12              PROSPECTIVE JUROR:  9.
13              THE COURT:  No. 9.  And your child with special needs,
14    where is he or she now?  Who is taking care of him or her right
15    now?
16              PROSPECTIVE JUROR:  With his brother.
17              THE COURT:  With his brother.  All right.  And you are
18    a scanning coordinator at Publix?
19              PROSPECTIVE JUROR:  Yes.
20              THE COURT:  What does that mean?
21              PROSPECTIVE JUROR:  The prices.
22              THE COURT:  I'm sorry?
23              PROSPECTIVE JUROR:  The prices.
24              THE COURT:  Oh, prices.  So do you work in a
25    supermarket?
```

Proceedings
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1              PROSPECTIVE JUROR:  Yes.

2              THE COURT:  Thank you, ma'am.

3              PROSPECTIVE JUROR:  You're welcome.

4              THE COURT:  Anyone else?

5              Third row.  In the back, we have some hands.

6              PROSPECTIVE JUROR:  No. 29.

7              THE COURT:  29?

8              PROSPECTIVE JUROR:  29.

9              THE COURT:  And are you understanding me okay?

10             PROSPECTIVE JUROR:  My English, is very limited.

11             THE COURT:  How many years have you been in this

12    country?

13             PROSPECTIVE JUROR:  25.  25.

14             THE COURT:  25?

15             PROSPECTIVE JUROR:  Yes.

16             THE COURT:  Okay.  Did you attend school here?

17             PROSPECTIVE JUROR:  No.

18             THE COURT:  Okay.  Thank you.

19             PROSPECTIVE JUROR:  31, Oivin Chaple.

20             THE COURT:  All right.  And how many years have you

21    been in this country?

22             PROSPECTIVE JUROR:  17.

23             THE COURT:  17?

24             PROSPECTIVE JUROR:  Yes, never student, only work.

25             THE COURT:  Thank you.

Proceedings
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

```
 1                PROSPECTIVE JUROR:  Ana Salcedo.

 2                THE COURT:  I'm sorry, ma'am.  Salcedo?  Yes, ma'am.

 3      Juror 34?

 4                PROSPECTIVE JUROR:  34.

 5                THE COURT:  And you work in -- you are a dental

 6      hygiene.

 7                PROSPECTIVE JUROR:  Dental assistant.

 8                THE COURT:  Dental assistant.  How many years have you

 9      been in this country?

10                PROSPECTIVE JUROR:  Almost 30.

11                THE COURT:  30.  Did you attend school here?

12                PROSPECTIVE JUROR:  For my course.

13                THE COURT:  For your course?

14                PROSPECTIVE JUROR:  Yes.

15                THE COURT:  And was your test in English?

16                PROSPECTIVE JUROR:  Excuse me?

17                THE COURT:  Was the exam in English to become a dental

18      hygienist?

19                PROSPECTIVE JUROR:  No.  I'm assistant.

20                THE COURT:  I see.  All right.  Thank you, ma'am.

21                PROSPECTIVE JUROR:  Thank you.

22                THE COURT:  Any other hands?

23                Ladies and gentlemen, let me talk to you briefly about

24      the schedule in this case.  We will proceed throughout the day

25      with the trial.  We will resume on Wednesday from 2:00 to 6:00,
```

Proceedings
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1    and Thursday starting in the morning, a regular trial day, and

2    we'll likely finish on Thursday, if not Friday morning.

3           Is there anyone here who, if you are selected to serve

4    as a juror in this case, cannot return with the schedule that I

5    have just laid out?

6           Starting over here, second row.

7           Yes, ma'am?

8           PROSPECTIVE JUROR:  Juror No. 7.

9           THE COURT:  7?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  All right.  Thank you.

12          That's all right.  Okay.  Thank you.

13          PROSPECTIVE JUROR:  Okay.

14          THE COURT:  Anyone else on the second row?

15          On the third?  At the end of the second row, please.

16   Oh, I'm sorry, at the end of the second row, please.  Here at

17   the very end.

18          Thank you, ma'am.

19          PROSPECTIVE JUROR:  Juror 12.

20          THE COURT:  12.  And what do you have, ma'am?

21          PROSPECTIVE JUROR:  Well, I have two full-time jobs,

22   and I only sleep four hours a day, so my scheduling conflict is

23   major.

24          THE COURT:  All right.  You have two full-time jobs?

25          PROSPECTIVE JUROR:  Correct.

1           THE COURT:  Thank you, ma'am.

2           PROSPECTIVE JUROR:  No. 19, Judy Flook.

3           THE COURT:  Yes, ma'am.  Thank you.

4           Anyone else?

5           All the way at the end.

6           PROSPECTIVE JUROR:  No. 13.

7           THE COURT:  Yes, ma'am.

8           PROSPECTIVE JUROR:  I have a doctor's appointment on

9    Wednesday that I've been waiting for for about three or four

10   months; it's very hard to get into.

11          THE COURT:  In the afternoon?

12          PROSPECTIVE JUROR:  In midday.

13          THE COURT:  Midday.  Thank you, ma'am.

14          All right.  In the back.

15          PROSPECTIVE JUROR:  26.

16          THE COURT:  I'm sorry?

17          PROSPECTIVE JUROR:  26.  Thank you.

18          THE COURT:  Next.

19          PROSPECTIVE JUROR:  No. 30.

20          THE COURT:  What do you have, sir?

21          PROSPECTIVE JUROR:  I'm a homeland security passport

22   courier.

23          THE COURT:  I'm sorry?

24          PROSPECTIVE JUROR:  Homeland security passport

25   courier.

1    THE COURT:  My question is, what conflict do you have

2  with the trial schedule?

3    PROSPECTIVE JUROR:  The problem is, I am the only one

4  qualified to deliver the passports.

5    THE COURT:  Oh, all right.  Thank you.

6    PROSPECTIVE JUROR:  No. 29.

7    THE COURT:  29, yes.  All right.

8    PROSPECTIVE JUROR:  Tomorrow is my wife's birthday.

9    THE COURT:  All right.

10    PROSPECTIVE JUROR:  I will have the day with her.

11    THE COURT:  Thank you.

12    PROSPECTIVE JUROR:  No. 25.

13    THE COURT:  Yes, thank you.

14    PROSPECTIVE JUROR:  No. 33.  I have -- Wednesday I

15  have a procedure -- my wife has a procedure, medical procedure.

16    THE COURT:  Is this Juror 33?

17    PROSPECTIVE JUROR:  Yes, Barzola.

18    THE COURT:  At what time?

19    PROSPECTIVE JUROR:  9 o'clock.

20    THE COURT:  All right.  We start at 2 o'clock in the

21  afternoon.

22    PROSPECTIVE JUROR:  But I mean, sometimes -- it's a --

23  it's a kidney stone removal, and last time they did one and now

24  she has the other one.  And the first time they say at 9:00 and

25  we end up, you know, like at 3:00 or 4 o'clock in the

```
 1    afternoon.  So you never know.

 2              THE COURT:  Thank you.

 3              PROSPECTIVE JUROR:  I do attend to endovascular

 4    procedures outside the county, and I have scheduled something

 5    for Thursday because I have procedure on Friday.

 6              THE COURT:  Thank you.

 7              PROSPECTIVE JUROR:  Thank you, Your Honor.  32,

 8    Armando Diaz.

 9              THE COURT:  Yes.

10              PROSPECTIVE JUROR:  I'm sorry if this seems trivial.

11    I spent the last six month rehearsing for my first ever

12    professional musical at the Seminole Theatre, Jekyll & Hyde,

13    and today is the opening week.  And we rehearse from, like,

14    4 p.m. till midnight, and I'm horrified because it's the jump

15    start of my career and everything's kind of happening, all this

16    at once but --

17              THE COURT:  Understood.  Thank you.

18              PROSPECTIVE JUROR:  Good morning, Your Honor.

19              THE COURT:  Good morning.

20              PROSPECTIVE JUROR:  I'm in law enforcement.  I have a

21    narcotic search warrant on Thursday and I'm also the supervisor

22    of the narcotics unit.

23              THE COURT:  Your juror number or name, please?

24              PROSPECTIVE JUROR:  45.

25              THE COURT:  45?  I'm sorry, keep the microphone.
```

1    That's Mr. Salinas?

2           PROSPECTIVE JUROR:  Yes, Your Honor.

3           THE COURT:  All right.  Thank you.

4           PROSPECTIVE JUROR:  43.

5           THE COURT:  Yes.

6           PROSPECTIVE JUROR:  My son has an appointment with the

7    maxillofacial surgeon on Thursday at 2:30.

8           THE COURT:  Thank you, ma'am.

9           First row, yes, ma'am.

10          PROSPECTIVE JUROR:  24.  I'm Odile Carro.  I'm a

11   periodontist with the University of Miami health system.

12          THE COURT:  I'm sorry, ma'am, give me your juror

13   number again.

14          PROSPECTIVE JUROR:  24.

15          THE COURT:  24?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Okay.

18          PROSPECTIVE JUROR:  Yes.  I'm a periodontist with the

19   University of Miami health system in the Jackson Memorial

20   Hospital.  I'm the only periodontist in the whole system.  So I

21   would have to -- I canceled 20 patients today to be here.  I

22   would have to cancel, I don't know, 50 patients, 60 patients.

23          THE COURT:  Understood.  Thank you.

24          Is there anyone who's glad to be here this morning?

25   Anyone happy to be here, to have been summoned for jury

Case 1:21-cr-20242-CMA   Document 298   Entered on FLSD Docket 01/03/2024   Page 35 of 192
35
Proceedings
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1    service?  I see one hand, all right, sort of two hands, sort

2    of.  Okay.  Very good.

3         We recognize -- frankly, we recognize jury service is

4    never convenient for anyone.  We never sent you a card with an

5    RSVP, come if you want, we'll have a nice party.  We summoned

6    you, and you can understand why we summon people, because

7    otherwise we don't have volunteers or very many volunteers.

8         So let me just say that we are mindful of how this is

9    impacting your time, those who are replacing you at home and at

10   work.  And part of my job is to run this trial as efficiently

11   as possible so that we don't waste your time, but also, please

12   keep in mind how important our jury is to our system of

13   justice.  This is democracy in our courts.  If we didn't have

14   jurors deciding cases, you know who would be deciding them?

15   Me.  One judge.  And I'm sure that all of you can appreciate

16   that if you found yourself in a legal predicament and you had a

17   controversy in a court of law, you would rather have a juror --

18   a set of jurors that you helped select judging your case.

19        Ladies and gentlemen, let me tell you briefly about

20   this case.  The indictment, which, again, is just a charging

21   document, charges three separate crimes against the Grenons.

22   Each crime is called a "count" in the indictment.  Count 1

23   charges that the Defendants knowingly and willfully engaged in

24   a conspiracy to defraud the United States, specifically United

25   States Food and Drug Administration, and to violate specific

Proceedings
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

```
 1      criminal laws of the United States.
 2              Counts 2 and 3 charge Jonathan and Jordan Grenon with
 3      committing contempt of court, what we call a substantive
 4      offense.
 5              So by way of background, this case will involve
 6      evidence relating to COVID-19.
 7              Does anyone here have strong feelings about COVID-19
 8      or related topics, such as vaccines, that you think will result
 9      in you not being a fair and impartial juror?
10              That's fine, I see the hand.  Thank you.
11              The case involves allegations about something that's
12      called the Genesis II Church of Health and Healing.
13              Has anyone here heard about Genesis II Church of
14      Health and Healing?
15              THE PROSPECTIVE PANEL:  (No audible response.)
16              THE COURT:  Is anyone familiar with that organization?
17              THE PROSPECTIVE PANEL:  (No audible response.)
18              THE COURT:  The case involves allegations that the
19      Defendants unlawfully conspired to sell an unapproved new drug
20      called Miracle Mineral Solution.
21              We all may have views about the healthcare system,
22      including cost and availability of drugs, but do any of you
23      have such strong feelings about these topics that I am going
24      over with you that you think you may not be able to serve as a
25      fair and impartial juror?
```

1          THE PROSPECTIVE PANEL:  (No audible response.)

2          THE COURT:  Is anyone here familiar with Miracle

3     Mineral Solution?  Have you ever heard of it?

4          THE PROSPECTIVE PANEL:  (No audible response.)

5          THE COURT:  As you heard, the case will involve

6     testimony from a witness who works for the U.S. Food and Drug

7     Administration, known as the FDA.  The FDA is responsible for

8     regulating the safe distribution of drugs in our country.

9          Has anyone here had any positive or negative

10    experiences with the FDA that you think might affect your

11    ability to judge the case fairly?

12         THE PROSPECTIVE PANEL:  (No audible response.)

13         THE COURT:  Is there anyone here who has had positive

14    or negative experiences with an agency of the federal

15    Government such as -- such that you don't think you can judge

16    the case fairly?

17         THE PROSPECTIVE PANEL:  (No audible response.)

18         THE COURT:  So in Count 1, the conspiracy count, it

19    charges the Defendants with conspiring to do three things.

20    There are three objects of the conspiracy according to the

21    Government and the Indictment.  The first object of the

22    conspiracy is that the Defendants conspired to defraud the

23    United States, that is the FDA.  To "defraud" means to

24    interfere with any of the FDA's lawful function by deceit,

25    craft or trickery, even if the FDA does not suffer a loss of

1    money or property.

2           The second object of the conspiracy charged in Count 1

3    is that the Defendants conspired to commit an offense against

4    the United States, that is to violate the FDCA which makes it a

5    federal crime for anyone to cause the introduction or delivery

6    for introduction into interstate commerce of any unapproved new

7    drug.

8           And the third object of the conspiracy charged in

9    Count 1 of the indictment is that the Defendants conspired to

10   commit another offense specifically to violate another

11   provision of the FDCA which makes it a federal crime for anyone

12   to cause the introduction or delivery for introduction into

13   interstate commerce of a misbranded drug.

14          Counts 2 and 3 which charge contempt, I will be

15   instructing you that it's a federal crime for anyone to

16   willfully disobey or resist any order of any court of the

17   United States.  And the Defendants who are charged in Counts 2

18   and 3 can be found guilty only if the Government proves beyond

19   a reasonable doubt that a court of the United States entered an

20   order of reasonable specificity, the Defendants violated the

21   order and the violation was willful.

22          Again, this all relates to the new drug called Miracle

23   Mineral Solution.

24          Now that you have a general understanding of this

25   case, a very general understanding, is there anyone here who

Case 1:21-cr-20242-CMA   Document 298   Entered on FLSD Docket 01/03/2024   Page 39 of 192
39
Proceedings
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

```
 1   thinks you cannot serve as a fair and impartial juror?

 2           THE PROSPECTIVE PANEL:  (No audible response.)

 3           THE COURT:  Is there anyone here who has any

 4   health-related restriction, difficulty sitting for extended

 5   periods of time, difficulty hearing or a health concern that

 6   you think will impair your ability to serve as a fair and

 7   impartial juror?

 8           A hand in the back.

 9           PROSPECTIVE JUROR:  Sarah Anderson.  I do have a

10   chronic pain disorder, so sitting or standing for prolonged

11   periods of time is difficult.

12           THE COURT:  Thank you, ma'am.

13           Ladies and gentlemen, I have some follow-up questions

14   for some of you.  I'd like to begin with Juror No. 3 over here.

15   I may not have questions for all of you.

16           And I believe you wrote that your wife is a law

17   enforcement officer?

18           PROSPECTIVE JUROR:  Yes; she is a 911 dispatcher.

19           THE COURT:  All right.  Is there anything about the

20   type of work that she does that you think will affect your

21   ability to judge this case fairly?

22           PROSPECTIVE JUROR:  No.

23           THE COURT:  And the matter of carrying without a

24   permit and trespass, did that involve yourself or someone close

25   to you?
```

Proceedings
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1          PROSPECTIVE JUROR:  Me.

2          THE COURT:  And would that affect your ability to

3   judge this case fairly?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  Thank you.

6          Juror No. 14.  Sir, you wrote about some people close

7   to you who have been accused of crime, some people close to you

8   who have been victims of crime and someone close to you who

9   works in law enforcement.

10          Will any of those experiences or relationships affect

11   your ability to judge this case fairly?

12          PROSPECTIVE JUROR:  No, because none of us are related

13   to what -- crime that's -- been accused of.

14          THE COURT:  Thank you.

15          Juror 15.

16          PROSPECTIVE JUROR:  Good morning.

17          THE COURT:  Ma'am, you wrote about someone close to

18   you who has been convicted or accused of a crime.  Will that

19   relationship affect your ability to judge this case fairly?

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  It will.  Thank you, ma'am.

22          Juror No. 16.

23          PROSPECTIVE JUROR:  Good morning, Your Honor.

24          THE COURT:  Good morning.  You wrote about something

25   that occurred back in 2005; was that yourself?

 1              PROSPECTIVE JUROR:  Yes.

 2              THE COURT:  Will that experience and its continued

 3    effects affect your ability to judge this case fairly?

 4              PROSPECTIVE JUROR:  No, Your Honor.

 5              THE COURT:  And the type of work that your father

 6    does, will that affect your ability to judge this case fairly?

 7              PROSPECTIVE JUROR:  No.

 8              THE COURT:  Thank you.

 9              Juror No. 18?

10              PROSPECTIVE JUROR:  Good morning.

11              THE COURT:  Good morning.  And you served on a federal

12    grand jury for a long time.  This is a short period of time in

13    comparison to that, wouldn't you say?

14              PROSPECTIVE JUROR:  That's right.

15              THE COURT:  All right.  You understand the differences

16    between the role of a grand jury and the role of a petit jury

17    in a trial?

18              PROSPECTIVE JUROR:  Yes.

19              THE COURT:  Is there anything about your prior work on

20    that grand jury that will affect your ability to judge this

21    case fairly?

22              PROSPECTIVE JUROR:  No, ma'am.

23              THE COURT:  Thank you.

24              Juror 21, good morning.

25              PROSPECTIVE JUROR:  Good morning.

Proceedings
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1        THE COURT:  You were the foreperson in a trial -- in a

2   jury, and it was a criminal case?

3        PROSPECTIVE JUROR:  Correct.

4        THE COURT:  And it was federal?

5        PROSPECTIVE JUROR:  Correct.

6        THE COURT:  How long ago was that?

7        PROSPECTIVE JUROR:  It was before COVID, so I think it

8   was either 2018 or 2019; I don't recall.

9        THE COURT:  Now, your husband who I know, he practices

10   in civil; is that right?

11        PROSPECTIVE JUROR:  Correct.

12        THE COURT:  He does not do criminal law?

13        PROSPECTIVE JUROR:  His firm does some criminal law.

14        THE COURT:  But he does not.

15        PROSPECTIVE JUROR:  Correct.

16        THE COURT:  Is there anything about your experiences,

17   you have a lot of involvement with lawyers, you know what they

18   do, you speak to your husband and your prior experience as a

19   juror, any of that that would affect your ability to judge this

20   case fairly?

21        PROSPECTIVE JUROR:  No, I don't think so.  I -- I

22   should also mention that he also worked for the Justice

23   Department before he was in private practice; that was in the

24   1990s, and he was in the civil division of federal programs.

25        THE COURT:  Thank you.  Thank you very much.

```
 1                PROSPECTIVE JUROR:  You're welcome.

 2                Juror 22.  The back.

 3                Good morning.

 4                PROSPECTIVE JUROR:  Good morning, Your Honor.

 5                THE COURT:  Ma'am, you wrote about something that

 6      occurred back in the -- some time ago, in 1997.  Was that

 7      something that happened to you?

 8                PROSPECTIVE JUROR:  Yes.

 9                THE COURT:  Is there anything about that experience

10      that would affect your ability to judge this case fairly?

11                PROSPECTIVE JUROR:  No.

12                THE COURT:  And you have someone close to you who

13      works for the Miami-Dade Police Department as a law enforcement

14      officer?

15                PROSPECTIVE JUROR:  Yeah.  Well, a cousin.

16                THE COURT:  Cousin.  Is there anything about that

17      relationship that would affect your ability to judge this case

18      fairly?

19                PROSPECTIVE JUROR:  No.

20                THE COURT:  Thank you, ma'am.

21                PROSPECTIVE JUROR:  You're welcome.

22                THE COURT:  Juror 35.

23                PROSPECTIVE JUROR:  Good morning, Your Honor.

24                THE COURT:  Good morning.  Ma'am, you have someone

25      close to you who works in law enforcement.  Would that
```

1   relationship affect your ability to judge this case fairly?

2          PROSPECTIVE JUROR:  No.

3          THE COURT:  Thank you.

4          Juror 37.  Good morning.

5          PROSPECTIVE JUROR:  Good morning.

6          THE COURT:  And, ma'am, you were the victim of a

7   crime?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  How long ago?

10          PROSPECTIVE JUROR:  About 15 years ago.

11          THE COURT:  Would that experience affect your ability

12   to judge this case fairly?

13          PROSPECTIVE JUROR:  No.

14          THE COURT:  Thank you.

15          Juror 38.

16          PROSPECTIVE JUROR:  Yes, Your Honor.

17          THE COURT:  Good morning.  And I believe you were also

18   the victim of a crime?

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  How long ago was that?

21          PROSPECTIVE JUROR:  Approximately 10 years.

22          THE COURT:  Would that experience affect your ability

23   to judge this case fairly?

24          PROSPECTIVE JUROR:  No.

25          THE COURT:  Thank you.

1          Juror 39?

2          PROSPECTIVE JUROR:  Good morning.

3          THE COURT:  Good morning.  And the lawyers that you

4   work with, do they practice in criminal or civil?

5          PROSPECTIVE JUROR:  Within the firm, I'm just with the

6   civil team.

7          THE COURT:  Okay.  But some folks in the firm practice

8   criminal as well?

9          PROSPECTIVE JUROR:  Correct.

10          THE COURT:  Is there anything about the work that you

11   do or your experiences that would affect your ability to judge

12   this case fairly?

13          PROSPECTIVE JUROR:  I don't believe so.

14          THE COURT:  Thank you.

15          And Juror 45.

16          PROSPECTIVE JUROR:  Good morning, Your Honor.

17          THE COURT:  Good morning.  When you worked in

18   corrections, that was for the State of Florida?

19          PROSPECTIVE JUROR:  That is correct.

20          THE COURT:  That was before becoming a police officer?

21          PROSPECTIVE JUROR:  That is correct.

22          THE COURT:  Would the work that you have done and are

23   currently doing affect your ability to judge this case fairly

24   and follow the law as I instruct?

25          PROSPECTIVE JUROR:  No, Your Honor.

1              THE COURT:  Thank you.

2              Ladies and gentlemen, one last point that I'd like to

3     touch with you.  You have all noticed that the four Defendants

4     are sitting at counsel table without attorneys representing

5     them.  That is their right.  Like you have the right to remain

6     silent, such as the presumption of innocence, the right to

7     represent one's self and not have a lawyer is one's right and

8     that is the right that they have elected.

9              Is there anyone here who will hold it against the

10    Defendants because they do not have counsel?

11             THE PROSPECTIVE PANEL:  (No audible response.)

12             THE COURT:  Is there anyone here who has any issue or

13    concern that I have not touched on that you would like to share

14    with us before we select the jury?

15             THE PROSPECTIVE PANEL:  (No audible response.)

16             THE COURT:  All right.  What we are going to do at

17    this point, is we are going to give you a break.  We are going

18    to ask that you wait outside on this floor; that you not

19    discuss this case, don't do any reading or research about it or

20    start looking on your phone to look up things that I have

21    mentioned.  And just wait patiently and give us some time as we

22    need to go through the list of jurors and select those of you

23    who will be serving as jurors in this case.  Don't leave the

24    floor.  Thank you very much.

25             COURT SECURITY OFFICER:  All rise for the jury.

1      (Prospective jury panel exited the courtroom at 10:37 a.m.)

2          THE COURT:  Please be seated.  At this time, I'm going

3   to run through a list of jurors that I will ask if anyone seeks

4   to challenge the juror for cause.

5          For the benefit of the Grenons, this means that you

6   can challenge a juror without any reason and because they are

7   not qualified to serve, such as they can't speak English, such

8   as they have some bias or prejudice that they can't put aside,

9   these are jurors who simply cannot serve for one reason or

10  another.  You will have the opportunity of striking other

11  jurors without cause.

12         I -- Juror No. 1, Brazier for the inability to

13  understand English.

14         MR. HOMER:  Cause, Your Honor, we agree.

15         THE COURT:  Any objection from Defendants?

16         (No audible response.)

17         THE COURT:  I hear no objection.

18         Juror No. 2, Byrd, for sympathy.

19         MR. HOMER:  Agreed, Your Honor.

20         THE COURT:  Cause.  Any objection from Defendants?

21         (No audible response.)

22         THE COURT:  Juror No. 4, Acosta, English language.

23         MR. HOMER:  Agreed, Your Honor.

24         THE COURT:  Any objection from Defendants?

25         (No audible response.)

1              THE COURT:  Juror No. 8, Alonso, for inability to

2     understand English.

3              MR. HOMER:  Agreed, Your Honor.

4              THE COURT:  Any objection from the Defendants?

5              (No audible response.)

6              THE COURT:  Juror No. 9, Jimenez De Giraldo, English

7     again.

8              MR. HOMER:  Agreed.

9              THE COURT:  Any objection from Defendants?

10             (No audible response.)

11             THE COURT:  Juror No. 10, Mr. Arnold who favors police

12    officers.

13             MR. HOMER:  Agreed, Your Honor.

14             THE COURT:  Any objection from Defendants?

15             (No audible response.)

16             THE COURT:  Juror No. 11, Morales, English language

17    again.

18             MR. HOMER:  Agreed, Your Honor.

19             THE COURT:  No objection from Defendants?

20             (No audible response.)

21             THE COURT:  All right.

22             Juror No. 12, Correa.

23             MR. HOMER:  With the two full-time jobs, we agree.

24             THE COURT:  Any objection from the Defendants?

25             (No audible response.)

1          THE COURT:  Stricken.

2          Juror No. 13, Zitnik Brown.

3          MR. HOMER:  Agreed, Your Honor.

4          THE COURT:  Any objection from Defendants?

5          (No audible response.)

6          THE COURT:  Juror No. 15, Alba.

7          MR. HOMER:  Agreed, Your Honor.

8          THE COURT:  Any objection from Defendants?

9          (No audible response.)

10          THE COURT:  Stricken.

11          Juror No. 24, Carro, the doctor with many, many

12  patients.

13          MR. HOMER:  Agreed, Your Honor.

14          THE COURT:  Any objection from Defendants?

15          (No audible response.)

16          THE COURT:  Stricken.

17          Juror No. 26, Torres.  Needs to hear from the

18  Defendants and has sympathy.

19          MR. HOMER:  One moment, Your Honor, please.

20      (Pause in proceedings.)

21          MR. HOMER:  No objection, Your Honor.

22          THE COURT:  Any objection from Defendants?

23          (No audible response.)

24          THE COURT:  Stricken.

25          Juror 27, McCoy, again, needs to hear from the

Proceedings
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

```
 1   Defendants and has sympathy.
 2           MR. HOMER:  No objection.
 3           THE COURT:  Any objection from Defendants?
 4           (No audible response.)
 5           THE COURT:  Stricken.
 6           Juror 29, Venereo, for the English language.
 7           MR. HOMER:  Agreed.
 8           THE COURT:  Any objection from Defendants?
 9           (No audible response.)
10           THE COURT:  Juror 31, Chaple, English language.
11           MR. HOMER:  Agreed, Your Honor.
12           THE COURT:  Any objection from Defendants?
13           (No audible response.)
14           THE COURT:  Stricken.
15           Juror 32, Diaz, needs to hear from the Defendants.
16           MR. HOMER:  Yes, Your Honor, and I felt for him with
17   his musical commitment.
18           THE COURT:  I wanted him to perform so we could see
19   how he is doing.
20           Anyway, any objection from Defendants?
21           (No audible response.)
22           THE COURT:  Juror 33, Barzola, with the schedule of
23   the case.
24           MR. HOMER:  Agreed, Your Honor.
25           THE COURT:  Any objection from Defendants?
```

Proceedings
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

```
1              (No audible response.)

2              THE COURT:  Stricken.

3              Juror 34, Salcedo, English language.

4              MR. HOMER:  Agreed.

5              THE COURT:  Any objection from Defendants?

6              (No audible response.)

7              THE COURT:  Stricken.

8              Juror 41, Velasco, sympathy.

9              MR. HOMER:  Agreed, Your Honor.

10             THE COURT:  Any objection from the Defendants?

11             (No audible response.)

12             THE COURT:  Stricken.

13             Juror 43, Vargas, sympathy.

14             MR. HOMER:  Agreed.

15             THE COURT:  Any objection from Defendants?

16             (No audible response.)

17             THE COURT:  Stricken.

18             Any other cause challenges?

19             MR. HOMER:  Your Honor, may I have a moment to confer?

20             THE COURT:  Yes.

21        (Pause in proceedings.)

22             THE COURT:  Joseph Grenon, did you want to consult

23   with your standby counsel, Mr. Donnelly?

24             DEFENDANT J. T. GRENON:  (No audible response.)

25             THE COURT:  No answer.
```

1    Any cause challenges from the Defendants?

2    (No audible response.)

3    (Pause in proceedings.)

4    MR. HOMER:  Your Honor, we agree that those are all

5    the appropriate cause challenges.

6    THE COURT:  I didn't hear anything else from the

7    Defendants, so how much time would you like?  Five minutes?

8    MR. SHIPLEY:  Five minutes.

9    MR. HOMER:  Five minutes would be great, Your Honor.

10   THE COURT:  All right.  We'll take five minutes.  Once

11   we return, we'll go down the list of jurors to select them.

12   To the Grenons, I am going to be asking you if you

13   accept or do not accept the juror.  By your silence, I will

14   interpret that as you accepting that juror.

15   Thank you.

16   COURT SECURITY OFFICER:  All rise.

17   (A recess was taken from 10:44 a.m. to 10:52 a.m.)

18   COURT SECURITY OFFICER:  All rise.

19   THE COURT:  Please be seated.

20   All right.  We will begin with the Government.

21   Juror No. 3?

22   MR. HOMER:  We will strike, Your Honor.

23   THE COURT:  Defendants, Juror No. 5?

24   (No audible response.)

25   THE COURT:  Defendants are silent.  I take the silence

Proceedings
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1    as acceptance.

2           Government?

3           MR. HOMER:  Accept, Your Honor.

4           THE COURT:  Government, Juror 6?

5           MR. HOMER:  I thought 6 was already struck, Your

6    Honor.

7           THE COURT:  No.  Magalie Joseph?  That's the one I

8    think you had a concern about the English but she never spoke.

9    Is that right?

10          MR. HOMER:  That is correct.  We had raised the

11   concern and then we didn't hear from her.

12          THE COURT:  She didn't speak up when I asked if

13   anybody had difficulty with English.

14          MR. HOMER:  Your Honor, if I may have just one moment?

15          THE COURT:  Yes.

16      (Pause in proceedings.)

17          MR. HOMER:  We'll strike, Your Honor.

18          THE COURT:  Defendants, Juror No. 14?

19          (No audible response.)

20          THE COURT:  Defendants are silent.  I take the silence

21   as acceptance.

22          Government?

23          MR. HOMER:  We'll strike.

24          THE COURT:  Government, 16?

25          MR. HOMER:  Accept.

```
 1              THE COURT:  Defendants?

 2              (No audible response.)

 3              THE COURT:  Defendants are silent.  I take the silence

 4     as acceptance.

 5              Defendants, Juror 17?  Do you accept?

 6              (No audible response.)

 7              THE COURT:  Defendants are silent.  By the silence, I

 8     interpret that as acceptance.

 9              Government?

10              MR. HOMER:  Accept.

11              THE COURT:  Government, Juror 18?

12              MR. HOMER:  Accept.

13              THE COURT:  Defendants, Juror 18, do you accept?

14              (No audible response.)

15              THE COURT:  Defendants are silent.  The silence is

16     interpreted as acceptance.

17              Juror 21, Government?

18              MR. HOMER:  19 was already struck, Your Honor?

19              THE COURT:  Correct.

20              MR. HOMER:  I apologize.  You asked --

21              THE COURT:  21.

22              MR. HOMER:  Accept.

23              THE COURT:  Defendants, do you accept Juror 21?

24              (No audible response.)

25              THE COURT:  The defendants are silent.  The silence is
```

1    interpreted as acceptance.

2         Defendants, Juror 22, Melissa Banks?

3         (No audible response.)

4         THE COURT:  Defendants are silent.  I interpret the

5    silence as acceptance.

6         Government?

7         MR. HOMER:  Accept.

8         THE COURT:  Government, Juror 23?

9         MR. HOMER:  Accept.

10        THE COURT:  Defendants, do you accept 23?

11        (No audible response.)

12        THE COURT:  Defendants accept 23 by their silence.

13        Government, Juror 25?

14        MR. HOMER:  Your Honor, I thought we struck 25.

15        THE COURT:  I thought we did as well.  He is stricken

16   for cause.

17        Government, 28?

18        MR. HOMER:  Accept.

19        THE COURT:  Defendants, 28?

20        (No audible response.)

21        THE COURT:  Defendants are silent signalling their

22   acceptance.

23        Defendants, Juror 40 -- I'm sorry, 30, do you accept

24   Felix Chang, Defendants?

25        (No audible response.)

1      THE COURT:  Defendants are silent.  The silence is

2  acceptance.

3          Government?

4      MR. HOMER:  We'll accept, Your Honor.

5      THE COURT:  Government, 35?

6      MR. HOMER:  Accept.

7      THE COURT:  Defendants, do you accept 35?

8      (No audible response.)

9      THE COURT:  By their silence, I interpret that as

10  acceptance.

11          Defendants, Juror 36, do you accept 36?

12      (No audible response.)

13      THE COURT:  Defendants are silent.  The silence is

14  interpreted as acceptance.

15          Government?

16      MR. HOMER:  Strike 36, Your Honor.

17      THE COURT:  Government, 37?

18      MR. HOMER:  Accept.

19      THE COURT:  Defendants, do you accept 37?

20      (No audible response.)

21      THE COURT:  I interpret the silence as acceptance.

22  The Defendants accept 37.

23          Defendants, 38?  Do you accept Juror 38?

24      (No audible response.)

25      THE COURT:  The silence is interpreted as acceptance.

Case 1:21-cr-20242-CMA   Document 298   Entered on FLSD Docket 01/03/2024   Page 57 of 192
Proceedings
July 17, 2023
57
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1          Government?

2          MR. HOMER:  Strike 38.

3          THE COURT:  Government, 39?

4          MR. HOMER:  Accept.

5          THE COURT:  Defendants, do you accept 39?

6          (No audible response.)

7          THE COURT:  By your silence, I interpret that as

8   acceptance.  That makes 12 jurors.

9          Moving on to the alternates.  Government, Juror 40?

10         MR. HOMER:  Strike, Your Honor.

11         THE COURT:  Defendants, Juror 42?

12         (No audible response.)

13         THE COURT:  By the silence, I interpret acceptance.

14         Defendants -- I'm sorry, Government, do you accept 42?

15         MR. HOMER:  Just one moment, Your Honor.

16     (Pause in proceedings.)

17         MR. HOMER:  Accept, Your Honor.

18         THE COURT:  And, Government, do you accept 44?

19         MR. HOMER:  We do.

20         THE COURT:  Defendants, do you accept 44 as your

21   second alternate on this jury?

22         (No audible response.)

23         THE COURT:  Defendants are silent; I interpret that as

24   acceptance.

25         Let me go over the names once more.

July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1       Juror No. 5, ████; 16, ███████; 17, █████████; 18,

2       ██████████; 21, ██████████; 22, ███████; 23, ██████████; 28,

3       ██████████; 30, ███████; 35, █████████; 37, ███████; 39, █████████;

4       42, ████████; and 44, ████████.

5              Does the Government accept the jury?

6              MR. HOMER:  We do, Your Honor.

7              THE COURT:  Defendants, do you accept the jury?

8              (No audible response.)

9              THE COURT:  And by your silence, I interpret that you

10      do accept this jury.

11             We will bring them in, have them sworn.  I will give

12      them some preliminary instructions.

13             How long is the Government's opening statement?

14             MR. HOMER:  About 25 minutes.

15             THE COURT:  All right.  Let's bring them in, please.

16             COURT SECURITY OFFICER:  All rise for the jury,

17      please.

18          (Prospective jury panel entered the courtroom at 10:39 a.m.)

19             THE COURT:  Everyone, please be seated.

20             Ladies and gentlemen, I wish to thank you for your

21      time and attention this morning.  I am going to call out the

22      juror numbers and last names of those jurors who have been

23      selected in this case.  If you hear your juror number and name

24      called out, it means that you were selected and you have to

25      stay in the courtroom.



1    After I finish reading all of these names, the rest of

2    you will be excused with instructions to return to the jury

3    pool section.  I believe there are other judges selecting

4    jurors -- or juries this morning.  And you may -- might be

5    needed in those cases.

6    So these are the jurors selected in this case.  Again,

7    if you hear your name called, please stay and don't leave with

8    the rest of the jurors when they exit the courtroom.

9    Juror No. 5, ▮▮▮; Juror 16, ▮▮▮▮; Juror 17,

10   ▮▮▮▮; 18, ▮▮▮▮▮; 21, ▮▮▮▮▮; 22, ▮▮▮; 23,

11   ▮▮▮▮; 28, ▮▮▮▮▮; 30, ▮▮▮; 35, ▮▮▮▮▮; 37, ▮▮▮;

12   39, ▮▮▮▮; 42, ▮▮▮▮, and 44, ▮▮▮.

13   Again, to the rest of you, thank you very much.

14   Please return to the jury pool section.

15   COURT SECURITY OFFICER:  All rise.

16   (Prospective jury panel exited the courtroom at 11:02 a.m.)

17   THE COURT:  Ms. ▮▮▮, if you step into the first row

18   all the way down, please.  Mr. ▮▮▮▮, if you could follow

19   her.  Then Mr. ▮▮▮, ▮▮▮▮, and Mr. ▮▮▮▮.  And

20   Ms. ▮▮▮▮.  Ms. ▮▮▮, if you could join them in row one.

21   And Ms. ▮▮▮.

22   In row two, Ms. ▮▮▮▮, Mr. ▮▮▮, Ms. ▮▮▮▮,

23   Ms. ▮▮▮.  ▮▮▮▮▮▮ and Ms. Vargas.

24   Ladies and gentlemen, please stand.  At this time, my

25   courtroom deputy will administer your oath as jurors in this

1    case.  Please raise your right hands.

2        (Time 11:05 a.m.)

3        (The selected jury panel was sworn.)

4            THE JURY:  Yes.

5            THE COURT:  Thank you.  Please be seated.

6            Members of the jury, now that you have been sworn, I

7    need to explain some basic principles about a criminal trial

8    and your duty as jurors.  These are preliminary instructions.

9    At the end of the trial, I will give you more detailed

10   instructions.

11           It will be your duty to decide what happened so that

12   you can determine whether the Defendants are guilty or not

13   guilty of the crimes charged in the Indictment.  At the end of

14   the trial, I will explain the law that you must follow to reach

15   your verdict.  You must follow the law as I explain it to you,

16   even if you do not agree with the law.

17           You must decide the case solely on the evidence

18   presented here in the courtroom.  As I mentioned earlier,

19   evidence can come in many forms.  It can be testimony about

20   what someone saw or heard or smelled.  It can be an exhibit

21   admitted into evidence.  It can be someone's opinion.

22           Some evidence proves a fact indirectly.  Indirect

23   evidence, what we call circumstantial evidence, is simply a

24   chain of circumstances that proves a fact as far as the law is

25   concerned.  It makes no difference whether evidence is direct

July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1   or indirect.  You may choose to believe or disbelieve either

2   kind, and you should give every piece of evidence whatever

3   weight you think it deserves.

4        Now, certain things are not evidence and must not be

5   considered.  I will list them for you now.  The statements and

6   arguments of the lawyers and any statements and arguments that

7   the Defendants who are proceeding without lawyers may make in

8   opening statement.

9        In their opening statements and closing arguments, the

10  lawyers and in this case, perhaps the Defendants, will discuss

11  the case, but their remarks are not evidence.  Questions and

12  objections of the lawyers and/or the Defendants who are

13  proceeding without counsel, the lawyers' questions are not

14  evidence.  Only the witness's answers are evidence.

15       You should not think that something is true just

16  because a lawyer's question or a parties' question suggests

17  that it is.  For instance, if a lawyer or a party asks a

18  witness, You saw the defendant hit his sister, didn't you?,

19  that question is no evidence whatsoever of what the witness saw

20  or what the Defendant did unless the witness agrees with it in

21  the witness's answer.

22       There are Rules of Evidence that control what can be

23  received into evidence.  When a lawyer or a party asks a

24  question or offers an exhibit, and a lawyer or a party on the

25  other side thinks it is not permitted by the Rules of Evidence,

1  the lawyer or the party may object.  If I overrule the

2  objection, then the question may be answered or the exhibit

3  received.

4          If I sustain the objection, then the question cannot

5  be answered and the exhibit cannot be received.  Whenever I

6  sustain an objection to a question, you must ignore the

7  question and not try to guess what the answer would have been.

8          Sometimes I may order that evidence be stricken and

9  that you disregard or ignore the evidence.  That means that

10  when you are deciding the case, you must not consider that

11  evidence.  Some evidence is admitted only for a limited

12  purpose.  When I instruct you that an item of evidence has been

13  admitted for a limited purpose, you must consider it only for

14  that limited purpose and no other.

15          As you know, this is a criminal case.  There are three

16  basic rules about a criminal case that you must keep in mind.

17  First, the Defendant is -- Defendants are presumed innocent

18  until proven guilty.  The indictment against the Defendants

19  brought by the Government is only an accusation, nothing more.

20  It is not proof of guilt or anything else.  The Defendants,

21  therefore, start out with a clean slate.

22          Second, the burden of proof is on the Government until

23  the very end of the case.  The Defendants have no burden to

24  prove their innocence or to present any evidence or to testify.

25  Since the Defendants have the right to remain silent and may

Case 1:21-cr-20242-CMA   Document 298   Entered on FLSD Docket 01/03/2024   Page 63 of 192
Proceedings                                    63
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1   choose whether to testify, you cannot legally put any weight on

2   a Defendant's choice not to testify.  It is not evidence.

3          Third, the Government must prove the Defendants' guilt

4   beyond a reasonable doubt.  I will give you further

5   instructions on this point later, but bear in mind the level of

6   proof required is high.

7          Our law requires jurors to follow certain instructions

8   regarding their personal conduct in order to help assure a just

9   and fair trial.  I will now give you those instructions.

10         Do not talk either among yourselves or with anyone

11   else about anything related to the case.  You may tell the

12   people with whom you live and your employer that you are a

13   juror and you may give them information about when you will be

14   required to be in court, but you may not discuss with them or

15   anyone else anything related to the case.

16         Do not at any time during the trial request, accept,

17   agree to accept or discuss with any person any type of payment

18   or benefit in return for supplying any information about the

19   trial.  You must promptly tell me about any incidents you know

20   of involving an attempt by any person to improperly influence

21   you or any member of the jury.

22         Do not visit or view the premises or places where the

23   charged crimes were allegedly committed.  You must not use

24   Internet maps or Google Earth or any other program or device to

25   search for a view of any location that is discussed in the

Case 1:21-cr-20242-CMA  Document 298  Entered on FLSD Docket 01/03/2024  Page 64 of 192
Proceedings
July 17, 2023
64
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1    testimony.

2          Do not read, watch or listen to any accounts or

3    discussions related to the case which may be reported by

4    newspapers, television, radio, the Internet or any other news

5    media.  Do not attempt to research any fact, issue or law

6    related to this case, whether by discussions with others, by

7    library or Internet research or by any other means or source.

8          In this age of instant electronic communication and

9    research, I want to emphasize that in addition to not talking

10   face-to-face with anyone about the case, you must not

11   communicate with anyone about the case by any other means, and

12   that includes by telephone, text message, e-mail, Internet

13   chat, chat rooms, blogs or social networking websites such as

14   Facebook or Twitter.

15         You must not provide any information about the case to

16   anyone by any means whatsoever, and that includes posting

17   information about the case or what you are doing in the case on

18   any device or Internet site including blogs, chat rooms, social

19   websites or any other means.

20         You also must not use Goggle or otherwise search for

21   any information about the case or the law that applies to it or

22   the people involved in it, including the Defendants, the

23   witnesses, the lawyers or myself.

24         It is important that you understand why these rules

25   exist and why they are so important.  Our law does not permit

July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1    jurors to talk with anyone else about the case or to permit

2    anyone to talk to them about the case because only jurors are

3    authorized to render a verdict.  Only you have been found to be

4    fair, and only you have promised to be fair.  No one else is so

5    qualified.

6           Our law also does not permit jurors to talk among

7    themselves about the case until the Court tells them to begin

8    deliberations because premature discussions can lead to a

9    premature and final decision.

10          Our law also does not permit you to visit a place

11   that's discussed in the testimony.  First, you can't be sure

12   that the place is in the same condition as it was on the day in

13   question.  Second, even if it were in the same condition, once

14   you go to a place discussed in the testimony to evaluate the

15   evidence, in light of what you see, you become a witness, no

16   longer a juror.

17          As a witness, you may now have a mistaken view of the

18   scene that neither party may have a chance to correct and that

19   is not fair.

20          Finally, our law requires that you not read or listen

21   to any news accounts of the case and that you not attempt to

22   research any fact, issue or law related to the case.  Your

23   decision must be based solely on the testimony and other

24   evidence presented in this courtroom.

25          Also, the law often uses words and phrases in special

Case 1:21-cr-20242-CMA   Document 298   Entered on FLSD Docket 01/03/2024   Page 66 of 192
Opening Statement on Behalf of the Government
July 17, 2023
66
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1   ways, so it is important that any definitions you hear come

2   only from me and not from any other source.

3          It would not be fair to the parties for you to base

4   your decision on some reporter's view or opinion or upon other

5   information you acquire outside the courtroom.  These rules are

6   designed to help guarantee a fair trial, and our law

7   accordingly sets forth serious consequences if the rules are

8   not followed.  I trust that you understand and appreciate the

9   importance of following these rules, and in accord with your

10  oath and promise, I know that you will do so.

11         Although the Defendants are being tried together, you

12  must give separate consideration to each Defendant.  In doing

13  so, you must consider which evidence in the case applies to a

14  particular Defendant and disregard any evidence admitted solely

15  against some other Defendant.  The fact that you may find one

16  of the Defendants guilty or not guilty should not control your

17  verdict as to any other defendant.

18         The trial will now begin.  First, the Government will

19  make an opening statement, which is simply an outline to help

20  you understand the evidence as it comes in.  Next, the

21  Defendants may, but do not have to, make an opening statement.

22  Opening statements are neither evidence nor argument.  The

23  Government will then present its witnesses, and Defendants may

24  cross-examine them.

25         Following the Government's case, Defendants may, if

Case 1:21-cr-20242-CMA   Document 298   Entered on FLSD Docket 01/03/2024   Page 67 of 192

Opening Statement on Behalf of the Government                    67
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1    they wish, present witnesses whom the Government may

2    cross-examine.  After all the evidence is in, the attorneys and

3    the parties will present their closing arguments to summarize

4    and interpret the evidence for you and I will instruct you on

5    the law.  After that, you will go to the jury room to decide

6    your verdict.

7            Government?

8            MR. HOMER:  Thank you, Your Honor.  With the Court's

9    permission, can I address the jury from the well?

10           THE COURT:  Yes.

11           MR. HOMER:  Madam Court Reporter, do I need a

12   microphone for that?

13           THE COURT REPORTER:  Yes.

14           OPENING STATEMENT ON BEHALF OF THE GOVERNMENT

15           MR. HOMER:  Cancer, Alzheimer's disease, HIV/AIDS,

16   leukemia, diabetes.  The Defendants sold a product which they

17   claim could cure all of those diseases, and more.  They called

18   their product Miracle Mineral Solution.  They did not develop

19   this product in a laboratory or a medical center.  They made

20   this product in a filthy, rundown shed in the backyard of their

21   home in Bradenton, Florida and then they sold it to people all

22   across the country through their online store, people who were

23   suffering from serious, often lifetime illnesses and diseases.

24           Ladies and gentlemen, this product the Defendants

25   sold, which they told people was a miracle cure, it was

opening statement on behalf of the Government
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1    industrial bleach.  That's right.  Bleach.  But there was an

2    aggressive online marketing campaign in which the Defendants

3    targeted a vulnerable population; people who were desperate for

4    a cure.  The Defendants were able to sell tens of thousands of

5    bottles of Miracle Mineral Solution and they made more than

6    $1 million.

7           Now, if you market a product as a cure for a disease

8    in America, that product is considered a drug under federal law

9    and it's, therefore, subject to regulation by the U.S. Food and

10   Drug Administration, or FDA for short.  The FDA regulates drugs

11   in order to protect the health and safety of the American

12   public.

13          It's the FDA's mission to ensure the drugs marketed in

14   this country are safe and effective.  Now, one of the primary

15   ways in which the FDA fulfills that mission is by requiring

16   that before a drug can be marketed in America, it must first be

17   approved by the FDA.  This FDA approval requirement protects

18   the health and safety of the American public by preventing

19   conmen and snake oil salesman from selling bogus drugs.

20          Miracle Mineral Solution, the products the Defendants

21   sold, was not approved by the FDA as a cure for cancer.  It was

22   not approved by the FDA as a cure for Alzheimer's disease or

23   diabetes or HIV/AIDS or leukemia.  Miracle Mineral Solution was

24   not approved by the FDA for any use whatsoever, but the

25   Defendants sold it anyway.  That's why these Defendants, Mark

Opening Statement on Behalf of the Government
July 17, 2023
69
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1    Grenon and his three sons, Jonathan Grenon, Jordan Grenon and

2    Joseph Grenon, are charged in this case with criminal

3    conspiracy, because they unlawfully worked together to

4    distribute an unapproved new drug, Miracle Mineral Solution.

5            Two of those Defendants, Jonathan and Jordan Grenon,

6    are also charged with contempt of court.  "Contempt of court"

7    is what it's called when somebody intentionally violates a

8    judge's orders.

9            Before those Defendants were arrested in this case, a

10   federal judge here in Miami issued -- excuse me, issued a

11   temporary restraining order and a preliminary injunction which

12   ordered those Defendants to immediately stop distributing their

13   unlawful bleach product.  The Defendants refused to comply.

14   They continued distributing Miracle Mineral Solution, and they

15   bragged about it in recorded interviews that you will get to

16   see during trial.  They proudly proclaimed, We are violating a

17   temporary restraining order and we don't care.

18           Now, I'd like to tell you about something called the

19   Genesis II Church of Health and Healing.  During this trial,

20   you are going to see evidence that the Defendants knew that

21   selling Miracle Mineral Solution was illegal because their

22   product had not been approved by the FDA.  So the Defendants

23   hatched a plan; they created an online church.  They called

24   that online church the Genesis II Church of Health and Healing.

25   They named themselves the bishops of that church.  They named

Opening Statement on Behalf of the Government
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA
70

1    their bleach product the sacrament of that church and then they

2    sold that sacrament through an online store they set up for

3    their church.

4         The evidence will show that the Defendants thought

5    that if they could disguise their sale of Miracle Mineral

6    Solution as some sort of religious activity, then they would be

7    able to use the First Amendment to shield their bleach product

8    from any Government regulation.

9         Somehow the notion of freedom of religion would allow

10   the Defendants to get away with committing a crime.  But this

11   was all a fraud.  The Genesis II Church of Health and Healing

12   was not a real church in any sense of the word.  There

13   certainly was no physical structure, a building, for people to

14   go to, congregate and worship.  In fact, there was no religion

15   at all.

16        Don't take my word for it.  Defendant Mark Grenon put

17   it best in a recorded interview he gave several years ago,

18   which you will see during trial, where he admitted that his

19   Genesis II Church had nothing to do with religion, and, in

20   fact, that the only reason he created that online church was so

21   that he could avoid going to jail for selling Miracle Mineral

22   Solution.  Those are his words, not mine.

23        Now, this is important, because to find the Defendants

24   guilty of criminal conspiracy, you will need to find that they

25   acted with the intent to defraud the FDA.  In other words, that

Opening Statement on Behalf of the Government
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA
71

```
 1    they acted with the intent to deceive or trick the FDA.  The

 2    evidence will show that's exactly what the Defendants intended.

 3             They knew that selling their bleach product, an

 4    unapproved new drug, was illegal because it had not been

 5    approved by the FDA.  So they created an online church through

 6    which to sell their bleach so they could use some concept of

 7    freedom of religion as a get-out-of-jail-free card.

 8             Ladies and gentlemen, that's a fraud and that's why

 9    all of you are here today.

10             The Government is going to call two witnesses during

11    this trial that you will hear from.  First, you will hear from

12    Special Agent Jose Rivera.  He is a special agent and criminal

13    investigator through the FDA's office of criminal

14    investigations.

15             He is going to tell you how he began this

16    investigation by scouring the Defendants' websites.  He spent

17    countless hours watching the promotional videos the Defendants

18    produced in which they touted the miracle healing properties of

19    drinking bleach.  He downloaded what he saw so that one day a

20    jury could see it too.  You are going to hear for yourself and

21    the Defendants own words, the wild claims they made about the

22    miracle healing properties of drinking Miracle Mineral

23    Solution.

24             Agent Rivera is going to show you and tell you how he

25    made several undercover purchases of Miracle Mineral Solution
```

Opening Statement on Behalf of the Government

July 17, 2023

USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1    from the online store the Defendants set up for the Genesis II

2    Church.  He went to that online store and saw the Miracle

3    Mineral Solution was available to obtain by donation to the

4    church; that these were not real donations.  There was no

5    option to donate as little money or as much money as he wanted.

6    There was a set sales price that he had to pay in order to get

7    the product.  It was like Amazon or any other online retailer.

8    The seller lists a price that the buyer has to pay plus

9    shipping in order to obtain the product.

10           Agent Rivera placed several orders, and the Defendants

11   shipped him the bleach he ordered for.  The Government has

12   those bottles of bleach.  And you are going to get to see them

13   and smell them for yourself during trial.

14           After Agent Rivera placed these undercover orders of

15   Miracle Mineral Solution.  He obtained a search warrant for

16   e-mail addresses that the Defendants controlled, the e-mails

17   they used to communicate with their customers.  You are going

18   to see those e-mails.  E-mails Defendants sent to each other

19   showing they were very aware that people were getting sick from

20   drinking their bleach product.

21           Customers who purchased Miracle Mineral Solution

22   routinely e-mailed the Defendants to complain about nausea

23   after taking their product, vomiting, diarrhea, sometimes even

24   hospitalizations.

25           The Defendants were not bothered.  Sometimes they

Opening Statement on Behalf of the Government
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1    accused the customer of lying, of making up the adverse

2    reaction they experienced.  Other times they told the customer,

3    Don't worry, the nausea, the vomiting, the diarrhea, that's

4    proof that the miracle solution is healing you.

5         Agent Rivera is going to tell you how the Defendants

6    exploited the COVID-19 pandemic.  In the spring of 2020, the

7    pandemic began, the world shut down, no one knew what to

8    believe.  The Defendants claimed that Miracle Mineral Solution

9    could cure COVID-19.  Their sales skyrocketed.  In just one

10   month early in the pandemic, the Defendants made more than

11   $100,000 in one month selling their bleach product as a cure

12   for coronavirus.

13        Agent Rivera is going to tell you how the FDA, back in

14   2020, the start of the pandemic, tried to stop the Defendants

15   from selling their unlawful bleach product as a COVID cure.

16   Specifically, the Government filed a civil lawsuit, not a

17   criminal case like this, but a civil lawsuit against the

18   Defendants; accused them of conspiring to violate law by

19   distributing an unapproved new drug, similar to the charge in

20   this case.

21        But in that civil case, the Government asked the

22   federal judge to order the Defendants to stop, not just stop,

23   stop immediately because of the danger caused by the

24   Defendants' actions in the midst of a public health emergency.

25   A federal judge agreed.  Again, a judge in Miami issued a

Opening Statement on Behalf of the Government
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1  temporary restraining order and then a preliminary injunction

2  which ordered those Defendants, very clearly, you must

3  immediately stop distributing Miracle Mineral Solution.  But

4  the Defendants refused.  They kept distributing their bleach

5  product, and in letters and videos you will see during trial,

6  they proudly told the judge that they would never comply with

7  their orders.

8          Finally, Agent Rivera is going to tell you about the

9  search warrant that was executed at the time of the Defendants'

10  arrests at Defendant Jonathan Grenon's home in Bradenton,

11  Florida.  He is going to tell you how inside Jonathan Grenon's

12  home, federal agents found a safe.  Inside that safe they found

13  $40,000 in cash constituting sales of Miracle Mineral Solution.

14          Agent Rivera will tell you how federal agents also

15  found in Jonathan Grenon's backyard a shed, a shed where the

16  Defendants were manufacturing their bleach product, bottling it

17  and packaging it for distribution to people all across the

18  country.  You are going to see pictures and videos of that shed

19  and all of the evidence found inside.

20          For example, you are going to see pictures of the

21  floor of that shed, the floor of the establishment where the

22  Defendants claimed they were creating the cure for cancer.  The

23  floor of that shed was covered in rodent droppings.  You are

24  also going to see huge blue metallic barrels stacked on top of

25  each other in the shed.  Those were chemical drums and they

Opening Statement on Behalf of the Government                    75
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1   contained sodium chloride powder.  Sodium chloride powder is

2   the main active ingredient in Miracle Mineral Solution.

3          The Defendants ordered this chemical from a chemical

4   manufacturer in China.  That manufacturer ships the blue

5   barrels with manufacturer's labels on the outside.  Those

6   labels did not read "miracle cure."  They did not read "for

7   medical use."  They read "toxic."

8          I want to make sure I have the labels correct.

9   "Toxic.  Harmful if swallowed.  If swallowed, call a poison

10  center.  And may cause damage to organs through prolonged or

11  repeated exposure."

12         After you have heard Agent Rivera's testimony and seen

13  all the evidence I described, you are going to hear testimony

14  from one other Government witness.  He is a doctor, and he is a

15  senior advisor with the FDA Center for Drug Evaluation and

16  Research.  This FDA senior advisor is an expert in the FDA's

17  regulation of drugs.

18         He is going to explain to you why Miracle Mineral

19  Solution is a drug under federal law, because its

20  manufacturers, the Defendants, claims that it can cure disease;

21  cancer, HIV, Alzheimer's disease and a host of other illnesses.

22  The FDA advisor will explain to you how it doesn't matter under

23  federal law whether the manufacturer of a product calls that

24  product a drug.  It doesn't matter if they say drug or not.

25  What matters is whether they claim that it can cure a disease.

Opening Statement on behalf of the Government
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA
76

1    And he will tell you that if the manufacturer claims

2    that it can cure a disease, like the Defendants did with

3    Miracle Mineral Solution, that it is a drug and it is subject

4    to regulation by the FDA.  That senior advisor is going to tell

5    you the Miracle Mineral Solution is not approved as a drug by

6    the FDA for any use at all; therefore, it's considered an

7    unapproved new drug.

8         And as I mentioned earlier, the Defendants are charged

9    with conspiring to violate federal law by distributing an

10   unapproved new drug.

11        The Defendants are also charged with conspiring to

12   violate federal law by distributing what's called a "misbranded

13   drug."  The FDA advisor will explain to you what the word

14   "misbranded" means and how the FDA prohibits the distribution

15   of misbranded drugs.  He will tell you there are two ways a

16   drug can be misbranded.  First, a drug can be misbrand if it's

17   manufactured at a facility that's not registered as a drug

18   manufacturing facility with the FDA.  And that poop infested

19   shed in the Defendant's backyard is not an FDA registered drug

20   manufacturing facility.

21        Second, a drug can be misbranded if its labelling

22   lacks directions that would enable an ordinary person to use

23   that product safely and effectively for its intended use.

24        The FDA advisor will tell you that the Defendants'

25   bleach product was misbranded because there are no instructions

Opening Statement on Behalf of the Government
July 17, 2023
77
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1  that would enable an ordinary person to drink their bleach

2  safely and effectively as a cure for cancer or as a cure for

3  COVID-19 or any of the other diseases the Defendants claimed it

4  could cure.

5       So to summarize, what you, the jury, are being asked

6  to decide in this case is simple.  Two questions:  First, did

7  the Defendants conspire to distribute a drug that had not been

8  approved by the FDA and it was misbranded?  And second, did two

9  of the Defendants, Jonathan and Jordan Grenon, intentionally

10 violate a restraining order and an injunction?  And I submit to

11 you that the Government will prove during this trial the answer

12 to both questions is yes.

13       And at the very end of trial, after you have seen and

14 heard all of this evidence, my colleague, Mr. Shipley, is going

15 to have a chance to stand up and speak with you and review all

16 that evidence with you.  And at that time, he is going to ask

17 you to return the only verdict that is consistent with all the

18 evidence in this case, that all four Defendants are guilty of

19 criminal conspiracy and Jonathan and Jordan Grenon are guilty

20 of contempt of court.

21       Thank you very much, ladies and gentlemen.

22       THE COURT:  Any opening statement from the Defendants?

23       (No audible response.)

24       THE COURT:  Ladies and gentlemen, if you wish, you may

25 take notes to help you remember -- we don't need the notebooks

Opening Statement on Behalf of the Government
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1   right now -- to remember what the witnesses say.  If you do

2   take notes, please keep them to yourself until you and your

3   fellow jurors go to the jury room to decide the case.  Do not

4   let note-taking distract you so that you do not hear other

5   answers by witnesses.

6          When you leave the courtroom, your notes should be

7   left in the jury room.  Whether or not you take notes, you

8   should rely on your own memory of what was said.  Notes are to

9   assist your memory only.  They are not entitled to any greater

10  weight than your memory or impression about the testimony.

11         Ladies and gentlemen, the First Amendment to the

12  United States Constitution establishes certain rights which

13  benefit everyone.  A person has a right to believe any religion

14  or no religion and express any point of view, but the First

15  Amendment does not protect the kind of criminal activity that

16  is charged in this case.  The First Amendment is not a defense

17  to the crimes charged in the Indictment.

18         If the Government proves all of the elements of the

19  crimes charged beyond a reasonable doubt, you must return a

20  verdict of guilty regardless of whether the Defendants' conduct

21  had some connection to religious activity.

22         Ladies and gentlemen, I think you have all been here

23  since 8:00 this morning, so we will take an early lunch break.

24  Before you break for lunch, you're going to be going into the

25  jury room where my courtroom deputy will meet with each of you

Opening Statement on Behalf of the Government
July 17, 2023
79
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1    and give you forms.  He will pass those out to have you fill

2    them out and give us contact information about yourself, and

3    that information is just for my courtroom deputy and myself to

4    have during the course of trial.  So if we need to reach you by

5    e-mail or phone, we have a way to do so.

6           He is also going to give each one of you my business

7    card which has a phone number.  And that's -- keep that

8    business card with you during the trial.  If you are ever

9    running late or have an issue, that would be the phone number

10   to call, not the jury pool section.  Once you've filled out all

11   of that information and received those cards, then you'll be

12   excused.  You can leave the courthouse for lunch or stay inside

13   the courthouse if you prefer.

14          During this break, as well as any other breaks we take

15   during the trial, please remember my instructions:  Not to

16   discuss this case with each other or with anyone else, by

17   writing, orally or in any other way.  Please avoid contact with

18   those whom you see have a relationship to the case.  You might

19   meet up with the prosecutors outside in the elevator; they

20   cannot have any contact with you or talk to you.  They are not

21   being rude, they are just avoiding the appearance of improper

22   contact.

23          After you have finished, please return to the jury

24   room.  We need you all gathered together before we bring you

25   back.  At that time, you will be hearing from the first

Opening Statement on Behalf of the Government
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA
80

1    witness.  And please don't do any reading or research about

2    this matter, this case, the names you have heard, the events as

3    described.

4         I ask that you all return and that you're back in the

5    jury room to begin by 1 o'clock.  We will see you back at 1:00.

6    Have a good lunch.

7         COURT SECURITY OFFICER:  All rise.

8      (The jury exited the courtroom at 11:38 a.m.)

9         THE COURT:  Any questions or issues before we resume

10   at 1 o'clock?

11        MR. HOMER:  No, Your Honor.

12        THE COURT:  Any questions or issues from the

13   Defendants?

14        (No audible response.)

15        THE COURT:  All right.  We're in recess.  Thank you.

16        (A lunch recess was taken from 11:39 a.m. to 1:08 p.m.)

17

18

19

20

21

22

23

24

25

```
 1                 A F T E R N O O N   S E S S I O N

 2           (1:08 p.m.)

 3           COURT SECURITY OFFICER:  All rise.

 4           THE COURT:  Are we ready for the jury?

 5           MR. HOMER:  Yes, Your Honor.

 6           THE COURT:  Let's bring the jury in, please.

 7           COURT SECURITY OFFICER:  Please remain standing for

 8   the jury.

 9       (The jury entered the courtroom at 1:08 p.m.)

10           THE COURT:  Everyone, please be seated.

11           Can you pass out those notebooks.  Thank you.

12           Government's first witness.

13           MR. HOMER:  Thank you, Your Honor.  The Government

14   calls Special Agent Jose Rivera.

15           THE COURT:  Agent, please raise your right hand.

16                   (Time:  1:10 p.m.)

17                      JOSE RIVERA,

18   a witness for the Government, testified as follows:

19           THE WITNESS:  Yes.

20           THE COURT:  Please be seated.

21                     DIRECT EXAMINATION

22   BY MR. HOMER:

23   Q.  Good afternoon, Agent Rivera.  Where are you employed, sir?

24   A.  I'm employed with the Food and Drug Administration, Office

25   of Criminal Investigations.
```

1          THE COURT:  Could you move the microphone closer to

2   you, thank you.

3   BY MR. HOMER:

4   Q.  What are the responsibilities of the FDA?

5   A.  So through regulation, the overarching mission is to ensure

6   that the medication you get as a consumer is both safe and

7   effective.

8   Q.  And what is FDA's Office of Criminal Investigations?

9   A.  Yeah.  So the Office of Criminal Investigations

10  investigates crimes that are related to FDA regulated products.

11  Q.  And what is your position there?

12  A.  I'm a special agent, criminal investigator.

13  Q.  What are some of your job responsibilities as a special

14  agent and criminal investigator?

15  A.  So basically investigate crimes and bring that forth to the

16  U.S. Attorney's Office for prosecution.

17  Q.  Are you familiar with a product called Miracle Mineral

18  Solution?

19  A.  Yes.

20  Q.  What is Miracle Mineral Solution?

21  A.  So Miracle Mineral Solution is essentially a mixture of two

22  things:  Sodium chloride liquid and an acid activator.  When

23  you mix those two together, you get chlorine dioxide which is

24  also known as Miracle Mineral Solution.

25  Q.  And are you familiar with chlorine dioxide?

Case 1:21-cr-20242-CMA   Document 298   Entered on FLSD Docket 01/03/2024   Page 83 of 192
83
Direct Examination - Cook-Reyes
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1  A.  Yes.

2  Q.  What is chlorine dioxide?

3  A.  It's an industrial bleach.  It's used for bleaching wood

4  and textiles and it's used in industrial water treatment.

5  Q.  Are either Miracle Mineral Solution or chlorine dioxide

6  approved by the FDA for any use whatsoever?

7  A.  No.

8  Q.  How did the FDA first become aware of the existence of

9  Miracle Mineral Solution?

10  A.  Through just a bunch of reports of adverse reactions.

11  Q.  What does "adverse reactions" mean?

12  A.  So an adverse reaction is basically is if someone gets

13  sick, then that's the adverse reaction.  So we were getting

14  these reports of, you know, both sickness and hospitalization.

15  Q.  And what did the FDA do in response to those reports?

16  A.  The FDA issued a warning to the public.

17  Q.  All right.  I am showing you what's been marked as

18  Government Exhibit 1.

19      (Government's Exhibit No. 1 was identified.)

20      (The exhibit was published to the jury.)

21  BY MR. HOMER:

22  Q.  Do you recognize Government Exhibit 1?

23  A.  Yes.

24  Q.  What is it?

25  A.  That is the -- the FDA's warning to the public, the warning

 1    letter.

 2            MR. HOMER:  Your Honor, permission to admit Government

 3    Exhibit 1 into evidence?

 4            THE COURT:  Hearing no objection, admitted.

 5        (Government's Exhibit No. 1 was admitted into evidence.)

 6    BY MR. HOMER:

 7    Q.  Can you please read for the jury the title of this FDA

 8    warning?

 9    A.  It says, Miracle treatment turns into potent bleach.

10    Q.  Can you read as well the summary, right here?

11    A.  Consumers are being warned not to drink a product sold on

12    the Internet as a medical treatment after some users got sick

13    after drinking it, including one person who had a

14    life-threatening reaction.

15    Q.  Several years ago did you begin investigating the

16    distribution of Miracle Mineral Solution?

17    A.  Yes.

18    Q.  And did you identify the organization that was primarily

19    responsible for distributing this product?

20    A.  Yes.

21    Q.  What was the name of that organization?

22    A.  The Genesis II Church of Health and Healing.

23    Q.  And at a high level, what is the Genesis II Church of

24    Health and Healing?

25    A.  It is an online organization made up of websites, videos of

1    infomercials and just websites that promoted and -- you know,

2    it was a place to buy -- buy the product as well.  Sorry.

3    Q.  Is there a physical Genesis Church somewhere that people

4    can go to?

5    A.  No.

6    Q.  Early in your investigation, how were you able to learn

7    first about the Genesis II Church of Health and Healing?

8    A.  From going to the websites themselves.  So their main page

9    and then kind of branching out from there.

10   Q.  And what type of information did you see on these websites?

11   A.  Information about Miracle Mineral Solution, how to buy it,

12   who sold it and, you know, what it did.  So claims of -- that

13   it can cure cancer and Alzheimer's and HIV, so on and so forth.

14   Q.  Could you purchase Miracle Mineral Solution on these

15   websites?

16   A.  Yes.

17   Q.  Did you identify who maintained and operated these

18   websites?

19   A.  Yes.

20   Q.  And who is that?

21   A.  The Defendants.

22   Q.  And to be clear, who are they?

23   A.  From right to left, Mark Grenon, Jonathan Grenon, Jordan

24   Grenon and Joseph Grenon.

25   Q.  And how do you know that those are the individuals who

1    maintained and operated the Genesis II Church websites?

2    A.   They had pictures on their websites.   They even said it

3    themselves.   In the beginning of their infomercials, they would

4    name who they were, who was present in the video.   And you

5    know, through -- you know, looking at the various websites,

6    they had pictures and also they identified themselves.

7    Q.   And are the Defendants related?

8    A.   Yes.

9    Q.   How are they related?

10   A.   Mark Grenon is the father and then Jonathan, Jordan and

11   Joseph are the three sons.

12   Q.   And on their website, what did the Defendants say Miracle

13   Mineral Solution could do?

14   A.   They said it could cure 95 percent of the world's diseases

15   to include cancer, Alzheimer's, autism, multiple sclerosis.

16   There were numerous.

17   Q.   And how did the Defendants instruct people to consume their

18   Miracle Mineral Solution?

19   A.   In various ways; mainly orally, but there is also douching,

20   enemas, inhalation and probably some others I didn't name.

21   Q.   Did these Genesis II websites describe the religion that

22   the Genesis II Church practiced?

23   A.   Yes.

24   Q.   And what was that religion?

25   A.   Nonreligious.

1   Q.   What do you mean?

2   A.   So they said that it's a nonreligious church, that anyone

3   could come, essentially.

4   Q.   And did they explain on their websites why they sold

5   Miracle Mineral Solution through this Genesis II Church?

6   A.   Yes.

7   Q.   And what did they say?

8   A.   They said specifically because they wanted to get away from

9   Government regulation.  To get -- get out of jail

10  essentially --

11  Q.   How --

12  A.   -- excuse me.

13  Q.   How did the Defendants refer to themselves on these

14  websites?

15  A.   As bishops and archbishops.

16  Q.   To your knowledge and through your investigation --

17          THE COURT REPORTER:  I'm sorry, the question again.

18  BY MR. HOMER:

19  Q.   To your knowledge and through your investigation, have any

20  of the Defendants been ordained by the Catholic church or any

21  other religious institution?

22          THE COURT REPORTER:  The answer was?

23          THE WITNESS:  No.

24  BY MR. HOMER:

25  Q.   Did the Defendants refer to Miracle Mineral Solution in

1   religious terms?

2   A.   Yes.

3   Q.   What did they call it?

4   A.   They called it the sacrament.

5   Q.   When you visited the Defendants' websites, did you take

6   screenshots and downloads of what you saw?

7   A.   Yes, I did.

8   Q.   Can you please explain that process for the jury?

9   A.   Yeah.  So when I go to capture a website or a video, I use

10  a computer software that lets me save or download whatever I am

11  seeing and that way at a later date we can then view it as if I

12  were watching it that same day.

13  Q.   I am showing you Government Exhibit 2.

14       (Government's Exhibit No. 2 was identified.)

15  BY MR. HOMER:

16  Q.   Do you recognize Government Exhibit 2?

17  A.   Yes.

18  Q.   What is it?

19  A.   That's the Genesis II Church of Health and Healing website.

20  Q.   And is it a screenshot?

21  A.   Yes.

22  Q.   Did you capture this in the same manner you just described?

23  A.   Yes.

24  Q.   Fair to say this looks what -- like the web page that you

25  visited on the day of -- when you visited it during the

1    investigation?

2    A.   Yes.

3            MR. HOMER:   Your Honor, permission to publish

4    Government Exhibit 2 into evidence and offer it for the jury?

5            THE COURT:   Any objection?

6            (No verbal response.)

7            THE COURT:   Hearing no objection, admitted.

8        (Government's Exhibit No. 2 was admitted into evidence.)

9        (The exhibit was published to the jury.)

10   BY MR. HOMER:

11   Q.   Do you see this image at the top left page?

12   A.   Yes.

13   Q.   What is that?

14   A.   That's the Genesis II Church of Health and Healing logo.

15   Q.   And do you see this individual pictured here?

16   A.   Yes.

17   Q.   Who is that?

18   A.   That's Mark Grenon.

19   Q.   All right.  Do you see what I have highlighted now in the

20   middle of Government Exhibit 2?

21   A.   Yes.

22   Q.   What are these items here?

23   A.   They are just various links that go to a different web page

24   within the website or out to other websites.

25   Q.   And do you see this image that appears to the left of most

  1    of the links that I have highlighted?

  2    A.   Yes.

  3    Q.   What is that image?

  4    A.   Those are shopping carts like you would typically see in

  5    any online store where you can go purchase items that are for

  6    sale.

  7    Q.   All right.   I am going to scroll up here.   Do you see what

  8    I have highlighted here?

  9    A.   Yes.

 10    Q.   What is that?

 11    A.   Yeah, that's their G2Voice broadcast.

 12    Q.   What is the G2Voice broadcast?

 13    A.   Yeah, so essentially the G2Voice broadcast was a weekly,

 14    like, infomercial where they would talk about the product and

 15    then talk about claims of, you know, what MMS did for users.

 16    Q.   How many broadcasts were there in total?

 17    A.   There's -- well, over 193 episodes.   It says 193 there, but

 18    that was at the time that I took the snapshot.   So there were

 19    several after that.

 20    Q.   And approximately how long in total were all of these

 21    G2Voice broadcasts?

 22    A.   361 hours, almost 362.

 23    Q.   Did you watch any of these G2Voice broadcasts?

 24    A.   Many.

 25    Q.   All right.   I'm now showing you what's been marked as

```
 1   Government Exhibit 3.

 2        (Government's Exhibit No. 3 was identified.)

 3        (The exhibit was published to the jury.)

 4   BY MR. HOMER:

 5   Q.  Pause that.  Are you familiar with Government Exhibit 3?

 6   A.  Yes.

 7   Q.  What is this?

 8   A.  Yes, that's the beginning of the -- one of the G2Voice

 9   broadcasts, specifically the G2Voice No. 6, dated October 23rd,

10   2016.  It says, "How to cure cancer and Protocol 2000."

11   Q.  Did you download this G2Voice broadcast in the manner you

12   described earlier?

13   A.  Yes.

14        MR. HOMER:  Your Honor, we'd offer Government Exhibit

15   3 into evidence, and permission to publish to the jury.

16        THE COURT:  Any objection?

17        (No audible response.)

18        THE COURT:  Hearing no objection, admitted.

19    (Government's Exhibit No. 3 was admitted into evidence.)

20        MR. HOMER:  And there is sound, hopefully it will

21   play.

22        (Audio/video exhibit played.)

23        MR. HOMER:  Pause quickly.

24   BY MR. HOMER:

25   Q.  What was that song we just listened to?
```

Case 1:21-cr-20242-CMA   Document 298   Entered on FLSD Docket 01/03/2024   Page 92 of 192
92
Direct Examination - Agent Rivera
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1  A.  It was a song that was made for the G2 broadcast about
2  Miracle Mineral Solution.
3  Q.  Roughly, how long was this broadcast?
4  A.  Two hours, over two hours.
5  Q.  We are just going to listen to a couple of segments.
6     Do you see the individuals pictured on the screen right
7  now?
8  A.  Yes.
9  Q.  Who are they?
10 A.  On the left you have Joseph Grenon and on the right you
11 have Mark Grenon.
12    (Audio/video exhibit played.)
13 BY MR. HOMER:
14 Q.  All right.  Agent Rivera, that was one clip.  Did this "How
15 to Cure Cancer" broadcast also contain any of the video
16 testimonials that Mark Grenon referenced in that clip?
17 A.  Yes, it did.
18 Q.  All right.  What is this video?
19 A.  That's the Genesis II Church testimony for lung cancer.
20 Q.  Can you describe it for the jury?
21 A.  It's just someone talking about, you know -- it's a claim
22 that someone took MMS and got cured from it.
23    (Audio/video exhibit played.)
24 BY MR. HOMER:
25 Q.  Agent Rivera, do you know who the women in that video are?

Case 1:21-cr-20242-CMA   Document 298   Entered on FLSD Docket 01/03/2024   Page 93 of 192
Direct Examination - Jonathan Rivera
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA
93

1    A.   No, I don't.

2    Q.   Did they report to FDA that they found a miracle drug that

3    can cure lung cancer?

4    A.   No.

5    Q.   What about a miracle drug that can fix a broken hand?

6    A.   No.

7    Q.   Do you recall Mark Grenon referencing something called

8    protocols in that video?

9    A.   Yes.

10   Q.   Can you tell the jury, what are the protocols?

11   A.   Yes.  So protocols are basically kind of like the dosing

12   instructions for Miracle Mineral Solution.  They have, like, a

13   starting procedure and then protocols 1000 and up.  The higher

14   the number, then you have more life-threatening illnesses.

15   Q.   All right.  I am showing you what's been previously marked

16   as Government Exhibit 4.

17       (Government's Exhibit No. 4 was identified.)

18   BY MR. HOMER:

19   Q.   Do you recognize Government Exhibit 4, Agent Rivera?

20   A.   Yes.

21   Q.   What is it?

22   A.   That's the Protocol 1000 video.

23           MR. HOMER:  I will move Government Exhibit 4 into

24   evidence at this time, Your Honor.

25           THE COURT:  Any objection?

1              (No audible response.)

2              THE COURT:  Hearing no objection, admitted.

3        (Government's Exhibit No. 4 was admitted into evidence.)

4              MR. HOMER:  Permission to publish?

5              THE COURT:  You may.

6        (The exhibit was published to the jury.)

7              (Audio/video exhibit played.)

8              MR. HOMER:  I am going to pause.

9    BY MR. HOMER:

10   Q.  Do you recognize the individual on the screen?

11   A.  Yes.

12   Q.  Who's that?

13   A.  Mark Grenon.

14       (Audio/video exhibit played.)

15             MR. HOMER:  I am going to pause quickly.

16   BY MR. HOMER:

17   Q.  Agent Rivera, do you see the bottles that Mark Grenon's

18   holding up?

19   A.  Yes.

20   Q.  Please tell the jury, what's in this green bottle?

21   A.  The green bottle is the MMS, the sodium chloride liquid.

22   Q.  And what's in the blue bottle?

23   A.  The blue bottle is the activator, so it's the hydrochloric

24   acid.

25   Q.  Thank you.

1        (Audio/video exhibit played.)

2   BY MR. HOMER:

3   Q.   Agent Rivera, do you recall Mark Grenon referencing in that

4   video his Health Restoration Center?

5   A.   Yes.

6   Q.   Could you please tell the jury, what is the Health

7   Restoration Center he is referring to?

8   A.   Yes.  So the Health Restoration Center is a center that

9   they have down in Colombia, South America where you can go meet

10   with the Grenons in person for one-on-one sessions and then

11   talk about the protocols and do the protocols while you are

12   down there.

13   Q.   And are those sessions free?

14   A.   No.

15   Q.   How much did they cost?

16   A.   Total, $5,000.

17   Q.   And who, in particular, operated that Health Restoration

18   Center in Colombia?

19   A.   Joseph Grenon and Mark Grenon.

20   Q.   All right.  So that was the Protocol 1000 we just watched.

21   What is the Protocol 2000?

22   A.   The Protocol 2000 is just for more life-threatening

23   diseases.

24   Q.   I'm showing you what's been previously marked as Government

25   Exhibit 5.

1          (Government's Exhibit No. 5 was marked for identification.)

2    BY MR. HOMER:

3    Q.   Do you recognize Government Exhibit 5?

4    A.   This is the Protocol 2000 video.

5          MR. HOMER:   Your Honor, we'd move to admit this into

6    evidence and publish it to the jury.

7          THE COURT:   No objection from Defendants?

8          (No audible response.)

9          THE COURT:   Hearing no objection, admitted.

10        (Government's Exhibit No. 5 was admitted into evidence.)

11        (The exhibit was published to the jury.)

12        (Audio/video exhibit played.)

13        MR. HOMER:   I am going to pause it briefly.

14   BY MR. HOMER:

15   Q.   Agent Rivera, are you familiar with calcium hypochlorite?

16   A.   Yes.

17   Q.   What is it?

18   A.   It is a granular substance.  It's often used for cleaning

19   out swimming pools.  It is more known as pool shock.  So if you

20   have, like, a green pool, you can throw that pool shock in

21   there, the calcium hypochlorite, and it will clean it right up.

22   Q.   And to be clear for this video, Mark Grenon is directing to

23   people to consume this?

24   A.   Yes.

25        (Audio/video exhibit played.)

Case 1:21-cr-20242-CMA   Document 298   Entered on FLSD Docket 01/03/2024   Page 97 of 192
97
Direct Examination - Agent Rivera
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1      MR. HOMER:  Just going to pause for a second.

2  BY MR. HOMER:

3  Q.  Agent Rivera, to be clear, Mark Grenon is telling people to

4  consume two things that when mixed together, are highly

5  flammable?

6  A.  Yes.

7  Q.  To cure 95 percent of the diseases known to mankind?

8  A.  Yes.

9      (Audio/video exhibit played.)

10 BY MR. HOMER:

11 Q.  Okay.  Agent Rivera, you said that there were approximately

12 200 videos and nearly 400 hours of videos on the Defendants'

13 website; is that correct?

14 A.  Yes.

15 Q.  Those were long videos; we are just going to watch a couple

16 more short clips.  I am going to show you Government Exhibit 6.

17     (Government's Exhibit No. 6 was identified.)

18 BY MR. HOMER:

19 Q.  Do you recognize Government's Exhibit 6?

20 A.  Yes.

21 Q.  What is Government Exhibit 6?

22 A.  That's another G2Voice broadcast about how to cure HIV.

23     MR. HOMER:  Your Honor, we would move Government

24 Exhibit 6 into evidence and publish it to the jury.

25     THE COURT:  Any objection from Defendants?

1          (No audible response.)

2          THE COURT:  Hearing no objection, admitted.

3      (Government's Exhibit No. 6 was admitted into evidence.)

4      (Audio/video exhibit played.)

5  BY MR. HOMER:

6  Q.  Agent Rivera, that was just a short clip.  Approximately

7  how long is the entirety of that G2Voice broadcast?

8  A.  About two hours.

9  Q.  Did you watch the entirety of that broadcast?

10 A.  Yes.

11 Q.  And generally, what was the remaining two hours about?

12 A.  It's about how to cure HIV with that Miracle Mineral

13 Solution.

14 Q.  Now I am showing you what's been marked Government Exhibit

15 7.

16     (Government's Exhibit No. 7 was identified.)

17 BY MR. HOMER:

18 Q.  Do you recognize Government Exhibit 7?

19 A.  Yes.  It is another G2Voice broadcast, specifically the

20 title of it is, "The Coronavirus is Curable!  Do you believe

21 it?  You better!"

22 Q.  And what is the number of this G2Voice broadcast?

23 A.  This was No. 182.

24 Q.  All right.  The last exhibit we saw was G2Voice No. 13.

25 This is 182.  Did you watch any of the roughly 170 other videos

1   on the Genesis website?

2   A.   Many, many of them, yes.

3   Q.   And generally speaking, what were they about?

4   A.   About curing a particular disease with the Miracle Mineral

5   Solution.

6   Q.   We are just going to watch the beginning of this video.

7        (Audio/video exhibit played.)

8            MR. HOMER:   Pausing it for one second.

9   BY MR. HOMER:

10  Q.   Agent Rivera, what was the date on this broadcast?

11  A.   March 8th, 2020.

12  Q.   I'd imagine the jury remembers, but can you tell the jury

13  what was happening in America around March 2020?

14  A.   Yeah.   That was the start of COVID.

15       (Audio/video exhibit played.)

16  BY MR. HOMER:

17  Q.   Agent Rivera, that was just a clip.   Approximately how long

18  was the entirety of that video?

19  A.   About two hours.

20  Q.   Did you watch that full video?

21  A.   Yes.

22  Q.   What was the remainder of the video about?

23  A.   About how to cure COVID with the Miracle Mineral Solution.

24  Q.   Do these G2Voice broadcasts also occasionally have

25  accompanying newsletters?

1  A.  Yes.

2  Q.  Showing you Government Exhibit 8.

3      (Government's Exhibit No. 8 was identified.)

4  BY MR. HOMER:

5  Q.  Do you recognize this document?

6  A.  Yes.

7  Q.  What is it?

8  A.  That is one of the newsletters, specifically the G2Voice

9  broadcast No. 182.  "The Coronavirus is curable!  Do you

10 believe it?  You better!"

11      MR. HOMER:  Your Honor, we would move Government's

12 Exhibit 8 into evidence and publish for the jury.

13      THE COURT:  Any objection from Defendants?

14      (No audible response.)

15      THE COURT:  Hearing no objection, admitted.

16     (Government's Exhibit No. 8 was admitted into evidence.)

17 BY MR. HOMER:

18 Q.  Agent Rivera, focusing first just on this data here, who is

19 this e-mail from?

20 A.  That is from the Genesis II Church, specifically

21 mmsnews@mmsnews.org.

22 Q.  And who is it to?

23 A.  That is to a Jose Moreno.

24 Q.  Who is Jose Moreno?

25 A.  It's an undercover identity controlled by FDA OCI.

```
 1    Q.   Controlled by who at FDA OCI in particular?
 2    A.   By me.
 3    Q.   And then scrolling up a bit.  The e-mail's been sent from
 4    Jose Moreno to Jose Rivera; that's you, correct?
 5    A.   Yes.
 6    Q.   Can you read the subject line of this e-mail?
 7    A.   Yep.  It's a forward, so it says, "G2Voice broadcast No.
 8    182, The Coronavirus is curable!  Do you believe it?  You
 9    better!"  And it has a date of March 3rd, 2020.
10    Q.   All right.  You said before that was the beginning of the
11    COVID outbreak in America, correct?
12    A.   Yes.
13    Q.   I imagine, again, the jury remembers, but can you please
14    describe the initial public reaction to the COVID-19 outbreak?
15    A.   Yeah, if anybody here remembers, I mean, there was lots of
16    confusion, lots of stuff in the media, lots of misinformation
17    that was going around.  And if you were anything like my
18    household, we were locked in our house and spraying everything
19    with alcohol and sanitizing wipes and, you know, getting
20    Instacart deliveries to the house.  So it was a -- definitely a
21    confusing time, a scary time, so.
22    Q.   When you say confusing, can you elaborate a bit what you
23    mean?
24    A.   Yeah, just all the misinformation that was going around.
25    You didn't really know, you know, what to believe.
```

Case 1:21-cr-20242-CMA   Document 298   Entered on FLSD Docket 01/03/2024   Page 102 of
192                                                                                                 102
Direct Examination, Rivera, J.
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1   Q.   And as an FDA special agent, are you familiar with the

2   FDA's work related to the pandemic back in 2020?

3   A.   Yes.

4   Q.   Can you describe that work?

5   A.   Yes.  So at FDA OCI, you know, we were going around and

6   trying to see, you know, what kind of misinformation was out

7   there and then investigating it and, you know, bringing that

8   forth to the U.S. Attorney's Office if it violated any crimes.

9   Q.   Sir, I know you are not a doctor, but as an FDA special

10  agent, do you know if there is a cure for the coronavirus?

11  A.   No, there's no cures for viruses.

12  Q.   Highlighting the second page of this newsletter, can you

13  read this whole thing for the jury, please?

14  A.   It says, "G2 Church sacramental dosing for coronavirus.

15  For adults:  6 drops activated MMS in 4 ounces of water every

16  two hours 5 times first day.  Repeat second day.  If all

17  symptoms are gone then continue with 3 drops an hour for 8

18  hours for another 3 days!

19       "For small children:  Same a [sic] above but with only 3

20  drops.  1 drop instead of 3 drops for the 3 days after the

21  first two days of strong dosing!

22       "NOTE:  This should wipe it out, this flu-like virus that

23  many are being scared with its presence in this world!"

24  Q.   Thank you, Agent Rivera.

25       Do you recall in that first video we watched, Government

1    Exhibit 3, about curing cancer, Mark Grenon referenced a man by

2    the name of Jim Humble?

3    A.   Yes.

4    Q.   Who is Jim Humble?

5    A.   Jim Humble was the cofounder of the church and he

6    discovered MMS.

7    Q.   And is Jim Humble still affiliated with the Genesis II

8    Church?

9    A.   No, he retired.

10   Q.   Approximately how old is Jim Humble now?

11   A.   Over 90 years old.

12   Q.   Showing you what's been marked as Government Exhibit 12.

13        (Government's Exhibit No. 12 was identified.)

14   BY MR. HOMER:

15   Q.   Do you recognize this document?

16   A.   Yes.

17   Q.   What is it?

18   A.   That's Jim Humble's website.

19        MR. HOMER:   We'd offer this into evidence at this

20   time, Your Honor, and ask for permission to publish for the

21   jury.

22        THE COURT:   Any objection from Defendants?

23        (No audible response.)

24        THE COURT:   Hearing no objection, admitted.   You may

25   do so.

1    (Government's Exhibit No. 12 was admitted into evidence.)

2    (The exhibit was published to the jury.)

3  BY MR. HOMER:

4  Q.   Okay, Agent Rivera, I'd ask you to read this first

5  paragraph on Jim Humble's website.

6  A.   Yep.  It says, "I want to tell you about a breakthrough

7  that can save your life or the life of a loved one.  In 1996

8  while on a gold mining expedition in South America, I

9  discovered that chlorine dioxide quickly eradicates milaria.

10 Since that time, it has proven to restore partial or full

11 health to hundreds of thousands of people suffering from a wide

12 range of disease, including cancer; diabetes; hepatitis A, B,

13 C; Lyme's disease; MRSA; multiple sclerosis; Parkinson's;

14 Alzheimer's; HIV/AIDS; milaria; autism; infections of all

15 kinds; arthritis; high cholesterol; acid reflux; kidney or

16 liver diseases; aches and pains; allergies; urinary tract

17 infections; digestive problems; high blood pressure; obesity;

18 parasites; tumors and cysts; depression; sinus problems; eye

19 disease; ear infections; Dengue fever; skin problems; dental

20 issues; problems with prostate, high PSA; erectile dysfunction,

21 and the list goes on.  This is by far not a comprehensive list.

22 I know it sounds too good to be true, but according to feedback

23 I received over the last 20 years, I think it's safe to say MMS

24 has the potential to overcome most diseases known to mankind."

25 Q.   Thank you, Agent Rivera.

1          This Jim Humble web page, was this linked to on the

2    Defendants' Genesis II Church websites?

3    A.    Yes.

4    Q.    You testified earlier that the Defendants and Jim Humble

5    acknowledged that their Genesis II Church wasn't actually

6    religious; is that correct?

7    A.    That's correct, yes.

8    Q.    Showing you what's been marked as Government Exhibit 13.

9          (Government's Exhibit No. 13 was identified.)

10   BY MR. HOMER:

11   Q.    Do you recognize this?

12   A.    That's the Genesis II website, specifically the -- about

13   the section about the church.

14   Q.    I am highlighting a paragraph from that.  Can you please

15   read that paragraph for the jury from the Defendants' own

16   website?

17   A.    Yes.  It says, "The Genesis II Church of Health and Healing

18   is a nonreligious church welcoming people from all walks of

19   life, religions, colors, creeds and belief systems.  We are a

20   health church and focus on restoring health to the world.  The

21   only prerequisite for becoming a member of the Genesis II

22   Church of Health and Healing is being in support of the

23   following beliefs."

24   Q.    Fair to say that most churches have some religious purpose?

25   A.    Yes.

1   Q.  Did the Defendants ever explain why they distributed

2   Miracle Mineral Solution under the guise of this church?

3   A.  Yes.

4   Q.  What did they say?

5   A.  To get around Government regulation and to not go to jail.

6   Q.  Who first decided to establish the Genesis II Church?

7   A.  Mark Grenon.

8   Q.  Anyone else?

9   A.  Jim Humble.

10  Q.  And approximately what time was that?  What year was that,

11  excuse me?

12  A.  What years?  Around 2010.

13  Q.  And that's around the same time as that Government Exhibit

14  1, the time when the FDA began warning consumers not to consume

15  this product because it was bleach?

16  A.  Yes.

17  Q.  Showing you what's been marked as Government Exhibit 14.

18      (Government's Exhibit No. 14 was identified.)

19  BY MR. HOMER:

20  Q.  Do you recognize this document?

21  A.  Yes.

22  Q.  What is it?

23  A.  One of the newsletters.

24      MR. HOMER:  Your Honor, we would ask that it be

25  admitted into evidence and published to the jury.

1    THE COURT:  Any objection from Defendants?

2         (No audible response.)

3         THE COURT:  Hearing no objection, admitted.  You may.

4      (Government's Exhibit No. 14 was admitted into evidence.)

5      (The exhibit was published to the jury.)

6   BY MR. HOMER:

7   Q.  Who is this newsletter from?  Who wrote it?

8   A.  That was Jim Humble.

9      (The exhibit was published to the jury.)

10        MR. HOMER:  We are going to go back up to the very top

11   of this newsletter.

12  BY MR. HOMER:

13  Q.  Okay.  Can you read the very first paragraph of the

14  newsletter, please?

15  A.  Yes.  It says, "Saludos from the Dominican Republic.  The

16  first MMS training seminar in the Dominican Republic has now

17  concluded.  Many thanks to the 26 people who came to this

18  historic course.  Everyone seemed to be very happy and

19  enthusiastic about the MMS information and practical ideas that

20  they learned and took their doses of MMS.  In fact, I really

21  feel that I can say that it was a fantastic success.  Ten

22  countries from all over the world were represented and everyone

23  became friends."

24  Q.  Okay.  I am going to scroll to the bottom of Page 2.  This

25  paragraph titled, The Genesis II Church of Health and Healing,

1    can you please read that paragraph for the jury, Agent Rivera?

2    A.   It says, "Genesis II Church of Health and Healing, let me

3    tell you one other important concept that was introduced to the

4    group that was here at our first seminar.  Now, hold onto your

5    chair and don't get upset until you have read it all.  Some of

6    the group here got upset at first, too, but they all left here

7    agreeing we have a tremendous idea for not only curing people,

8    but for changing the world as well.  So here it is, we are

9    forming a church of health and healing.  Now, that's not

10   religion, that's health and healing.  It is called Genesis II

11   Church of Health and Healing.  Genesis meaning the beginning

12   and II means the second beginning and this is the beginning of

13   a new world without disease."

14   Q.   Okay.  We are going to go to the next paragraph.  All

15   right.  Starting with the word "that," can you read this

16   paragraph, please?

17   A.   "That is what we will be doing, but there is a lot more to

18   it than that.  Do you understand the power that a church has

19   that hasn't given up its power?  Look at the Catholics.  Their

20   priests have been molesting women and children for centuries

21   and the governments have not been able to stop it.  If handled

22   properly, a church can protect us."

23   Q.   And have the Defendants, the Grenons, made any similar

24   admissions to these made by Jim Humble?

25   A.   Yes.

Direct Examination of Agent Rivera
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1   Q.   Showing you Government Exhibit 15.

2        (Government's Exhibit No. 15 was identified.)

3   BY MR. HOMER:

4   Q.   Are you familiar with Government Exhibit 15?

5   A.   Yes.   That's the Age of Truth video.   It's an interview

6   with the Grenons.

7             MR. HOMER:   Your Honor, we would move Government

8   Exhibit 15 into evidence and ask to publish it for the jury.

9             THE COURT:   Any objections from Defendants?

10            (No audible response.)

11            THE COURT:   Hearing no objection, admitted.

12       (Government's Exhibit No. 15 was admitted into evidence.)

13            THE COURT:   You may publish.

14       (The exhibit was published to the jury.)

15  BY MR. HOMER:

16  Q.   And how long was this video interview?

17  A.   Approximately two hours as well.

18  Q.   Okay.   We are just going to listen to a couple segments.

19       (Audio/video exhibit played.)

20            MR. HOMER:   All right.   We are going to watch one more

21  clip.

22            (Audio/video exhibit played.)

23  BY MR. HOMER:

24  Q.   Agent Rivera, the seminar with the Internet marketers that

25  Mark Grenon referenced in that video where he decided to create

1  this church to avoid going to jail, is that the same seminar

2  described by Jim Humble in the newsletter we previously saw?

3  A.   Yes.

4  Q.   All right.  After reviewing all of the online material that

5  we've discussed today, what was the next step you took in your

6  investigation?

7  A.   Yeah, I conducted an undercover purchase of the Miracle

8  Mineral Solution.

9  Q.   Okay.  I am going to show you Government Exhibits 16, 17,

10  18, 19, 20, 21 and 22, quickly.

11      (Government's Exhibit Nos. 16, 17, 18, 19, 20, 21 and 22

12       were identified.)

13  BY MR. HOMER:

14  Q.   You can identify them at once because they are related.

15  16, 17, 18, 19, and 22.

16      (The exhibit was published to the jury.)

17  BY MR. HOMER:

18  Q.   Do you recognize those documents?

19  A.   Yes, the Genesis website and online store.

20  Q.   And these are screenshots you took when making your

21  undercover purchase?

22  A.   Yes.

23          MR. HOMER:  Your Honor, we move to admit Government's

24  Exhibit 16 through 22 at this point.

25          THE COURT:  Any objection from Defendants?

1          (No audible response.)

2          THE COURT:  Hearing no objection, admitted.  You may

3    publish.

4      (Government's Exhibit Nos. 16, 17, 18, 19, 20, 21 and 22

5       were admitted into evidence.)

6          MR. HOMER:  Thank you.  This is Government Exhibit 16.

7      (The exhibit was published to the jury.)

8    BY MR. HOMER:

9    Q.  This is still the main Genesis II Church website, correct?

10   A.  Yes.

11   Q.  And I will highlight the very top of this page.  What does

12   this read here?

13   A.  Yeah.  That was the United States provider Genesis II

14   Church provider.  It says, "G2 Sacraments Church, Chapter No.

15   001" with the website of G2sacraments.org.

16   Q.  And did you click that website, G2sacraments.org?

17   A.  Yes.

18   Q.  Where does it take you?

19   A.  It redirected to newg2sacraments.org.

20   Q.  And is that another website maintained by the Defendants?

21   A.  Yes.

22   Q.  Here is Government Exhibit 17.

23       (The exhibit was published to the jury.)

24   BY MR. HOMER:

25   Q.  What are we looking at?

1   A.   That is the newg2sacraments.org website.

2   Q.   And what is the title of this document?

3   A.   It says, "Donate for the G2 sacraments."

4   Q.   What does it read here in the body of the website?

5   A.   "Welcome to the Genesis 2 Church Sacramental Provider

6   website.  All sacraments and products are to be acquired by

7   donation.  The Genesis II Church is a free church under common

8   law and is not under commercial law.  Please enjoy our

9   easy-to-use donation website."

10  Q.   Did you explore the products that were listed for sale on

11  this website?

12  A.   I did, yes.

13  Q.   And could you donate any amount you wanted to obtain the

14  products?

15  A.   No.

16  Q.   Can you describe that for the jury, please?

17  A.   Yes.  They were just purchase prices for the products they

18  had on the websites.

19  Q.   All right.  Here is Government Exhibit 18.

20       (The exhibit was published to the jury.)

21  BY MR. HOMER:

22  Q.   What are we looking at here, Agent Rivera?

23  A.   That's the single sacraments page.

24  Q.   And the very first item listed for sale?

25  A.   That's the Miracle Mineral Solution.

1   Q.  What was the price listed?

2   A.  $15 for the 4-ounce bottle.

3   Q.  What does it read below that?

4   A.  "Add donation to cart."

5   Q.  Just to be very clear, could you pay less than $15 and

6   obtain Miracle Mineral Solution?

7   A.  No.

8   Q.  Showing you Government Exhibit 19.

9      (The exhibit was published to the jury.)

10  BY MR. HOMER:

11  Q.  What are the items listed for sale in Government Exhibit

12  19, starting left to right?

13  A.  Yeah.  So you have the G2 sacramental kit, which is the

14  activator and MMS for $20.  In the middle, you have the

15  activator and MMS and also the DMSO, they call that one the G2

16  Sacramental Kit 2; that's $30.  And on the right, you have then

17  the MMS2 in capsules for $15.

18  Q.  To be clear, did you need to be a member in some way of the

19  Genesis Church to purchase these products?

20  A.  No.

21  Q.  Showing you Government Exhibit 20.

22     (The exhibit was published to the jury.)

23  BY MR. HOMER:

24  Q.  Did you, in fact, purchase any of these products, Agent

25  Rivera?

Case 1:21-cr-20242-CMA   Document 298   Entered on FLSD Docket 01/03/2024   Page 114 of
192                                                                                          114
Direct Examination - Joseph Vazquez
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1    A.   Yes.

2    Q.   What did you purchase?

3    A.   I purchased the G2 Sacramental Kit 2 and the MMS2 in

4    capsules.

5    Q.   Government Exhibit 21, highlighting the billing details.

6         (The exhibit was published to the jury.)

7    BY MR. HOMER:

8    Q.   Who is Russell Henderson?

9    A.   Russell Henderson is an undercover identity controlled by

10   FDA OCI.

11   Q.   Specifically, who controlled that?

12   A.   Me.

13   Q.   And scrolling down, what is that shipping address that is

14   listed here?

15   A.   Yeah, the address is an undercover address that's

16   controlled by FDA OCI.

17   Q.   And to be clear, you inputted this information into the

18   website?

19   A.   Yes.

20   Q.   Can you read the e-mail address that's listed there?

21   A.   Yes, it's Pelikanentint@yahoo.com.

22   Q.   And whose e-mail address is that?

23   A.   That's also an undercover e-mail address that FDA OCI

24   controls.

25   Q.   And can you read this for me right here that I've

1    highlighted?

2    A.   "Check the box to subscribe to our newsletter."

3    Q.   Did you, in fact, subscribe to the newsletter?

4    A.   I did, yes.

5    Q.   And the newsletter, just to be clear, that's the document

6    -- the type of document we saw earlier, The Coronavirus is

7    Curable, correct?

8    A.   Yes.

9    Q.   Showing you Government Exhibit 22.

10        (The exhibit was published to the jury.)

11   BY MR. HOMER:

12   Q.   What is Government Exhibit 22?

13   A.   That's an order confirmation, kind of receipt.

14   Q.   And what does it say up top?

15   A.   It says, "Thank you, Russell, for your donation."

16   Q.   Was this in any way a donation such that you could have

17   paid less than $45 plus $10 for shipping?

18   A.   No, that was the purchase price.

19   Q.   Going back to Government Exhibit 17.

20        (The exhibit was published to the jury.)

21   BY MR. HOMER:

22   Q.   Were those items that you purchased available in the bulk

23   sacraments or G2 Sacramental products category?

24   A.   It was in the G2 Sacramental products section.

25   Q.   Did you also explore any of the products that were

1  available for sale in the bulk sacraments category?

2  A.  I did, yes.

3  Q.  Can you describe for the jury an example of one of the bulk

4  sacraments --

5  A.  Yes.  I'm sorry.

6      If you wanted to purchase a lot of MMS and activator, you

7  could buy them in bulk in this section.  So just to give an

8  example of one of them, like a 40 bottle set would cost you

9  about $900.

10  Q.  Did you receive the items you paid for, Agent Rivera?

11  A.  Yes.

12  Q.  And what was in the packages that you received?

13  A.  The items that I purchased.

14  Q.  Showing you Government Exhibits 23, 24, 25, 26, 27 and 28.

15      (Government's Exhibit Nos. 23, 24, 25, 26, 26A, 27, 28A and

16       28B were identified.)

17  BY MR. HOMER:

18  Q.  What are those items that I just showed you?

19  A.  Those were the items or part of the order that I received.

20  Q.  Photographs of those items, correct?

21  A.  Excuse me?

22  Q.  Photographs of the items?

23  A.  Yes.

24  Q.  And are the photographs fair and accurate representations

25  of how these items looked the day you received this package in

1    the mail?

2    A.   Yes.

3            MR. HOMER:   Your Honor, we would move to admit these

4    into evidence and publish them for the jury, Government's 23

5    through 28.

6            THE COURT:   Any objections from Defendants?

7            (No audible response.)

8            THE COURT:   Hearing no objection, admitted.   You may

9    publish.

10       (Government's Exhibit Nos. 23, 24, 25, 26, 26A, 26B, 27,

11        28A and 28B were admitted into evidence.)

12       (The exhibit was published to the jury.)

13   BY MR. HOMER:

14   Q.   Focusing on this box for a second.   Where was this package

15   sent from?

16   A.   It was sent from 2014 Garden Lane, Bradenton, Florida.

17   Q.   And during your investigation, did you become familiar with

18   what's located at that address?

19   A.   Yes.

20   Q.   What is that address?

21   A.   That was Jonathan Grenon's address, residence.

22   Q.   And where was this package shipped to?

23   A.   It was shipped to an undercover address in Plantation,

24   Florida.

25   Q.   Government Exhibit 24.

1          (The exhibit was published to the jury.)

2     BY MR. HOMER:

3     Q.   What is this image of?

4     A.   Yeah, the green bottle is MMS.

5     Q.   25?

6          (The exhibit was published to the jury.)

7              THE WITNESS:  That's the activator.  That's in a blue

8     bottle.

9     BY MR. HOMER:

10    Q.   Showing you 26A and 26B.

11         (The exhibits were published to the jury.)

12    BY MR. HOMER:

13    Q.   Excuse me.  What are 26A and 26B a picture of?

14    A.   Yeah, so the one on the right, that's just the top view of

15    the jar of the MMS2, and then the one on the left is a side

16    view showing the MMS2 inside of it.

17    Q.   And again, can you remind the jury, what is MMS2, calcium

18    hypochlorite?

19    A.   Yeah, calcium hypochlorite is that pool shock that I talked

20    about earlier.

21    Q.   Showing you Government Exhibit 27.

22         (The exhibit was published to the jury.)

23    BY MR. HOMER:

24    Q.   What is Government Exhibit 27?

25    A.   That's just a contact card.

1    Q.   That was included in the package you received?

2    A.   Yes.

3    Q.   And the church website listed here, did that direct you to

4    the Genesis II Church website we have been reviewing throughout

5    your testimony today?

6    A.   Yes.

7    Q.   The G2 radio station, G2Voice, that directed you to the

8    G2Voice broadcasts?

9    A.   Yes.

10   Q.   And who were the e-mail addresses and names listed here?

11   A.   It says Bishop, Jonathan Grenon:

12   Jonathan@genesis2church.is.   And Bishop Jordan Grenon:

13   Jordan@genesis2church.is.

14   Q.   Now showing you 28A and 28B.   One moment, please.

15        (The exhibits were published to the jury.)

16   BY MR. HOMER:

17   Q.   All right.   What are Government's Exhibit 28A and 28B?

18   A.   So this was a tri-fold pamphlet that was part of that order

19   that came in.   And essentially, it is something they put in

20   these orders that tells you about MMS, the starting procedure,

21   so on and so forth.

22   Q.   And to be clear, this is just the back and front of that

23   pamphlet?

24   A.   Right.   That's the back and the front of it.

25   Q.   Okay.   Can you read for me what I have highlighted here

```
 1    from the pamphlet?
 2    A.  It says, "Contact information:  Read the history of the
 3    Genesis II Church and what DIS-EASE in the book 'Imagine, a
 4    World Without DIS-EASE' by Archbishop Mark Grenon
 5    www.gt2churchbooks.org.  Support questions:
 6    Support@genesis2church.is.  Seminar inquiries:
 7    Jonathan@genesis2church.is.  Sacramental Guidance:
 8    Joseph@genesis2church.is.  Order Inquiries:
 9    G2sacraments@gmail.com.  Membership Interest:
10    Membership@genesis2church.is.  Colombia Restoration Center:
11    Mark@genesis2church.is."
12    Q.  That's fine.  Thank you, Agent Rivera.
13        The Colombia Restoration Center is what you testified about
14    earlier where people could pay $5,000 to go take this relief
15    product with the Defendants in Colombia?
16    A.  Yes.
17    Q.  And to be clear, we have the names Jonathan, Joseph and
18    Mark here in e-mail addresses.  Those are three of the four
19    Defendants, correct?
20    A.  Yes.
21    Q.  During your investigation -- and we will discuss this later
22    -- did you communicate with this e-mail address,
23    G2Sacraments@gmail.com?
24    A.  Yes, I did.
25    Q.  And who controlled that e-mail?
```

Case 1:21-cr-20242-CMA   Document 298   Entered on FLSD Docket 01/03/2024   Page 121 of 192
121
Direct Examination - Agent Wezio
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1   A.   Jordan Grenon.

2   Q.   So that's the fourth Defendant, right?

3   A.   Yes.

4   Q.   I would like you to now read the back of the pamphlet,

5   which is shown on 28B, starting with this right here.  I will

6   make it a little bit bigger.  Can you read that for the jury,

7   please?

8   A.   Which section?

9   Q.   This entire call out here.

10  A.   Okay.  Okay.  "What are the G2" -- excuse me.  "What are

11  the Sacraments of the Genesis II Church?  Our sacraments are

12  minerals that have proven healing properties.  The most popular

13  being MMS1 (Chlorine Dioxide) that has been used for over 90

14  years to clean hospitals, gymnasiums, meat and fish markets

15  without needing to rinse off the products because it leaves

16  behind no toxins.

17       "Our most common sacramental kit is the g2kit2 which has

18  the MMS, HCL activator, and the DMSO.

19       "MMS is the mineral sodium chlorite that needs to be

20  activated to become chlorine dioxide.

21       "HCL is hydrochloric acid (stomach acid) that we use to

22  activate MMS.

23       "DMSO is a solvent made from trees during the process of

24  making paper.  It naturally has antiinflammatory properties and

25  is used to help bring MMS1 deeper into the body."

1  Q.  I won't ask you to read this whole thing, but fair to say

2  the starting procedure and these directions here, this is

3  another protocol just like we saw Mark Grenon explain earlier

4  in some of those protocol videos, correct?

5  A.  Yes.

6         MR. HOMER:  Your Honor, I am going to be handing Agent

7  Rivera some physical exhibits to look at.  To the extent Your

8  Honor wanted a break, this would probably be a good time,

9  although I'm also happy to continue.

10        THE COURT:  We can take one now.

11        Ladies and gentlemen, we will take an afternoon

12  recess.  We'll take about 10, 15 minutes.  Please do not

13  discuss the case.  Thank you.

14        COURT SECURITY OFFICER:  All rise.

15     (The jury exited the courtroom at 2:34 p.m.)

16        THE COURT:  We're in recess.

17     (A recess was taken from 2:35 p.m. to 3:01 p.m.)

18        COURT SECURITY OFFICER:  All rise.

19        THE COURT:  Let's bring the jury in, please.

20     (The jury entered the courtroom at 3:02 p.m.)

21        THE COURT:  Everyone, please be seated.  You may

22  proceed.

23        MR. HOMER:  Thank you, Your Honor.

24  BY MR. HOMER:

25  Q.  Agent Rivera, I am going to hand you what's been previously

Direct Examination - Alicia Rivera
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

```
 1    marked Government Exhibits 29 through 33.
 2        (Government's Exhibit Nos. 29, 30, 31, 32, 33 were
 3         identified.)
 4    BY MR. HOMER:
 5    Q.  Can you please tell the jury what I just handed you?
 6    A.  Yeah, these are the contents of the first shipment, the
 7    first undercover purchase.
 8            MR. HOMER:  Your Honor, at this time, we'd offer
 9    Government Exhibits 29 through 33 into evidence.
10            THE COURT:  Any objection from the Defendants?
11            (No audible response.)
12            THE COURT:  Hearing no objection, admitted.
13        (Government's Exhibit Nos. 29, 30, 31, 32 and 33 were
14         admitted into evidence.)
15    BY MR. HOMER:
16    Q.  Agent Rivera, can you just hold up Government Exhibit 29 so
17    the jury can see what that is, and please describe it for them?
18    A.  Yes, give me a second.  I am going to put my gloves on
19    here.
20        (Pause in proceedings.)
21            THE WITNESS:  All at once?  One by one?
22    BY MR. HOMER:
23    Q.  Starting with 29, please, yes.  Just tell the jury what
24    Government Exhibit 29 is.
25        (The exhibit was published to the jury.)
```

Direct Examination - Joseph Vega
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1          THE WITNESS:  This is 29.  It's the shipping box that

2   everything came in, the USPS shipping box.

3   BY MR. HOMER:

4   Q.  And now Government Exhibit 30.

5       (The exhibit was published to the jury.)

6          THE WITNESS:  30 is the MMS bottle.

7   BY MR. HOMER:

8   Q.  And can you please remove that bottle from the bag for a

9   moment and hold it up so the jury can see it?

10  A.  Yes.

11      (The exhibit was published to the jury.)

12  BY MR. HOMER:

13  Q.  Can you please describe the color of the label on that

14  bottle?

15  A.  This current one is -- it's yellow.

16  Q.  All right.  And up on the screen in front of you is

17  Government Exhibit 24.

18      (The exhibit was published to the jury.)

19  BY MR. HOMER:

20  Q.  To be clear, 24 is a picture of Government Exhibit 30,

21  correct?

22  A.  Yes.

23  Q.  So if this is the same bottle that's pictured on 24 that

24  you are holding in 30, why is the color different?

25  A.  It was bleached.

Direct Examination of Joseph Hayes

July 17, 2023

USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

Q.  All right.  I don't want you to open the bottle of Miracle

Mineral Solution.  But without opening it, can you just smell

the outside of the bottle?

A.  It's -- sorry.  It's a strong chemical smell.

Q.  Do you recall smelling the bottle when it was shipped to

you back in 2020?

A.  Yes; it was much stronger.

Q.  Can you please pick up Government Exhibit 32 containing the

MMS2?

A.  Yes.

Q.  And without opening that product, can you just smell it,

please.  Describe the smell for the jury.

A.  It's very much like a pool supply store.  It's very -- a

strong chemical odor.

Q.  Can you please put 32 back in the evidence bag and also

the -- excuse me, the Miracle Mineral Solution bottle, 30, back

in the bag?

A.  Yes.

        MR. HOMER:  Your Honor, permission to hand those

exhibits in the bags to the jury for inspection.

        THE COURT:  You may.

        MR. HOMER:  And I'll note for the jury that I am going

to hand these to you in the bags, the evidence bags, but we

also have disposable gloves available if anyone would like a

pair.

Case 1:21-cr-20242-CMA   Document 298   Entered on FLSD Docket 01/03/2024   Page 126 of
192
Direct Examination - Jose Rivera

126
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1          Permission to approach the jury?

2          THE COURT:  You may.

3      (The exhibits were published to the jury.)

4      (Pause in proceedings.)

5  BY MR. HOMER:

6  Q.  All right.  Special Agent Rivera, after you went to the

7  online store and purchased those products that we just

8  distributed to the jury, what was the next thing you did in

9  your investigation?

10  A.  I e-mailed the G2sacraments@gmail.com address.

11  Q.  I am going to show you what's been previously marked as

12  Government Exhibits 34, 35, 36, 37.

13      (Government's Exhibit Nos. 34, 35, 36 and 37 were

14       identified.)

15  BY MR. HOMER:

16  Q.  Are you familiar with those documents?

17  A.  Yes, those are the undercover e-mails.

18          MR. HOMER:  Your Honor, permission to offer those into

19  evidence and publish them for the jury?

20          THE COURT:  Any objections from Defendants?

21          (No audible response.)

22          THE COURT:  Hearing no objection, admitted.  You may

23  publish.

24      (Government's Exhibit Nos. 34, 35, 36 and 37 were admitted

25       into evidence.)

Direct Examination of RJ Henderson
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1   BY MR. HOMER:

2   Q.   This is Government Exhibit 34.

3        (The exhibit was published to the jury.)

4   BY MR. HOMER:

5   Q.   Can you tell the jury, who is this e-mail from and who is

6   it to?

7   A.   It's from RJ Henderson, the undercover e-mail address

8   that's controlled by FDA OCI, and it is to

9   G2sacraments@gmail.com.

10  Q.   And what was the subject line?

11  A.   "MMS thank you!"

12  Q.   I'm going to ask you to read this e-mail for the jury,

13  please.

14  A.   "Hello, I wanted to write to say thank you for the MMS.  I

15  received it and my wife started taking it to cure her cancer.

16  She has been taking it for three weeks now, but we haven't seen

17  any improvement from her last test results.  Should she

18  continue with the dosage or increase?

19       "Also, we would like to come to a seminar but can't travel

20  to South America in her condition.  Any plans for the U.S. any

21  time soon?  Thank you.  Russ."

22  Q.   And just to be clear, who wrote that e-mail?

23  A.   I did.

24  Q.   Showing you Government Exhibit 35.

25       (The exhibit was published to the jury.)

1    BY MR. HOMER:

2    Q.  Did you receive a reply to that e-mail?

3    A.  Yes, I did.

4    Q.  All right.  And who was the reply from?

5    A.  It's from G2sacraments@gmail.com.

6    Q.  Who signed the e-mail?

7    A.  Bishop Jordan Grenon.

8    Q.  All right.  Can you please read the Defendant, Jordan

9    Grenon's, response to your e-mail?

10   A.  "Thank you for your e-mail.  Tests can be unreliable, so

11   focus on going slow and listening to the body to see how you

12   feel.  Three weeks is not long enough for more serious diseases

13   like cancer.  How long has she been ill?  How many drops does

14   she take per hour?  There are no seminars planned at this time,

15   but we will send out the info when we do.  Thank you."

16   Q.  And did you reply to Jordan Grenon?

17   A.  I did, yes.

18   Q.  Showing you Government Exhibit 36.

19       (The exhibit was published to the jury.)

20   BY MR. HOMER:

21   Q.  Can you please read your reply?

22   A.  "Thank you, Bishop Grenon.  We got the news about four

23   months ago but she started with the back and pelvis pain seven

24   months ago.  We went straight to the doctor after she saw blood

25   in her urine.  We have been through so many doctors at this

Direct Examination - Joseph Wargo
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

```
 1   point for this bladder cancer.
 2        "She is following the MMS protocol at 1 drop per hour.  Too
 3   little?  She was going to start two drops but wanted to first
 4   get a recommendation.  Thank you, Russ."
 5   Q.  And again, this was an e-mail you wrote undercover?
 6   A.  Yes.
 7   Q.  Did Jordan Grenon from the G2Sacraments@gmail.com address
 8   reply to you?
 9   A.  Yes.
10   Q.  Showing you Government Exhibit 37.
11        (The exhibit was published to the jury.)
12   BY MR. HOMER:
13   Q.  Can you please read Jordan Grenon's reply.
14   A.  "Thank you for your e-mail.  The disease could have been
15   there before that as well as simply slowly growing.  One drop
16   per hour isn't bad.  She can try to go to two drops per hour,
17   but if she gets tired feelings or is not comfortable, you can
18   reduce back to one drop per hour.  Slow and steady."
19   Q.  To be clear, this is Jordan Grenon telling you for your
20   wife who has cancer, just to slow and steady with the Miracle
21   Mineral Solution to treat that the disease?
22   A.  Yes.
23   Q.  After this correspondence with Jordan Grenon, did you make
24   any additional undercover purchases of Miracle Mineral
25   Solution?
```

1  A.  Yes.

2  Q.  What did you order this time?

3  A.  I ordered the MMS and activator.

4  Q.  And did you receive the items you paid for?

5  A.  Yes.

6  Q.  I am going to show you Government Exhibits 38 and 39.

7       (Government's Exhibit Nos. 38 and 39 were identified.)

8  BY MR. HOMER:

9  Q.  Do you recognize those exhibits?

10  A.  Yes.  Those are pictures of the order I received.

11       MR. HOMER:  Your Honor, permission to publish this to

12  the jury and admit them into evidence?

13       THE COURT:  Any objection from Defendants?

14       (No audible response.)

15       THE COURT:  Hearing no objection, admitted.

16     (Government's Exhibit Nos. 38 and 39 were admitted into

17      evidence.)

18     (The exhibit was published to the jury.)

19  BY MR. HOMER:

20  Q.  I would like to highlight the shipping label first of the

21  box.  Where was this package sent from?

22  A.  It was sent from the 2014 Garden Lane address in Bradenton,

23  Florida.

24  Q.  And that is the same address that the last package you

25  received shipped from?

1   A.   Yes.

2   Q.   And again, what is that address?

3   A.   2014 Garden Lane, Bradenton, Florida 34205.

4   Q.   Let me ask it a different way.  What is the significance of

5   that address?

6   A.   Yes, sorry.  That is Jonathan Grenon's residence.

7   Q.   Where did this package of Miracle Mineral Solution ship to?

8   A.   That shipped out to Atlanta, Georgia, 54 110th Street

9   Northwest, Suite 174.

10  Q.   So to be clear, this went from Florida to Georgia?

11  A.   Yes.

12  Q.   So this was an interstate shipment?

13  A.   Yes.

14  Q.   I am going to hand you now Government Exhibits 40 through

15  43.

16       (Government's Exhibit Nos. 40, 41, 42 and 43 were

17        identified.)

18  BY MR. HOMER:

19  Q.   No need to take anything out of the bag, but can you

20  identify those items I just handed you for the jury?

21  A.   Yes, those are the items from the second undercover

22  purchase.

23  Q.   Can you hold them up one at a time and just show the jury

24  what they are, starting with Government's Exhibit 40?

25       (The exhibit was published to the jury.)

1        THE WITNESS:  So this is 40, that was the USPS box

2   that I received it in.

3      (The exhibit was published to the jury.)

4        THE WITNESS:  And 41, it's the smaller bottle of MMS,

5   the green bottle.

6      (The exhibit was published to the jury.)

7        THE WITNESS:  42 is the activator which is the

8   hydrochloric acid in the smaller bottle.

9      (The exhibit was published to the jury.)

10       THE WITNESS:  And 43 is the tri-fold pamphlet and

11   contact card.

12       MR. HOMER:  Your Honor, the Government moves to admit

13   Government Exhibits 40 through 43.

14       THE COURT:  Any objection from Defendants?

15       (No audible response.)

16       THE COURT:  Hearing no objection, admitted.

17     (Government's Exhibit Nos. 40, 41, 42 and 43 were admitted

18      into evidence.)

19   BY MR. HOMER:

20   Q.  Agent Rivera, after the second undercover purchase of

21   Miracle Mineral Solution did you obtain any e-mails of the

22   Defendants in connection with this investigation?

23   A.  Yes.

24   Q.  Can you describe that process for the jury, please?

25   A.  Yes.  So the way we get e-mails, excuse me, I basically

1   have to provide probable cause to get an -- what's called an

2   e-mail search warrant, and with that search warrant, I provide

3   the probable cause to the court.  And a judge reviews

4   everything, approves it and then that search warrant itself was

5   provided to Google for them to then provide data that was part

6   of the case.

7   Q.  What was the e-mail address that you sought a search

8   warrant for?

9   A.  It was G2sacraments@gmail.com, so the e-mail address I had

10  been corresponding with before.

11  Q.  With Jordan Grenon?

12  A.  Yes.

13  Q.  And did Google provide you any materials in response to the

14  search warrant?

15  A.  Yes.

16  Q.  And what did they provide?

17  A.  They provided a lot of electronic data, so e-mails that

18  were part of the G2Sacraments@gmail.com e-mail address.

19  Q.  And did you search through those e-mails for evidence

20  pertinent to this case?

21  A.  Yes, I did.

22  Q.  What did you find?

23  A.  Lots of e-mails of orders, e-mails with customers, customer

24  complaints that were coming through e-mail.

25  Q.  So let's talk about the orders first.  Were you able to

1    tally up all the orders you were seeing in the e-mails for

2    Miracle Mineral Solution?

3    A.   Yes.

4    Q.   Approximately how many orders total were placed all across

5    the country for Miracle Mineral Solution?

6    A.   Orders, tens of thousands.

7    Q.   Were you also able to tally up roughly the total amount of

8    money the Defendants made for selling Miracle Mineral Solution

9    and its related products?

10   A.   Yes.

11   Q.   And what was that figure, approximately?

12   A.   Over 1 million.

13   Q.   Did you notice any trends in the Defendants' sales revenue

14   over time?

15   A.   Yes.

16   Q.   Can you describe that for the jury?

17   A.   So on average, they were making about $30,000 a month.

18   Then when COVID came around, that jumped up to over $120,000 a

19   month.

20   Q.   Did the orders you saw include shipping information?

21   A.   Yes.

22   Q.   And did all of the orders ship from the same location?

23   A.   Yes, the Bradenton address.

24   Q.   Jonathan Grenon's home?

25   A.   Jonathan Grenon's residence, yes.

1   Q.   And where were the orders shipped to?

2   A.   All over the country.  All over the United States.

3   Q.   Were some orders also shipped here to the Southern District

4   of Florida, such as Miami?

5   A.   Yes.

6   Q.   In addition to all these orders, did you find any other

7   notable communications through the Gmail search warrant?

8   A.   Yes.

9   Q.   Can you describe those e-mails for the jury?

10   A.   So lots of customer complaints of sickness and even

11   hospitalization.

12   Q.   How did the Defendants typically respond to those e-mails

13   from customers complaining?

14   A.   That they were liars.

15   Q.   I am going to show you Government Exhibits 44 and 45.

16        (Government's Exhibit Nos. 44 and 45 were identified.)

17   BY MR. HOMER:

18   Q.   Do you recognize those documents?

19   A.   Yes.

20   Q.   What are they?

21   A.   That was an order e-mail and then a customer e-mail.

22           MR. HOMER:  Your Honor, we would offer 44 and 45 into

23   evidence and permission to publish for the jury.

24           THE COURT:  Any objection from Defendants?

25           (No audible response.)

USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1    THE COURT:  Hearing no objection, admitted.  You may

2    do so.

3        (Government's Exhibit Nos. 44 and 45 were admitted into

4         evidence.)

5        MR. HOMER:  Thank you.

6        (The exhibit was published to the jury.)

7    BY MR. HOMER:

8    Q.  What orders are placed here in Government Exhibit 44, what

9    products, excuse me?

10   A.  That was the G2 Sacramental Kit 2 which, again, is the MMS,

11   the hydrochloric acid and the DMSO.  And then the other one was

12   the MMS2 in the capsules.

13   Q.  This is actually the same products that you purchased in

14   your first undercover order, correct?

15   A.  That's correct, yes.

16   Q.  And these are the same prices?

17   A.  Yes.

18   Q.  Again, no option to -- or at least nothing in this document

19   shows that this person paid less than what you had to pay for

20   this -- for these products, correct?

21   A.  That's correct, yes.

22   Q.  I know it says "donation" several times up top, but I am

23   going to scroll down to the bottom of the e-mail.  Can you read

24   how the e-mail concludes?

25   A.  "Congratulations on the sale."

Direct Examination - Rich Joseph Vega
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1   Q.  And is this e-mail representative of the types of e-mails

2   that you were able to tally to figure out total orders and

3   total sales for the Defendants?

4   A.  Yes.

5   Q.  All right.  What was the shipping address for this order?

6   A.  That was 566 Rio Hondo Road in Grand Junction, Colorado.

7   Q.  And what is the e-mail address of the customer who placed

8   this order?

9   A.  Bluefringe777@gmail.com.

10  Q.  I am now going to show you Government's Exhibit 45 admitted

11  into evidence.

12      (The exhibit was published to the jury.)

13  BY MR. HOMER:

14  Q.  Can you read for the jury the subject line and who this

15  e-mail is from and to?

16  A.  Yes.  It says, "Problem help."  And it says From:  Shannon

17  Morris, bluefringe77@ -- excuse me, bluefringe777@gmail.com.

18  And it's going to G2Sacraments@gmail.com.

19  Q.  Bluefringe777, that's who just placed the order we saw at

20  Government Exhibit 44?

21  A.  Yes.

22  Q.  And to the sacraments@gmail, that's Jordan Grenon?

23  A.  Yes.

24  Q.  Okay.  And let's review some of this e-mail.  We are going

25  to go down.  The second page.  Can you please read this e-mail

1  to the jury?

2  A.   Yes.  It says, "Hello I just recently ordered this product

3  as well as another product for my mother so the order has not

4  been used at all either has the other order as I was planning

5  to send it to her.  We have been using our own order for a few

6  weeks from our initial order after doing much research on it

7  and making sure we were safely using it but after taking it, my

8  husband had a very bad adverse reaction which landed him in the

9  hospital DUE TO SEVERE LOW BLOOD PRESSURE which occurred within

10 15 minutes after taking it.  He has never had any issues with

11 low blood pressure, and it was such a bad reaction, I thought

12 he was going to die.  I was purchasing this for my mother who

13 is need and now I cannot in good conscience have her take this

14 product.  Please let me know what I need to do to return this

15 product for a full refund.  I would also like to return my

16 product as well which has only slightly been used, and my dmso

17 has not been used at all.  I am sitting in the emergency room

18 as I e-mail this.  I have words except I am super upset please

19 let me know what can be done to return all the products, Most

20 of everything has not been used.  I am absolutely too afraid it

21 will cause some other loved one to become ill from taking it.

22 Please advise."

23 Q.   And did Jordan Grenon reply to that e-mail?

24 A.   Yes.

25 Q.   Can you please read Jordan Grenon's response?

1  A.  He says, "Thank you for your e-mail.  Very sorry to hear

2  about your husband.  What dose what he taking?  How long was he

3  taking the MMS?  You can ship back the sacraments and we can

4  issue a refund.  We have used the sacraments for years with

5  thousands of people with positive results.  Please let me know.

6  Thank you."

7  Q.  And can you please read the customer's reply to Jordan

8  Grenon?

9  A.  "Hello, thank you for the reply.  I will ship all items

10  back in one box with all 3 invoices.  As I said only a small

11  amount of mms and activator was used, not the dmso or mms2

12  tablets.  The other products from the other 2 orders have not

13  been used at all.  He was still only taking 1 drop each of MMS

14  and activator in water as shown having done the pour off method

15  for the first week.  This was absolutely a reaction to the MMS

16  and it was really frightening.  please confirm the address in

17  which to send the product back.  I appreciate your help."

18  Q.  And did Jordan Grenon reply?

19  A.  Yes.

20  Q.  Can you read Jordan Grenon's reply, please?

21  A.  "Thank you for your e-mail.

22      "Yes please ship back the package to Genesis II Church,

23  2014 Garden Lane, Bradenton, Florida 34205.  Do you know how

24  many drops he took?  Thank you."

25  Q.  Can you please read the customer's response?

A.   "Hello ok I will do that.  He took 1 drop of mms and 1 drop
of activator.  I mixed it for him carefully.  I really don't
understand but within 15 minutes it was absolutely a life
threatening situation.  I have everything packaged safely in
bubble wrap and marked two items that have been used, the rest
has all been unused.  I am sorry this did not work out.  I just
can't risk something like this happening to anyone else.  I
purchased 2 different orders for my mother with hopes this
would help her, but can't take the risk as I could never
forgive myself if she got sicker than she already is.  Thank
you for your help, Shannon Morris."

Q.   Did Jordan Grenon forward this entire e-mail exchange to
any of the other Defendants?

A.   Yes.

Q.   Can you read this first e-mail where he forwards the chain
along?

A.   It says, Someone took -- "Someone said they took 1 drop of
mms and hcl and they were in a really bad situation.  not sure
what was going on in his body."

Q.   And finally, the top e-mail, who is this e-mail from?

A.   It says it's from jonathan@genesis2church.is.  Jonathan
Grenon.

Q.   And who is it to?

A.   That is to the g2sacraments@gmail.com address and also
Archy <mark@genesis2church.is>.

1  Q.  And that's Jordan Grenon and Mark Grenon?

2  A.  That is Jordan Grenon and Mark Grenon, yes.

3  Q.  And in response to this lengthy e-mail exchange with this

4  customer reporting all of these adverse reactions from the

5  product, what did Jonathan Grenon write?

6  A.  He writes, "Liars.  Do not believe them.  And will not take

7  it back to return any money.  Why are we taking it back then

8  return their money?  That's stupid.  Don't get used to that.

9  They are lying.  John."

10  Q.  Agent Rivera, I am now going to show you Government

11  Exhibits 46 and 47.

12      (Government's Exhibit Nos. 46 and 47 were identified.)

13  BY MR. HOMER:

14  Q.  Do you recognize those documents?

15  A.  Yes.  That was another order and e-mail.

16  Q.  Starting with Government's Exhibit 46.  Who made this

17  purchase?

18  A.  This is from Leslie Wingate in Hawaii.

19  Q.  What is her address?

20  A.  Lesliewingat7@gmail.com.

21  Q.  You said the shipping info -- ships to which state?

22  A.  Hawaii.

23  Q.  And what did this individual purchase from the Defendants?

24  A.  The G2 Sacramental Kit 2, which is the MMS hydrochloric

25  acid and the DMSO.

Case 1:21-cr-20242-CMA   Document 298   Entered on FLSD Docket 01/03/2024   Page 142 of
192

142

Direct Examination - Josue Vargas
July 17, 2023

USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

 1  Q.  Just to be clear, because I'm not sure I said it before,

 2  what does MMS stand for?

 3  A.  MMS stands for Miracle Mineral Solution.

 4  Q.  Did this customer also e-mail the Defendants regarding her

 5  reactions with the products she purchased?

 6  A.  Yes.

 7  Q.  Showing Government Exhibit 47.

 8       MR. HOMER:  Your Honor, if I forgot, permission to --

 9  I'll offer these into evidence, 46 and 47, and permission to

10  show them to the jury.

11       THE COURT:  Any objection from the Defendants?

12       (No audible response.)

13       THE COURT:  Hearing no objection, admitted.

14     (Government's Exhibit Nos. 46 and 47 were admitted into

15      evidence.)

16  BY MR. HOMER:

17  Q.  Okay.  Who is this e-mail from?

18  A.  E-mail's from Leslie Wingate, Lesliewingate7@gmail.com.

19  Q.  Okay.  I am going to read some of this e-mail.  Can you

20  please read what Leslie Wingate e-mailed to Defendant Jordan

21  Grenon?

22  A.  "I started with half a drop on Friday night, felt detox

23  happening.  Didn't write symptoms.  Went to bed early.  Woke

24  feeling good and mixed three drops with 12 ounces of water.

25  Drank half drop worth.  Ten minutes later I felt so great that

1    I took another half drop, then started feeling sick.  Took

2    another half drop at 9:30 a.m.  I think maybe another at 10:30,

3    maybe till 12:30.  Half drop each hour until I sat in the sun

4    and drank lots of water, maybe too much which I also didn't

5    know was possible.  Then felt the strong need to get this thing

6    out of my inner ear and that had been there and making me feel

7    off balance for years.  So I filled the tube with air and

8    swallowed, sucking out a large piece of what was clogging it.

9    I felt it hit my stomach and then I started throwing up and

10   throwing up and pooping at one time.

11       "I texted my friend and neighbor and asked her to come help

12   me and look up her side reaction when she got here.  I was

13   unconscious by the time she got here.  She said I was vomiting

14   and had diarrhea when she got here, and I told her to call the

15   emergency room to ask what we could do, but they didn't know

16   what to tell her.  I also asked her to find my enema bucket but

17   she couldn't find it.  She put me in Epsom salt bath and then

18   she got online to research, and then I think she said I was

19   screaming and shaking.  I don't remember any of it.

20       "The doctor said if she hadn't come and gotten me to the

21   hospital, then I would have died.  And my parents keep

22   stressing to me that I would have died.  My mom made me promise

23   I would never try this again.

24       "It's been over a week since I got out of the hospital.

25   I'm still not back to normal.  My brain swelled.  I've had

1  trouble remembering things and typing, and I wish I had seen

2  more info about how dangerous this is for some people.  It said

3  only 50 percent of people recover from this, and they told my

4  daughter five times that I might not wake up.

5      "I feel like I have some brain damage from this.  That is

6  how most of my sentences look before I go back and check them.

7  Why did I never see any warnings about this when I searched and

8  watched hours of hours of movies about MMS and read articles?"

9  Q.  Agent Rivera, did Jordan Grenon respond to this e-mail?

10  A.  Yes.

11  Q.  I'm sorry, not respond.  Did he forward the e-mail along to

12  any of the other Defendants?

13  A.  That's correct.  He, excuse me, forwarded it to -- to Mark

14  Grenon.

15  Q.  Can you read his -- what he wrote when he forwarded the

16  e-mail along?

17  A.  "Hey, Dad, this is a very strong reaction to MMS.  What do

18  you think?"

19  Q.  And can you read Mark Grenon's reply?

20  A.  Mark Grenon replies, "She obviously didn't listen.  How

21  much water did she drink?  How old is this person?  I hot

22  something hard, but what was she dealing with?  Her brain

23  swelled?"

24  Q.  Agent Rivera, I am now showing you Government Exhibits 48,

25  49.

Direct Examination - Joseph Rivera

July 17, 2023

USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

```
 1         (Government's Exhibit Nos. 48 and 49 were identified.)

 2    BY MR. HOMER:

 3    Q.   Are you familiar with those documents?

 4    A.   Yes.  That was another order and e-mail.

 5         MR. HOMER:  Your Honor, we would offer those into

 6    evidence and permission to publish them to the jury.

 7         THE COURT:  Any objection from Defendants?

 8         (No audible response.)

 9         THE COURT:  Hearing no objection, admitted.  You may

10    publish.

11       (Government's Exhibit Nos. 48 and 49 were admitted into

12        evidence.)

13       (The exhibit was published to the jury.)

14    BY MR. HOMER:

15    Q.   Agent Rivera, who is the customer for this order?

16    A.   Customer is Olga Kivvisova.

17    Q.   What's the e-mail address?

18    A.   It's olyakivvi@hotmail.com.

19    Q.   Where did this order ship to?  Just the state is fine.

20    A.   That's Massachusetts.

21    Q.   And what did they purchase?

22    A.   They purchased the G2 Sacramental Kit Worldwide.

23    Q.   Showing you Government Exhibit 49.

24       (The exhibit was published to the jury.)

25
```

Direct Examination - Joseph Lanius
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1    BY MR. HOMER:

2    Q.   Who is this e-mail between?

3    A.   That's between Jordan Grenon and Olga Kivvisova.

4    Q.   Can you please read for the jury what this customer wrote

5    to Jordan Grenon?

6    A.   "Hello, I have a friend of mine with diabetes 2 on Protocol

7    1000.  The first few hours his blood sugars dropped from 397 to

8    228, but his blood pressure increased dangerously.  The next

9    day he continued with MMS and his blood pressure keeps rising,

10   so does his sugar levels.  It is back to 275.  I am scared.

11   Should we continue?  Please advise.  Thank you, Genesis II

12   Church of Health and Healing member, Olga Kivvisova."

13   Q.   And did Jordan Grenon reply to this e-mail?

14   A.   Yes.

15   Q.   Did he advise this person to seek medical attention?

16   A.   No.

17   Q.   Would you please read Jordan Grenon's response?

18   A.   Jordan Grenon replies, "Great to hear from you.  How many

19   drops was he taking per hour?  It is best to start slow.  How

20   did he test the levels and pressure?  Sometimes when cleansing,

21   the body goes through changes so things can go up and down, but

22   if you do it slow and steady, the person should feel

23   comfortable healing."

24   Q.   We're going to do just one more example, showing you

25   Government's Exhibits 50 and 51.

```
 1        (Government's Exhibit Nos. 50 and 51 were identified.)

 2    BY MR. HOMER:

 3    Q.  Do you recognize those documents?

 4    A.  Yes, that was another order and e-mail.

 5            MR. HOMER:  Your Honor, we would offer these into

 6    evidence and permission to publish them.

 7            THE COURT:  Any objections from Defendants?

 8            (No audible response.)

 9            THE COURT:  Hearing no objection, admitted.  You may

10    be publish.

11        (Government's Exhibit Nos. 50 and 51 were admitted into

12         evidence.)

13        (The exhibit was published to the jury.)

14    BY MR. HOMER:

15    Q.  All right.  For Government Exhibit 50, what is the e-mail

16    address for the customer who placed the order?

17    A.  That is somethingsap2016@gmail.com.

18    Q.  And where was this order shipped to?  Just the state is

19    fine.

20    A.  Washington.

21    Q.  What did this person purchase?

22    A.  The G2 Sacramental Kit 2.

23    Q.  And this is the same product you purchased, correct?

24    A.  Yes.

25    Q.  I am showing you Government's Exhibit 51.
```

Case 1:21-cr-20242-CMA   Document 298   Entered on FLSD Docket 01/03/2024   Page 148 of
192                                                                                              148
Direct Examination Joseph Vega
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1        (The exhibit was published to the jury.)

2    BY MR. HOMER:

3    Q.  Can you please read what this customer wrote to Jordan

4    Grenon, starting from the top?

5    A.  "Hello.  Yes, I am pretty sure that the drops become

6    activated within 30-60 seconds.  The smell is horrible and the

7    taste is even worse!  Once mixed it is a deep amber/yellow.  I

8    only became nauseated and headaches once when I pushed the drop

9    count in the beginning.

10        "The symptoms I'm having are as follows:

11        "Currently the back of my throat burns from the drinking

12   the drops with water.

13        "I get this tickle cough in my throat.

14        "The back of my front teeth feel like the enamel is

15   stripped off from drinking the mixture.

16        "I have started to see biofilm (I wonder how long this will

17   take?)

18        "Occasionally I some diarrhea (I'm normally constipated).

19        "Nothing else to report and the reason I am taking MMS is

20   for heavy metals/parasites, candida, biofilm, etc.  I have not

21   seen any improvements as of yet but it's only been three weeks.

22   I plan on increasing my drops to ten so once I reach this count

23   I will then introduce enemas and baths.  Please let me know

24   your thoughts.  Sincerely, Susana."

25   Q.  Did Jordan Grenon reply to that e-mail?

Case 1:21-cr-20242-CMA   Document 298   Entered on FLSD Docket 01/03/2024   Page 149 of
192                                                                                          149
Direct Examination of Josef Vetra
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

 1  A.   Yes.

 2  Q.   Can you please read his reply?

 3  A.   "Thank you for the e-mail, yes the die off reactions can

 4  happen when increasing the doses.  Slow and steady!

 5       "It is best to focus on doing it right orally then adding

 6  new protocols, for the enema, we normally do not do unless

 7  extreme blockage.  That sounds like a good idea though."

 8  Q.   Did the customer reply?

 9  A.   Yes.

10  Q.   Can you please read her reply?

11  A.   "So does it sound like the mixture is correct?  Dark

12  yellow/amber color, stinks and tastes like bleach?

13       "When do people start seeing a difference?

14       "How long do people take MMS for?

15       "Please provide any encouraging information or details

16  since I am new to this program."

17  Q.   And did Jordan Grenon reply?

18  A.   Yes.

19  Q.   This is the top e-mail.  Can you please read this for the

20  jury?

21  A.   "Yes that is the correct description of MMS.

22       "Sometimes it takes a few days or weeks going slow,

23  normally it first has to clean out the digestive system, then

24  can go into the blood to circulate around the body.

25       "3 weeks is a basic protocol but it can take longer for

Direct Examination - Joseph Rivera
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

```
 1   more serious diseases.
 2       "We have seen great results and testimonies from people
 3   using MMS.  Go to mmstestimonials on YouTube to see many
 4   videos!"
 5   Q.  When Jordan Grenon writes, "Yes this is the correct
 6   description of MMS," he is referring to this comment here,
 7   "stinks and tastes like bleach"?
 8   A.  Yes, dark yellow amber color, stinks and tastes like
 9   bleach.
10   Q.  Agent Rivera, were these the only e-mails you found in
11   which customers complained to the Defendants about getting sick
12   from Miracle Mineral Solution?
13   A.  No, that's just some of them.
14   Q.  Just a sample?
15   A.  Just a sample.
16   Q.  Did you see any e-mails that suggested who was
17   manufacturing the Miracle Mineral Solution?
18   A.  Yes.
19   Q.  Showing you Government Exhibit 52.
20       (Government's Exhibit No. 52 was identified.)
21   BY MR. HOMER:
22   Q.  Do you recognize 52?
23   A.  Yes.
24   Q.  What is this?
25   A.  It's -- it's an e-mail about just -- someone was curious
```

1    about who was making it in this e-mail.

2    Q.  We are just going to read a segment of this.  Can you read

3    what this customer writes to ask Jordan Grenon?

4    A.  "I just clicked on the link to the church's new official

5    number one web store, www.g2sacraments.org and I have a couple

6    of questions.  Who produces these MMS sacrament products?  Does

7    Jim, Mark and/or Mark's sons, et al., produce them for this,

8    quote/unquote, official Church store?  What would" --

9    Q.  I'm sorry.  That's fine.  I apologize.

10       Can you please read Jordan Grenon's response?

11   A.  "Darryl, sorry for the late reply, I just saw your message.

12   This is Jordan, one of Mark's sons.  Yes, me and my brothers

13   make the MMS and package everything from the

14   www.g2sacraments.org number one store.  We ship from Bradenton,

15   Florida.

16       "If you have any more questions, please let me know."

17   Q.  Okay.  Agent Rivera, now that we have reviewed a sample of

18   those e-mails, let's move on to another topic.

19       Is one of your duties as an FDA special agent to assist the

20   Government with court proceedings?

21   A.  Yes.

22   Q.  Does that include court proceedings to remedy unlawful

23   conduct?

24   A.  Yes.

25   Q.  Through those duties, have you become familiar with the

1   concept of a temporary restraining order?

2   A.   Yes.

3   Q.   Were you, in fact, involved with the Government's efforts

4   to obtain a temporary restraining order against the Defendants?

5   A.   Yes.

6   Q.   For background for the jury, what is a temporary

7   restraining order?

8   A.   So a temporary restraining order is, essentially, an order

9   from the court to stop something immediately.  So you have to

10  think, I mean, this was the time during COVID and then we have

11  this group that's selling the MMS.  It's, you know, life

12  threatening.  People were getting sick, and we, you know, had

13  to stop it immediately.  So we stopped the order to do the --

14  to stop it.

15  Q.   Now, it's called a temporary restraining order.  Is there a

16  way for a court to similarly order the Defendants to stop

17  something unlawful after the temporary restraining order

18  expires?

19  A.   Yes.

20  Q.   What's that?

21  A.   Preliminary injunction.

22  Q.   And is that similar to the restraining order?

23  A.   It's similar, just extends it.

24  Q.   Did a federal court issue a temporary restraining order

25  against the Defendants?

1    A.   Yes.

2    Q.   What about a preliminary injunction?

3    A.   Yes.

4    Q.   Were those orders issued by a federal judge here in Miami?

5    A.   Yes.

6    Q.   Were they issued by Chief Judge Cecilia Altonaga or by a

7    different federal judge?

8    A.   Different federal judge.

9    Q.   Do you recall the name of that federal judge?

10   A.   Judge Williams.

11   Q.   Generally speaking, what did the temporary restraining

12   order and preliminary injunction order the Defendants to do?

13   A.   It ordered them to immediately stop labeling, holding and

14   distributing Miracle Mineral Solution.

15   Q.   Agent Rivera, I am showing you Government Exhibit 53.

16       (Government's Exhibit No. 53 was identified.)

17   BY MR. HOMER:

18   Q.   Do you recognize this document?

19   A.   Yes.  That is the temporary restraining order.

20       MR. HOMER:  Your Honor, I would offer this into

21   evidence and permission to publish for the jury.

22       THE COURT:  Any objection from Defendants?

23       (No audible response.)

24       THE COURT:  Hearing no objection, admitted.  You may

25   publish.

1      (Government's Exhibit No. 53 was admitted into evidence.)

2      (The exhibit was published to the jury.)

3  BY MR. HOMER:

4  Q.  Agent Rivera, can you read for the jury who the parties are

5  to this action?

6  A.  Yep.  On the Plaintiff's side, it's the United States of

7  America versus Mark Grenon, Joseph Grenon, Jordan Grenon and

8  Jonathan Grenon.

9  Q.  And to be clear, those are the Defendants in this criminal

10  case as well?

11  A.  Yes, they are the Defendants.

12  Q.  Not the Genesis II Church as an entity, but the four named

13  Defendants?

14  A.  Yes.

15  Q.  Can you read what this document's titled?

16  A.  Sealed Temporary Restraining Order.

17  Q.  Can you please read the beginning of the temporary

18  restraining order for the jury.  We are not going to read the

19  whole thing, just read these first paragraphs for me.

20  A.  Um-hmm.  "Plaintiff has filed a Complaint for Injunction

21  against Genesis II Church of Health and Healing ("Genesis") and

22  Mark Grenon, Joseph Grenon, Jordan Grenon and Jonathan Grenon,

23  individuals (collectively, the "Defendants"), pursuant to the

24  Food -- Federal Food Drug and Cosmetic Acts, ("FDCA"), 21

25  U.S.C. 332(a) and the inherent equitable authority of this

1   Court, alleging that the Defendants directly or indirectly do

2   or cause the following acts:

3       "A) violate 21 U.S.C. 331(d), by introducing or delivering

4   for introduction into interstate commerce new drugs, as defined

5   in 21 U.S.C. 321(p), that are neither approved pursuant to 21

6   U.S.C. 355 nor exempt from approval..."

7   Q.  Thank you.  We are going to skip ahead now to the end of

8   the order, Page 3.  Can you read for me how the order

9   concludes, everything on the page here?

10  A.  "After considering the foregoing, it is therefore, ORDERED,

11  ADJUDGED AND DECREED that:

12      "The United States' motion for temporary restraining order

13  is GRANTED without notice to Defendants pursuant to Federal

14  Rule of Civil Procedure 65(b)(2), this Temporary Restraining

15  Order was issued on April 17th, 2020 at 10:00A.M.  This

16  Temporary Restraining Order shall expire May 1st, 2020, at

17  10:00A.M., unless it is extended by the Court for good cause

18  shown or the Defendants consent to a longer extension.

19      "Upon entry of this order, Defendants and each and all of

20  their directors, officers, agents, representatives, employees,

21  successors, assigns, attorneys and all -- any and all persons

22  in active concert or participation with any of them

23  (hereinafter, "Associated Persons") who receive actual notice

24  of this Order shall not, during the pendency of this action,

25  directly or indirectly, label, hold and/or distribute any drug,

1    including, but not limited to MMS..."

2    Q.   That's fine.   Thank you, Agent Rivera.

3         Were Defendants Jonathan and Jordan Grenon served with a

4    copy of that document?

5    A.   Yes.

6    Q.   How do you know that?

7    A.   I was part of the process.

8    Q.   Showing you Government Exhibit 54.

9         (Government's Exhibit No. 54 was identified.)

10   BY MR. HOMER:

11   Q.   Do you recognize Government Exhibit 54?

12   A.   Yes.   That's the order on preliminary injunction.

13        MR. HOMER:   Your Honor, the Government offers 54 into

14   evidence and permission to publish for the jury.

15        THE COURT:   Any objections from Defendants?

16        (No audible response.)

17        THE COURT:   Hearing no objection, admitted.   You may

18   publish.

19        (Government's Exhibit No. 54 was admitted into evidence.)

20   BY MR. HOMER:

21   Q.   Agent Rivera, same parties as in the temporary restraining

22   order?

23   A.   Yes.

24   Q.   And what was the name of this document?

25   A.   Order on Preliminary Injunction.

Case 1:21-cr-20242-CMA   Document 298   Entered on FLSD Docket 01/03/2024   Page 157 of
192

157

Direct Examination - Ch. Officer Rivera
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1    Q.   Here too, we are going to read just some but not the entire

2    thing.  Can you read for me the beginning, the first page?

3    A.   "Plaintiff has filed a Complaint for Injunction against

4    Genesis II Church of Health and Healing ("Genesis") and

5    individual Defendants, Mark Grenon, Joseph Grenon, Jordan

6    Grenon and Jonathan Grenon (collectively "Defendants") pursuant

7    to the Federal Food Drug and Cosmetic Act, (FDCA) 21 U.S.C.

8    332(a), alleging that the Defendants directly or indirectly

9    violate 21 U.S.C. 331(d) by introducing or delivering for

10   introduction into interstate commerce new drugs as defined in

11   21 U.S.C. 321(p) that are neither approved pursuant to 21

12   U.S.C. 355 nor exempt from approval."

13   Q.   This document is ten pages.  We are just going to skip

14   ahead.  Page 8.  And no need to read the citations, just read

15   the words if you will, Agent Rivera.

16   A.   "Upon entry of this order, Defendants and each and all --

17   each and all of their directors, officers, agents,

18   representatives -- where are we at here -- "attorneys and any

19   and all persons in active concert or participation with any of

20   them who receive actual notice of this Order shall not, during

21   the pendency of this action, directly or indirectly, label,

22   hold and/or distribute any drug, including, but not limited to

23   MMS."

24   Q.   You can keep reading, Agent Rivera.

25   A.   "That does not have any" -- excuse me.  "That does not have

 1   an approved New Drug Application pursuant to 21 U.S.C. 355(b)

 2   or Abbreviated New Drug Application, pursuant to 21 U.S.C.

 3   355(j), and an Investigational New Drug Application in effect

 4   for its use to -- pursuant to 21 U.S.C. 355(i) or any drug that

 5   is misbranded within the meaning of 21 U.S.C. 352."

 6   Q.   Agent Rivera, in your investigation, did you learn whether

 7   MMS has any of these things:  An Approved New Drug Application,

 8   an Abbreviated New Drug Application or an Investigation of a

 9   New Drug Application?

10   A.   It doesn't have any of that.

11   Q.   And were the Defendants served with a copy of this

12   preliminary injunction?

13   A.   Yes.

14   Q.   How do you know that?

15   A.   Again, I was part of the process.

16   Q.   Did the Defendants comply with either the temporary

17   restraining order or the preliminary injunction?

18   A.   Can you ask the question again?

19   Q.   Sure.  Did the Defendants comply -- let me ask it

20   differently.

21       Did the Defendants comply with the temporary restraining

22   order?

23   A.   No.

24   Q.   Did the Defendants comply with the preliminary injunction?

25   A.   No.

Case 1:21-cr-20242-CMA   Document 298   Entered on FLSD Docket 01/03/2024   Page 159 of 192
159
Direct Examination Jane Vang
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1    Q.  Can you describe their response to those orders?

2    A.  They responded with a letter to the Court saying that they

3    were going to defy the order.

4    Q.  I am showing you Government Exhibit 55.

5        (Government's Exhibit No. 55 was identified.)

6    BY MR. HOMER:

7    Q.  Do you recognize this document?

8    A.  Yes.  That is the letter from the Genesis II Church of

9    Health and Healing.

10           MR. HOMER:  Your Honor, we'd move to offer this into

11   evidence and publish it for the jury.

12           THE COURT:  Any objection from Defendants?

13           (No audible response.)

14           THE COURT:  Hearing no objection, admitted.  You may

15   publish.

16       (Government's Exhibit No. 55 was admitted into evidence.)

17       (The exhibit was published to the jury.)

18   BY MR. HOMER:

19   Q.  This is the Genesis logo we see up top, correct?

20   A.  Yes.

21   Q.  Can you read what follows, please?

22   A.  "All laws which are repugnant to the constitution are null

23   and void.  *Marbury versus Madison*, 1803.  Nothing is lawfully

24   right that is morally wrong.  Bishop Mark S. Grenon.  We are

25   practicing civil disobedience against this unjust order.

Direct Examination - Joseph Vazquez

July 17, 2023

USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

```
 1        "April 21st, 2020.  A complete and total rejection of this
 2   temporary restraining order under the case number 1:20-cv-21601
 3   by the unincorporated Genesis II Church of Health and Healing
 4   due to a gross negligence and incompetent violation of our
 5   First Amendment God-given rights of the free exercise of our
 6   religion."
 7   Q.   Who's this letter from?
 8   A.   Excuse me.  From Mark Grenon.
 9   Q.   And who was it to?
10   A.   To the court.
11   Q.   How many pages was this letter?
12   A.   23.
13   Q.   We are not going to review all 23 pages, but can you just
14   summarize the contents of this letter for the jury?
15   A.   That they are not going to comply.
16   Q.   I do want to highlight one other piece of this letter,
17   Page 7.  Can you read that for the jury, please?
18   A.   "Civil disobedience is permitted in the U.S. Constitution
19   peaceably, of course, at first, if possible.  It was put there
20   for situations when the government is trying to make its people
21   obey immoral laws.  Fits really well here.
22        "Note:  The Second Amendment is there in case it can't be
23   done peaceably."
24   Q.   In case the jury is not aware, can you just summarize,
25   what's the second amendment?
```

Direct Examination - Joseph Vazquez

July 17, 2023

USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1   A.   It's your right to own guns.

2   Q.   Was this the only letter sent from the Defendants to Judge

3   Williams?

4   A.   No.

5   Q.   Showing you Government Exhibit 56.

6        (Government's Exhibit No. 56 was identified.)

7   BY MR. HOMER:

8   Q.   Do you recognize this document?

9   A.   Yes.

10  Q.   What is this?

11  A.   That's the stop harassment order from Genesis II Church of

12  Health and Healing, again to the court.

13       MR. HOMER:  Your Honor, we'd offer this into evidence

14  and permission to publish this to the jury.

15       THE COURT:  Any objection from Defendants?

16       (No audible response.)

17       THE COURT:  Hearing no objection, admitted.  You may

18  publish.

19       (Government's Exhibit No. 56 was admitted into evidence.)

20       (The exhibit was published to the jury.)

21  BY MR. HOMER:

22  Q.   What's the date of this letter?

23  A.   April 21st, 2020.

24  Q.   And who is this letter signed by?

25  A.   By the Defendants.

Q.  All four?

A.  Yes, Mark Grenon, Joseph Grenon, Jonathan Grenon and Jordan Grenon.

Q.  All right.  We will go to the second page.  We won't read this whole thing either.  Can you just read this middle paragraph, please?

A.  This letter serves as documentation of a pattern of harassing activities that began on April 8th, 2020, by the FDA in a letter titled:  Unapproved And Misbranded Products Related to Coronavirus Disease 2019, COVID-19.  Then followed by a complaint by the DOJ, United States District Court, Southern District of Florida, with the case number, United complaint for preliminary and permanent injunction and finished with a TRO from the DOJ.

United States District Court, Southern District of Florida, case number.  United States of America sealed temporary restraining order, April 17, 2020.

Q.  Fair to say this letter pretty clearly shows the Defendants were aware of the judge's orders?

A.  Yes.

Q.  You recall earlier today we watched several of the Defendants' G2Voice broadcasts?

A.  Uh-huh, yes.

Q.  Did the Defendants discuss the temporary restraining order and injunction in any of those broadcasts?

1   A.   They did, yes.

2   Q.   Showing you Government Exhibit 57.

3        (Government's Exhibit No. 57 was identified.)

4   BY MR. HOMER:

5   Q.   What is Government Exhibit 57?

6   A.   It is another G2Voice broadcast.

7   Q.   Which one?  Can you read this for me?

8   A.   It's title -- it's No. 189.  It says part two.  "This

9   INSANITY HAS TO STOP!"  An urgent message to the world from

10  Bishop Mark Grenon, and it's dated April 26, 2020.

11  Q.   Approximately how long was this G2Voice broadcast?

12  A.   About two hours.

13  Q.   We're just going to play a clip.

14        MR. HOMER:  Your Honor, I apologize.  Could we offer,

15  at this time, 57 into evidence and permission to publish?

16        THE COURT:  Any objection from Defendants?

17        (No audible response.)

18        THE COURT:  Hearing no objection, admitted.  You may

19  publish.

20        MR. HOMER:  Thank you, Your Honor, my apologies.

21     (Government's Exhibit No. 57 admitted into evidence.)

22     (The exhibit was published to the jury.)

23     (Audio/video exhibit played.)

24        MR. HOMER:  Madam Court Reporter, is the sound off by

25  any chance?

Case 1:21-cr-20242-CMA   Document 298   Entered on FLSD Docket 01/03/2024   Page 164 of
192
164
Direct Examination of Agent Rivera
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

```
 1        (Pause in proceedings.)

 2            MR. HOMER:  If Your Honor will allow me just one

 3   moment, I am going to reconnect this just to see if that fixes

 4   the sound issue.

 5        (Pause in proceedings.)

 6            MR. HOMER:  Let's try again.

 7        (Pause in proceedings.)

 8            MR. HOMER:  I am not sure why the sound is not working

 9   because it is working on my computer.  But I can have the

10   microphone here just pick up the speakers since the video is

11   playing.

12        (Pause in proceedings.)

13            MR. HOMER:  Your Honor, I apologize.  If I may have

14   just one moment to try to sort this technological issue out.

15   It was not happening with the earlier exhibits.

16        (Pause in proceedings.)

17            THE COURT REPORTER:  Let me try to disconnect and see

18   if that helps.

19            MR. HOMER:  Starting 57, this clip, at the beginning.

20            (Audio/video exhibit played.)

21   BY MR. HOMER:

22   Q.  Agent Rivera, are you familiar with the acronym DOJ?

23   A.  Yes.

24   Q.  What does it stand for?

25   A.  Department of Justice.
```

1    Q.   Did the Department of Justice sign the temporary

2    restraining order in this case?

3    A.   No.

4    Q.   Did the FDA sign the temporary restraining order?

5    A.   No.

6    Q.   Who signed the temporary restraining order?

7    A.   The judge.

8    Q.   In this same broadcast, in addition to discussing how they

9    were going to refuse to comply with the restraining order, did

10   the Defendants describe actions they might take if the

11   Government tried to enforce the restraining order?

12   A.   Yes.

13   Q.   And can you describe for the jury what the Defendants

14   threatened?

15   A.   Inciting violence; pick up weapons and insight violence.

16   Q.   Play one more clip from 57.

17        (Audio/video exhibit played.)

18   BY MR. HOMER:

19   Q.   Agent Rivera, did the Defendants produce any other G2Voice

20   broadcasts where they discussed their decision to violate the

21   temporary restraining order?

22   A.   Yes.

23   Q.   Showing you Government Exhibit 58.

24        (Government's Exhibit No. 58 was identified.)

25

Direct Examination of Rivera
July 17, 2023

USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

BY MR. HOMER:

Q.  Do you recognize Government Exhibit 58?

A.  Yes.  That's another G2Voice broadcast, No. 190, "Happy 10th anniversary to the Genesis II Church of Health and Healing!"  Dated May 3rd, 2020.

Q.  And approximately how long was this video?

A.  Two hours.

Q.  We're going to skip ahead and play one clip from this video.

    (Audio/video exhibit played.)

BY MR. HOMER:

Q.  Agent Rivera, did the Defendants remove the labeling from their websites in which they claimed the Miracle Mineral Solution could cure all of these diseases as they were ordered to by Judge Williams?

A.  No, they did not.

Q.  Did the Defendants stop distributing the Miracle Mineral Solution as they were ordered to by Judge Williams?

A.  No, they did not.

Q.  I am showing you Government Exhibit 59.

    (Government's Exhibit No. 59 was identified.)

BY MR. HOMER:

Q.  Do you recognize Government Exhibit 59?

A.  Yes, that's the G2Worldwidemission website.

        MR. HOMER:  Your Honor, I apologize if I forgot to

1  admit Government Exhibit 58; I'd move to do so at this time.  I

2  also move to admit Government Exhibit 59.

3           THE COURT:  No objection from Defendants?

4           (No audible response.)

5           THE COURT:  Hearing no objection, admitted.

6     (Government's Exhibit Nos. 58 and 59 were admitted into

7      evidence.)

8     (The exhibit was published to the jury.)

9  BY MR. HOMER:

10  Q.  It's a bit hard to read, Agent Rivera, but can you read the

11  title of Government Exhibit 59?

12  A.  GT worldwide news 7, dated June 13, 2020.

13  Q.  And who published this newsletter?

14  A.  Bishop Jordan.

15  Q.  Can you read -- you don't need to read the whole link, but

16  read the black letters here that I've highlighted?

17  A.  Yeah.  So it says, "Video of the week.  Freely gifting of

18  the G2Sacraments," and it has a link to where you can learn how

19  to do that.

20  Q.  And did you watch the video that's linked to there?

21  A.  Yes.

22  Q.  Will you describe that video for the jury?

23  A.  Essentially it is just the video on how to get the

24  sacraments.

25  Q.  Who is featured in that video?

Direct Examination - Rivera/Homer
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

A.   Jonathan Grenon.

Q.   To be clear, did the preliminary injunction merely prohibit the Defendants from selling the Miracle Mineral Solution?

A.   No.

Q.   What did it prohibit them from doing?

A.   From labeling, holding and distributing.

Q.   I am showing you Government Exhibit 60.

     (Government's Exhibit No. 60 was identified.)

          THE COURT:  Are we still having problems with the sound?

          MR. HOMER:  We are, Your Honor.

          THE COURT:  It's not projecting when he plays it. Thank you.

          MR. HOMER:  Madam Court Reporter, if I could have the screen back just for a moment.

     (Pause in proceedings.)

          MR. HOMER:  Best laid plans, ladies and gentlemen.  Is everyone hearing okay when I hold the microphone up to the computer?

          THE JUROR:  Yep, some of it.

     (Pause in proceedings.)

BY MR. HOMER:

Q.   Agent Rivera, we were discussing the video, the freely gifting of the Miracle Mineral Solution.  I am showing you Government Exhibit 60.  Do you recognize Government Exhibit 60?

July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1   A.   Yes.

2   Q.   What is this?

3   A.   That is a video that was on the G2worldwidemission's

4   website about freely giving the MMS.

5         MR. HOMER:   Your Honor, if we could offer 60 into

6   evidence at this time and permission to publish for the jury.

7         THE COURT:   Any objection from Defendants?

8         (No audible response.)

9         THE COURT:   Hearing no objection from Defendants,

10   admitted.   You may publish.

11      (Government's Exhibit No. 60 was admitted into evidence.)

12      (The exhibit was published to the jury.)

13      (Audio/video exhibit played.)

14   BY MR. HOMER:

15   Q.   All right.   Agent Rivera, that's just one clip from

16   Government's Exhibit 60.   Later in the same video did Jonathan

17   Grenon explain how a customer could go about placing an order

18   for a supposed free shipment of Miracle Mineral Solution?

19   A.   Yes, he did.   You had to answer a questionnaire,

20   essentially.

21   Q.   Can you describe the questionnaire for the jury?

22   A.   Yeah.   So you had to answer some questions, if you had used

23   MMS before and also if you were part of the Government, FDA,

24   CDC, so on and so forth.

25   Q.   And was filling out that questionnaire and answering those

Direct Examination - Joseph Rivera
July 17, 2023

USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1    questions necessary during your earlier undercover purchases?

2    A.  No, not earlier.

3        (Audio/video exhibit played.)

4    BY MR. HOMER:

5    Q.  Agent Rivera, to be clear, did you have to answer that

6    question when you first made the undercover purchases?

7    A.  No.

8    Q.  So the Defendants only started asking that question after a

9    federal judge ordered them to stop distributing Miracle Mineral

10   Solution?

11   A.  Yes.

12   Q.  Did you order any MMS at that time from the Defendants?

13   A.  I did, yes.

14   Q.  Showing you Government Exhibit 61.

15       (Government's Exhibit No. 61 was identified.)

16   BY MR. HOMER:

17   Q.  Do you recognize Government Exhibit 61?

18   A.  Yes.  That's the picture of the order I received after

19   watching the video.

20           MR. HOMER:  Your Honor, we would offer this into

21   evidence.  Permission to publish it?

22           THE COURT:  Any objection from Defendants?

23           (No audible response.)

24           THE COURT:  Hearing no objection, admitted.  You may

25   publish.

Direct Examination of Joseph Rivera
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

```
 1          (Government's Exhibit No. 61 was admitted into evidence.)

 2          (The exhibit was published to the jury.)

 3   BY MR. HOMER:

 4   Q.   Agent Rivera, where was this shipment shipped from and

 5   where was it shipped to?

 6   A.   That was shipped from the Garden Lane, Bradenton address,

 7   which is Jonathan Grenon's residence.  And that was shipped to

 8   Jose Moreno, which is an undercover identity that's controlled

 9   by FDA OCI, which is me, to Kansas.

10   Q.   And it's a little hard to tell, but can you read for the

11   jury the date the shipment was sent?

12   A.   That's July 6th, 2020.

13   Q.   To be clear, that's after the issuance of the temporary

14   restraining order and the preliminary injunction?

15   A.   Yes.

16   Q.   Can you tell the jury what you received in the mail?

17   A.   I received the MMS and the activator.

18   Q.   And was there also some letter, it looks like here?

19   A.   Yeah.  The -- again, the tri-fold pamphlet, the contact

20   card and also the letter that was titled:  Our free gift to

21   you.

22   Q.   Can you read what that letter says at the bottom?

23   A.   It says, "Donate forward.  We are gladly able to freely

24   give you a gift of our sacraments because of others generous

25   donations to the church.  If you would consider donating
```

 1  forward to allow us to continue giving our sacraments away

 2  freely, please contact jordan@genesis2church.is."

 3  Q.  Agent Rivera, I am handing you what's been marked as

 4  Government Exhibit 62.

 5       (Government's Exhibit No. 62 was identified.)

 6  BY MR. HOMER:

 7  Q.  Do you recognize Government Exhibit 62?

 8  A.  Yes.  This was the order that I got from the Grenons.

 9          MR. HOMER:  Your Honor, we would offer 62 into

10  evidence at this time.

11          THE COURT:  Any objection from Defendants?

12          (No audible response.)

13          THE COURT:  No objection, admitted.  You may publish.

14       (Government's Exhibit No. 62 was admitted into evidence.)

15       (The exhibit was published to the jury.)

16  BY MR. HOMER:

17  Q.  Agent Rivera, was this shipment of Miracle Mineral Solution

18  the only instance in which the Defendants distributed Miracle

19  Mineral Solution in violation of the restraining order and

20  preliminary injunction?

21  A.  No.

22  Q.  Showing you what's been marked as Government Exhibit 63.

23       (Government's Exhibit No. 63 was identified.)

24          MR. HOMER:  Pausing at the beginning.

25

Direct Examination of Oscar Rivera
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

 BY MR. HOMER:

Q.   Do you recognize Government Exhibit 63?

A.   Yes.  That is a video of Jonathan Grenon; he is going to

talk about the gifting.

     (Audio/video exhibit played.)

BY MR. HOMER:

Q.   Okay.  I am going to keep that clip up.  I will show one

other clip from that same video.

     (Audio/video exhibit played.)

BY MR. HOMER:

Q.   Agent Rivera, in that second clip, Jonathan Grenon states

that over the prior two to three weeks, the Grenons distributed

over a hundred bottles of Miracle Mineral Solution; is that

right?

A.   Yes.

Q.   To be clear, looking back at the first clip, what was the

date of that statement?

A.   July 3rd.

Q.   So those 100-plus bottles distributed, that's all after the

restraining order and preliminary injunction?

A.   Yes.

Q.   Agent Rivera, what did the FDA do at this point once it

became clear the Defendants were not going to comply with court

orders?

A.   We sought the arrest warrant and search warrant of the

1    premises.

2    Q.   Were you involved in the arrests of the Defendants?

3    A.   Yes.

4    Q.   When were Defendants Jonathan and Jordan Grenon arrested?

5    A.   That was July 8th, 2020.

6    Q.   When were Defendants Mark Grenon and Joseph Grenon

7    arrested?

8    A.   After.

9    Q.   Why were they not arrested on the same date at Jonathan and

10   Jordan Grenon?

11   A.   They were in Colombia, South America.

12   Q.   At the Health Restoration Center?

13   A.   Yes.

14   Q.   I would like to direct your attention to the date of the

15   arrest of Jonathan and Jordan Grenon.

16        Where were the Defendants arrested?

17   A.   In their residences, in their homes.

18   Q.   You mentioned a search warrant of Jonathan Grenon's home.

19   Can you explain for the jury again what a search warrant of a

20   premises is like?

21   A.   Yes.  So the -- the search warrant for a premises, again,

22   we have to establish that probable cause to get into the

23   residence and, you know, search and seize items that are

24   relevant to the case, and that is signed by a judge and then we

25   go and effect the search warrant that day.  So we did that with

Case 1:21-cr-20242-CMA   Document 298   Entered on FLSD Docket 01/03/2024   Page 175 of
192                                                                                              175
Direct Examination Rivera/By Mr. Homer
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1    the search -- the same day as the arrest, excuse me.

2    Q.  And what was the address of that search?

3    A.  It was the Garden Lane address in Bradenton, Florida.

4    Q.  That was Jonathan Grenon's home?

5    A.  Yes.

6    Q.  The high level, can you please describe for the jury what

7    federal agents discovered when executing that search warrant?

8    A.  Yeah.  We discovered lots of promotional material for MMS,

9    lots of cash inside a safe.  We also got -- there was a

10   manufacturing facility in the backyard.  There were several

11   blue metal drums that were filled with sodium chlorite and then

12   also prepackaged bottles of MMS and activator.

13   Q.  Agent Rivera, I'm going to show you Government Composite

14   Exhibit 64.  Here is 64A and at the end, 64O.

15       (Government's Exhibit Nos. 64A through 64O was identified.)

16   BY MR. HOMER:

17   Q.  Can you describe for the jury what's featured in

18   Government's composite Exhibit 64?

19   A.  Yep.  So that's items that were in a safe.  The safe itself

20   and then also the items that were in the safe.

21   Q.  And are these pictures fair and accurate representations of

22   the safe and its contents the day the search warrant was

23   executed?

24   A.  Yes.

25            MR. HOMER:  Your Honor, we'd move to admit Government

 1   Exhibit -- Composite Exhibit 64A through O and publish them to

 2   the jury.

 3              THE COURT:  Any objection from Defendants?

 4              (No audible response.)

 5              THE COURT:  Hearing no objection, admitted.  You may

 6   publish.

 7              MR. HOMER:  Thank you.

 8         (Government's Exhibit Nos. 64A through 64O were admitted

 9          into evidence.)

10         (The exhibit was published to the jury.)

11   BY MR. HOMER:

12   Q.   Agent Rivera, here's 64A.  You said that's the safe.

13        I'm showing you 64B.

14         (The exhibit was published to the jury.)

15   BY MR. HOMER:

16   Q.   What is 64B?

17   A.   Picture of the contents of the safe.

18   Q.   64 -- well, first.  You see the pink and green boxes here?

19   A.   Yes.

20   Q.   What were inside of those boxes?

21   A.   Cash and coins.

22   Q.   Here's 64C.

23         (The exhibit was published to the jury.)

24   BY MR. HOMER:

25   Q.   This is inside one of the green boxes.  What was inside

Direct Examination - Joseph Lewis
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1   this blue envelope and this manila envelope?

2   A.   The blue envelope and manila envelope had cash inside.

3   Q.   What was in this plastic-looking container here?

4   A.   Coins.

5   Q.   When you say coins, are you talking pennies and quarters?

6   A.   No, gold and silver coins.

7   Q.   64D.

8        (The exhibit was published to the jury.)

9   BY MR. HOMER:

10  Q.   What is 64D?

11  A.   More contents.  More envelopes that were stuffed with cash

12  and on the left there you had the coins.

13  Q.   What about 64E?

14       (The exhibit was published to the jury.)

15           THE WITNESS:  Envelopes with cash.

16  BY MR. HOMER:

17  Q.   All of those envelopes had cash inside?

18  A.   Yes.

19  Q.   64F?

20       (The exhibit was published to the jury.)

21  BY MR. HOMER:

22  Q.   What is this?

23  A.   An envelope of cash.

24  Q.   64G?

25       (The exhibit was published to the jury.)

1           THE WITNESS:  Some of the cash is laid out on the

2    table.

3    BY MR. HOMER:

4    Q.   64H?

5        (The exhibit was published to the jury.)

6           THE WITNESS:  An envelope with cash in it.

7    BY MR. HOMER:

8    Q.   64I?

9        (The exhibit was published to the jury.)

10          THE WITNESS:  The envelope and then the cash laid out.

11   BY MR. HOMER:

12   Q.   64J?

13       (The exhibit was published to the jury.)

14          THE WITNESS:  Cash with the envelope.

15   BY MR. HOMER:

16   Q.   64K?

17       (The exhibit was published to the jury.)

18          THE WITNESS:  More cash.

19   BY MR. HOMER:

20   Q.   64L?

21       (The exhibit was published to the jury.)

22          THE WITNESS:  Cash with an envelope.

23   BY MR. HOMER:

24   Q.   64M?

25       (The exhibit was published to the jury.)

Direct Examination of Jonathan Wong

July 17, 2023

USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

```
1              THE WITNESS:  More cash.

2    BY MR. HOMER:

3    Q.   And 640?

4         (The exhibit was published to the jury.)

5              THE WITNESS:  More cash.

6    BY MR. HOMER:

7    Q.   Were these pictures depicting all of the cash that you

8    found inside that safe?

9    A.   No.

10   Q.   Approximately how much cash in total did Jonathan Grenon

11   have inside that safe?

12   A.   $40,000.

13   Q.   You testified that a video was taken -- strike that.  I

14   apologize.

15        Was a video taken during the search warrant of Jonathan

16   Grenon's house?

17   A.   Yes.

18   Q.   I am showing you Government Exhibit 65.

19        (Government's Exhibit No. 65 was identified.)

20             (Video exhibit played.)

21   BY MR. HOMER:

22   Q.   Do you recognize Government Exhibit 65?

23   A.   Yes.  That's a video that we took of the search warrant,

24   and that's in their backyard.

25             MR. HOMER:  Your Honor, we'd offer this into evidence
```

Case 1:21-cr-20242-CMA   Document 298   Entered on FLSD Docket 01/03/2024   Page 180 of
192                                                                                          180
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

 1    and permission to publish.

 2             THE COURT:  Any objection from Defendants?

 3             (No audible response.)

 4             THE COURT:  Hearing no objection, admitted.  You may

 5    publish.

 6        (Government's Exhibit No. 65 was admitted into evidence.)

 7        (The exhibit was published to the jury.)

 8    BY MR. HOMER:

 9    Q.  What are we looking at right now, Agent Rivera?

10    A.  Yes, that's a large shed in their backyard.  Essentially

11    it's their manufacturing facility for the MMS.

12    Q.  When you arrived, was the door to the -- when you arrived

13    for the arrest and search warrant, was this door here open?

14    A.  I can't recall.

15    Q.  That's the Genesis logo, correct?

16    A.  Yes, that is.

17             (Video exhibit played.)

18    BY MR. HOMER:

19    Q.  What are we looking at here, Agent Rivera?

20    A.  Yes.  So the -- the plastic drums with the wheels on the

21    bottom, those are filled with the smaller bottles of MMS that

22    we saw earlier.  And then some of the other ones are filled

23    with the bulk product.  So not more bottles, but, like,

24    literally just the liquid inside the bins.

25    Q.  And what about this kind of bench tabletop, what was this

Direct - Kristopher Jacques Rivera
July 17, 2023

USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1   being used for?

2   A.   Yeah, it is just like a typical workbench where, you know,

3   we would -- they would fill up bottles there and get it ready

4   for distribution.

5   Q.   To be clear, this is the location where, according to the

6   Defendants, they were creating the cure for cancer?

7   A.   Yes.

8   Q.   Having watched more of this video, do you recall whether

9   that large side door was open when you first arrived?

10  A.   Right now, it -- now that I'm thinking about it, it was --

11  it was closed and --

12  Q.   Why --

13  A.   -- the only reason I remember that is, we had a HAZMAT team

14  with us, and they are the ones that opened it up to air out the

15  -- the manufacturing facility.

16  Q.   Continuing with 65.

17       (Video exhibit played.)

18  BY MR. HOMER:

19  Q.   Agent Rivera, did agents also take photographs of what was

20  inside these sheds?

21  A.   Yes.

22  Q.   Showing you Government's Composite Exhibit 66, starting

23  with 66A.

24       (Government's Exhibit Nos. 66A through 66M were

25        identified.)

1        (The exhibit was published to the jury.)

2    BY MR. HOMER:

3    Q.  Do you recall this composite exhibit?

4    A.  Yes.

5    Q.  What are these?

6    A.  These are pictures of what was in the smaller shed next to

7    the manufacturing facility.

8            MR. HOMER:  Your Honor, we will offer Government

9    Exhibits 66A through M, composite exhibit, into evidence at

10   this time, and permission to publish.

11           THE COURT:  Any objection from Defendants?

12           (No audible response.)

13           THE COURT:  Hearing no objection, admitted.

14       (Government's Exhibit Nos. 66A-66M were admitted into

15        evidence.)

16       (The exhibit was published to the jury.)

17   BY MR. HOMER:

18   Q.  Agent Rivera, 66A, you see these big blue drums?

19   A.  Yes.

20   Q.  What are those?

21   A.  Those are blue metal drums that are filled with the sodium

22   chlorite powder.

23   Q.  I am showing you 66B.

24       (The exhibit was published to the jury.)

25

1   BY MR. HOMER:

2   Q.   What are we looking at here?

3   A.   So that's a close-up shot one of the labels that's on that

4   blue metal drum.

5   Q.   Can you read, starting at the top for me all the way down,

6   what's on that label?

7   A.   Yeah.  It says, Commodity:  Sodium chlorite 80 percent

8   powder.  Used for industry.  Net weight:  50 kilograms.  Gross

9   Weight:  53.6 kilograms.  Batch No. 2018-12-03.  Manufacturing

10   date:  December 03, 2018.  Expiration date:  December 2nd,

11   2020.  Made in China.

12       And then you have a label on the right which is a typical

13   flammable signal -- symbol, excuse me, and it has a number

14   underneath it, 1496.

15   Q.   For people like me who are not good with the metric system,

16   approximately how many pounds is 50 kilograms of sodium

17   chlorite powder?

18   A.   It is a little over 100 pounds.

19   Q.   And approximately how many of these drums were in that

20   shed?

21   A.   There were 85.

22   Q.   85 and approximately 100 pounds.  So roughly how many

23   pounds of sodium chlorite powder were in the shed?

24   A.   Over 8,500 pounds.

25   Q.   And again, sodium chlorite powder, this is the main active

 1    ingredient of Miracle Mineral Solution?

 2    A.  Yes.

 3    Q.  You mentioned it before, December 2nd, 2020 is the

 4    expiration date.  When did you execute this search warrant and

 5    take these pictures?

 6    A.  We executed it July 8th, 2020.

 7    Q.  So, about 8400 pounds of this flammable chemical were set

 8    to expire in a matter of months?

 9    A.  Yes.

10    Q.  I am showing Government's Exhibit 66C.

11        (The exhibit was published to the jury.)

12    BY MR. HOMER:

13    Q.  What is this?

14    A.  That is another label on the blue metal drum.

15    Q.  Is this an FDA label?

16    A.  No.

17    Q.  Who put that label there?

18    A.  The manufacturer of the sodium chloride.

19    Q.  I would like you to read every single word on this label

20    starting up top.

21    A.  So it says, Chlorine chlorite powder.  Composition:  Sodium

22    chlorite powder UN No. 1496.  Hazard statements:  May cause

23    fire or explosion.  Strong oxidizer.  Harmful if swallowed.

24    Cause serious eye damage.  May cause damage to organs through

25    prolonged or repeated exposure.  Very toxic to aquatic life.

1  Supplementary information:  Contact with acids cause exothermic

2  reaction and explosion.

3  Q.  I'd ask you to pause right about the contact with acids.

4      Do you recall watching those protocol videos in Mark Grenon

5  earlier today?

6  A.  Yes.

7  Q.  And in those videos, what does Mark Grenon direct people to

8  mix sodium chlorite power with?

9  A.  Hydrochloric acid.

10 Q.  Can you please read everything on the right-hand side?

11 A.  HAZARD.  Precautionary statements:  Keep away from heat,

12 sparks, open flames, hot surfaces.  No smoking.  Take any

13 precaution to avoid mixing with combustibles or acids.  Wear

14 protective gloves, protective clothing, eye protection, face

15 protection.  Do not eat, drink or smoke when using this

16 products.  In case of fire, use Co2 powder alcohol resistant

17 foam to extinguish.

18     If swallowed, call a poison center, a medical service if

19 you feel unwell.  If in eyes, rinse cautiously with water for

20 several minutes.  Remove contact lenses, if present and easy to

21 do.  Continue rinsing.  Dispose of contents/container in

22 accordance with local regulations.

23     Then it says Parents Bright Industries, telephone,

24 1 (832) 715-1031 and it's from Hong Kong Sincerely Industry

25 Corporation Limited, with the telephone.

Direct Examination - Joseph Vazquez

July 17, 2023

USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1  Q.  And all of these hazard and warning statements, these are

2  about the main active ingredient in the product the Defendants

3  were selling as a miracle cure?

4  A.  Yes.

5  Q.  Showing you Government Exhibit 66D.

6     (The exhibit was published to the jury.)

7  BY MR. HOMER:

8  Q.  What was inside these bins that were underneath the

9  workbench?

10  A.  Yes.  So the bins had already prepackaged products, so the

11  bottles like you saw here.  And it also had the bulk liquid

12  product inside of some of them.

13  Q.  I am showing you Government Exhibit 66E.

14     (The exhibit was published to the jury.)

15  BY MR. HOMER:

16  Q.  Is this an example of what was inside the bins?

17  A.  Yes.

18  Q.  What is this?

19  A.  That is the activator solution, the hydrochloric acid.

20  Q.  I'm showing you 66F.

21     (The exhibit was published to the jury.)

22  BY MR. HOMER:

23  Q.  What is this?

24  A.  That's more of the activator.

25  Q.  66G?

Case 1:21-cr-20242-CMA   Document 298   Entered on FLSD Docket 01/03/2024   Page 187 of
192
187

Direct Examination - Joseph Ferro

July 17, 2023

USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

```
 1          (The exhibit was published to the jury.)

 2              THE WITNESS:  That's the MMS in a prepackaged bottle.

 3   BY MR. HOMER:

 4   Q.  66H?

 5          (The exhibit was published to the jury.)

 6              THE WITNESS:  The smaller bottles left of the MMS on

 7   the right is the activator.

 8   BY MR. HOMER:

 9   Q.  And again, this was all in Defendant Jonathan Grenon's

10   backyard?

11   A.  Yes, in the manufacturing facility.

12   Q.  Tell me about what's going on in 66I.

13          (The exhibit was published to the jury.)

14              THE WITNESS:  These are jars.  The tops of them, from

15   left to right, if you can see it, it says DMSO, the middle one

16   says MMS and then the one on the right also says MMS.

17   BY MR. HOMER:

18   Q.  66J?

19          (The exhibit was published to the jury.)

20              THE WITNESS:  Yep.  That was a small closet that they

21   had that had, like, plungers and, you know, jars, basically

22   things that you would typically use to fill -- you know,

23   package the product for shipment.

24   BY MR. HOMER:

25   Q.  What's over here on the right-hand half of this picture?
```

1  A.  Yeah, on that side, there were just large kind of

2  containers that had labels, other boxes and things to ship the

3  product out.

4  Q.  I will show you one of those boxes.  66K.

5      (The exhibit was published to the jury.)

6  BY MR. HOMER:

7  Q.  Can you read for me what is inside 66K?

8  A.  Yeah.  That is the G2 Sacramental Travel Kit.

9  Q.  What is the G2 Sacramental Travel Kit?

10 A.  So the travel kit was their, kind of like, TSA sized

11 bottles that you could travel with.

12 Q.  66L, what are we seeing here.

13     (The exhibit was published to the jury.)

14         THE WITNESS:  Those are the USPS shipping boxes.

15 BY MR. HOMER:

16 Q.  The same type of shipping box that you received your

17 Miracle Mineral Solution from the Defendants in?

18 A.  Yes.

19 Q.  Here is 66M.

20     (The exhibit was published to the jury.)

21 BY MR. HOMER:

22 Q.  Where is this photo taken?

23 A.  That is on the smaller door on the manufacturing facility.

24 Q.  And you saw this location for yourself, correct?

25 A.  Yes.  And it is right on the floor, right when you go in.

1  Q.  As an FDA special agent, have you seen any other drug

2  manufacturing facilities in your career?

3  A.  Several, yes.

4  Q.  Did this shed in Jonathan Grenon's backyard resemble any of

5  the other drug manufacturing facilities that you have seen?

6  A.  No.

7  Q.  This photo was taken where the Defendants manufactured what

8  they claimed was the cure for cancer?

9  A.  Yes.

10  Q.  See these items all over the floor that I am highlighting?

11  A.  I do, yes.

12  Q.  What is that?

13  A.  Poop, animal poop.

14       MR. HOMER:  Your Honor, the Government has no further

15  questions for this witness.

16       THE COURT:  Thank you.

17       Do the Defendants have any questions of this witness?

18       Mark Grenon, do you have any questions you would like

19  to ask the agent?

20       (No audible response.)

21       THE COURT:  I hear no response.

22       Jonathan Grenon, would you like to ask any questions

23  of this witness?

24       (No audible response.)

25       THE COURT:  Getting no response.

Proceedings
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1        Jordan Grenon, any questions you have of this witness

2   the agent?

3        (No audible response.)

4        THE COURT:  No response.

5        And Joseph Grenon, any questions?

6        (No audible response.)

7        THE COURT:  No response.

8        All right.  Agent, thank you very much.  You may step

9   down.

10        THE WITNESS:  Thank you, Your Honor.

11        THE COURT:  Ladies and gentlemen, let me go over the

12   schedule with you because we will be adjourning for the day in

13   just a few moments.  So because I have a meeting all day

14   tomorrow, we have no trial tomorrow.  We will resume on

15   Wednesday, the 19th, at 2 p.m., and we will go from 2:00 to

16   6:00.  And then on Thursday, the 20th, we'll start at 9 o'clock

17   and we will go from 9 o'clock for the entire day; we'll likely

18   end by 5:00.  And then on -- do we think it's going into

19   Friday?

20        MR. HOMER:  I do not, Your Honor, no.

21        THE COURT:  All right.  If necessary for Friday, we

22   would have you come back at 9 o'clock as well.  That is our

23   schedule.

24        Please remember my instructions:  Not to discuss this

25   case with anyone.  Not to do any reading or research about

Proceedings
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1   these matters.  Please avoid contact with those whom you see

2   have a relationship to the case.  And please return Wednesday

3   afternoon at 2 o'clock, and be gathered in the jury room.  We

4   will be resuming at 2 o'clock on Wednesday.

5           Thank you very much.  You can leave those notebooks in

6   the jury room, they'll be waiting for you.

7           COURT SECURITY OFFICER:  All rise.

8       (The jury exited the courtroom at 4:35 p.m.)

9           THE COURT:  Any questions or issues before I see

10  everyone on Wednesday at 2:00?

11          MR. HOMER:  None from the Government.  Thank you, Your

12  Honor.

13          THE COURT:  Any questions or issues from the

14  Defendants.

15          (No audible response.)

16          THE COURT:  Thank you.  We're adjourned.

17      (The proceedings adjourned at 4:36 p.m.)

18

19

20

21

22

23

24

25

Court reporter's Certificate
July 17, 2023
USA v Mark Scott Grenon, et al., 21-cr-20242-CMA

1                     **C E R T I F I C A T E**

2

3            I hereby certify that the foregoing is an

4    accurate transcription of the proceedings in the

5    above-entitled matter.

6

7    _12/31/2023_
         DATE                    STEPHANIE A. McCARN, RPR
8                                Official United States Court Reporter
                                 400 North Miami Avenue, Thirteenth Floor
9                                Miami, Florida 33128
                                 (305) 523-5518
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25